IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| ELIZABETH AWALT, as Administrator | ) | |
| of the ESTATE OF ROBERT AWALT, | ) | |
| | ) | No. 11 CV 6142 |
| Plaintiff, | ) | |
| | ) | Judge Thomas M. Durkin |
| RICKMARKETTI as Administrator of the Estate | ) | |
| ofTERRY MARKETTI, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S COMBINED RESPONSE TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Arthur Loevy
Michael Kanovitz
Jon Loevy
Anand Swaminathan
Steven Art
Cindy Tsai
LOEVY & LOEVY
312 N. May St., Ste. 100
Chicago, IL 60607
(312) 243-5900

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Ste. 460
Boulder, CO 80302
(720) 328-5642

## TABLE OF CONTENTS

**INTRODUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**SUMMARY OF FACTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**LEGAL STANDARD**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**ARGUMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.  There Is Sufficient Evidence For A Reasonable Jury To Conclude That The County
    Defendants Were Deliberately Indifferent To Awalt's Serious Medical Need. . . . . . . . . . 6

    A.  McComas. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.  Obrochta. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.  Matteson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    D.  Defendants are not entitled to qualified immunity. . . . . . . . . . . . . . . . . . . . . . . . 11

II.  There Is Sufficient Evidence For A Reasonable Jury To Conclude That Defendants
     Spoliated Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A.  The Grundy County Defendants had a duty to preserve surveillance video. . . . . 13

    B.  A reasonable jury could conclude that Awalt's complaints existed and
        were seen by the Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III.  There Is Sufficient Evidence For A Reasonable Jury To Conclude That Clauson
      And Cullinan Were Deliberately Indifferent To Awalt's Serious Medical Need. . . . . . . 17

    A.  Cullinan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    B.  Clauson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV.  There Is Sufficient Evidence For A Reasonable Jury To Conclude That The County
     And CHC's Policies And Practices Caused Awalt's Injury. . . . . . . . . . . . . . . . . . . . . . . . 25

    A.  McComas, Cullinan, and Clauson were final policymakers or were
        delegated final policymaking authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        1.  McComas. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        2.  Cullinan and Clauson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

B.     The County and CHC's policy limiting reordering of medication.. . . . . . . . . . . 31

C.     The County and CHC's policy not to track grievances, institute oversight, have continuous quality improvement, or wean detainees off medications.. . . . . 33

     1.     No grievance mechanism. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

     2.     No oversight or continuous quality improvement program. . . . . . . . . . . 35

     3.     No policy of weaning detainees off medication. . . . . . . . . . . . . . . . . . 37

D.     Failure to provide health care training. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

E.     Widespread practice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

V.     There Is Sufficient Evidence For A Reasonable Jury To Conclude That Defendants Conspired To Violate Awalt's Rights And Failed To Intervene. . . . . . . . . . . . . . . . . . . 44

VI.     Defendants Are Not Entitled To Dismissal Of Plaintiff's Intentional Infliction Of Emotional Distress, Willful And Wanton, Or Negligence Claims. . . . . . . . . . . . . . . . . 45

VII.     The Grundy County Defendants Are Not Entitled To Tort Immunity. . . . . . . . . . . . . . 46

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998) ....................................................33, 35, 42

*Arnett v. Webster*, 658 F.3d 742 (7th Cir. 2011)..............................................................................7

*Auriemma v. Rice*, 957 F.2d 397 (7th Cir. 1992) ........................................................................31

*Belbachir v. County of McHenry*, 726 F.3d 975 (7th Cir. 2013) ................................................25

*Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010) ......................................................................17

*Boyd v. Travelers Ins. Co.*, 652 N.E.2d 267 (Ill. 1995) .........................................................13, 16

*Bd. of County Comm'rs v. Brown*, 520 U.S. 397 (1997) ..............................................................30

*Brobbey v. Enterprise Leasing Co.*, 935 N.E.2d 1084 (Ill. App. Ct. 2010) ................................14

*Calhoun v. Ramsey*, 408 F.3d 375 (7th Cir. 2005) .................................................................33, 42

*Carmichael v. Village of Palatine, Ill.*, 605 F.3d 451 (7th Cir. 2010) .........................................28

*Cavalieri v. Shepard*, 321 F.3d 616 (7th Cir. 2003) ...................................................................12

*Chapman v. Keltner*, 241 F.3d 842 (7th Cir. 2001) .....................................................................46

*City of Canton v. Harris*, 489 U.S. 378 (1989) ...........................................................................37

*City of Oklahoma v. Tuttle*, 471 U.S. 808 (1985) ........................................................................33

*Collignon v. Milwaukee Cnty.*, 163 F.3d 982 (7th Cir. 1998) .....................................................24

*Combs v. Schmidt*, 976 N.E.2d 659 (Ill. App. Ct. 2012) .............................................................14

*Connick v. Thompson*, 131 S. Ct. 1350 (2011) ...........................................................................37

*Dardeen v. Kuehling*, 821 N.E.2d 227 (Ill. 2004) .......................................................................14

*Demouchette v. Dart*, 2011 WL 679914 (N.D. Ill. 2011) ...........................................................38

*Estate of Miller v. Tobaisz*, 680 F.3d 984 (7th Cir. 2012) .............................................................6

*Estelle v. Gamble*, 429 U.S. 97 (1976) .......................................................................................12

*Farmer v. Brennan*, 511 U.S. 825 (1994) ...................................................................43

*Fox ex rel. Fox v. Peters*, 2011 WL 6378826 (N.D. Ill. Dec. 19, 2011) ...................24, 30, 36, 44

*Gerard v. ConAgra Foods, Inc.*, 2010 WL 1710820 (N.D. Ill. Apr. 28, 2010) ...........................15

*Hahn v. Walsh*, 762 F.3d 617 (7th Cir. 2014) ...................................................40, 41, 44

*Hansen v. Fincantieri Marine Group, LLC*, 763 F.3d 832 (7th Cir. 2014) ...................................5

*Hayes v. Snyder*, 546 F.3d 516 (7th Cir. 2008) ...........................................................7

*Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063 (7th Cir. 2012) ...................................20

*Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ...............................................................12

*Iskander v. Village of Forest Park*, 690 F.2d 126 (7th Cir. 1982)................................27

*Jones v. City of Chicago*, 787 F.2d 200 (7th Cir. 1986) ...................................................33

*Jones v. City of Chicago*, 856 F.3d 985 (7th Cir. 1988) ...................................................45

*Jones v. O'Brien Tire & Battery*, 871 N.E.2d 98 (Ill. App. Ct. 2007) ...........................13

*Kentucky v. Graham*, 473 U.S. 159 (1985)...................................................................25

*King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012) ...................................................20, 41

*Kingsley v. Hendrickson*, 744 F.3d 443 (7th Cir. 2014) ...................................................6

*Kujawski v. Bd. Of Comm'rs of Bartholomew*, 183 F.3d 734 (7th Cir. 1999) ...........................29

*Lane v. Dupage Cnty. Sch. Dist. 45*, 2014 WL 518445 (N.D. Ill. Feb. 10, 2014) ...................47

*Langston v. Peters*, 100 F.3d 1235 (7th Cir. 1996) ...................................................9

*Lieberman v. Budz*, 2013 WL 157200 (N.D. Ill. Jan. 15, 2013) ...........................20, 23

*Martin v. Keely & Sons, Inc.*, 979 N.E.2d 22 (Ill. 2012) ...............................................15

*Martinez v. Garcia*, 2012 WL 266352 (N.D. Ill. Jan. 30, 2012) ...........................7, 9

*McMillian v. Monroe Co.*, 520 U.S. 781 (1997) ...................................................28

*Miller v. Gonzalez*, 761 F.3d 822 (7th Cir. 2014) ...................................................5

*Miller v. Gupta*, 672 N.E.2d 1229 (Ill. 1996) ...........................................................................14

*Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978)..............................................................25

*Murray v. Chicago Youth Center*, 864 N.E.2d 176 (Ill. 2007) ..................................................46

*Nelson v. LaCrosse Cty. Dist. Atty.*, 301 F.3d 820 (7th Cir. 2002)...........................................28

*Norfleet v. Webster*, 439 F.3d 392 (7th Cir. 2006) ...................................................................17

*Ortiz v. City of Chicago*, 656 F.3d 523 (7th Cir. 2011) ............................................................5-6

*Pembaur v. City of Cinncinati*, 475 U.S. 469 (1986) .................................................................28

*Ponto v. Levan*, 972 N.E.2d 772 (Ill. App. Ct. 2012) ................................................................47

*Rice ex rel. Rice v. Correctional Medical Servs.*, 675 F.3d 650 (7th Cir. 2012)....................26, 37

*Roe v. Elyea*, 631 F.3d 843 (7th Cir. 2011) ..........................................................................12, 17

*Safford Unified Sch. Dist. v. Redding*, 557 U.S. 364 (2009) ......................................................12

*Sallenger v. City of Springfield*, 630 F.3d 499 (7th Cir. 2010).................................................38

*Schaefer v. Universal Scaffolding & Equip., LLC*, 2014 WL 509344(S.D. Ill. Feb. 10, 2014) ....13

*Schaub v. Vonwald*, 638 F.3d 905 (8th Cir. 2011) ....................................................................24

*Shields v. Illinois Department of Corrections,* 746 F.3d 782 (7th Cir. 2014) ...............................26

*Stoner v. Wal-Mart Stores, Inc.*, 2008 WL 3876077 (C.D. Ill. Aug. 18, 2008) ...........................15

*Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293 (7th Cir. 2010) ........................................32

*Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664 (7th Cir. 2009) ..........................25, 26, 28

*Vance v. Rumsfeld*, 701 F.3d 193 (7th Cir. 2012) .....................................................................46

*Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011) ......................................................28, 30

*Walker v. Benjamin*, 293 F.3d 1030 (7th Cir. 2002) ..................................................................11

*Wells v. Bureau Cnty.*, 723 F. Supp. 2d 1061 (C.D. Ill. 2010) ..................................................25

*Williams v. City of Chicago*, 733 F.3d 749 (7th Cir. 2013) .........................................................5

*Williams v. Rodriguez*, 509 F.3d 392 (7th Cir. 2007) ...............................................5, 46

*Woodward v. Correctional Med. Servs. of Ill., Inc.*, 368 F.3d 917 (7th Cir. 2004) ...............26, 40

**Statutes**

745 ILCS 10/1-210 ......................................................................................46

745 ILCS 10/2-201 ......................................................................................46

745 ILCS 10/4-105 ...................................................................................45, 46

## INTRODUCTION

Robert Awalt died at age 47 as a result of a series of seizures he suffered in the Grundy County Jail. Robert Awalt told the Grundy County Jail about his seizure condition and the medications he was taking the night he was booked into the jail, and told the Jail's nurse the same thing the next morning. Four days later, he was dead.

Although Mr. Awalt is not here to explain what happened between the time he entered the jail and the time he died, Plaintiff has nonetheless amassed a record that paints a vivid picture of Defendants' deliberate indifference. Awalt asked for medications, the Defendants refused; he had seizures, the Defendants ignored him as he writhed on the floor, in full view of the Jail's security cameras. And a host of Awalt's fellow detainees will testify that Awalt begged for medications and to see the nurse, the Defendants heard him, and nothing happened. His death was their fault.

The Defendants claim they gave Awalt medication, but they concede that Awalt never got one of the two medications they admit he told them he needed. And, based on the trace levels of the other medication found in Awalt's blood in the emergency room and at the time his death, there is no way he got the other. Defendants also claim they never saw or heard about seizures, but the jail was too small for that, and in any event the other detainees in the Jail have come forward to explain that the Defendants saw and heard Awalt's suffering, but just didn't care.

Moreover, the Defendants' reaction to Awalt's death is pregnant with guilt. Awalt was rushed to the hospital after his last seizure in the Jail, and as the doctors tried unsuccessfully to save him, the Defendants were reviewing security camera footage. Of the days of footage of Awalt's detention, the Defendants chose to save roughly four hours. The rest they destroyed. Equally suspicious, the Medication Administration Record that was supposed to be a log of

Awalt's receipt of medication was doctored; and in trying to explain it away, the Defendant who doctored it has caught himself in an obvious lie.

The events above, which do far more than establish a dispute of fact as to whether Defendants were deliberately indifferent to Awalt's serious medical need, are not an anomaly. They were the product of a set of routine practices that begin with a complete failure to train officers in any aspect of medical care, including how to administer and keep track of medications, and include a complete lack of discipline and oversight of the jail and medical staff that led inevitably to Defendants' remarkable failure to take Awalt life-threatening condition seriously. These policies and practices have harmed other detainees as well, including other detainees with seizures. The stories these detainees tell adds context, damning to the defense, of the systemic failure that contributed to Awalt's death.

In sum, this is no summary judgment case. Indeed, County Defendants partly acknowledge this by limiting their motion to just a few Defendants and just a few theories. So, this case is going to trial; the only question before the Court is thus whether certain claims against some Defendants should proceed. For the reasons that follow, the Court should deny these attempts at partial summary judgment, and leave it to the jury sort out the facts.

## SUMMARY OF FACTS[1]

Robert Awalt had a seizure disorder and required two different anti-seizure medications twice a day to control his seizures: Dilantin and Topamax. Resp. to CSOF ¶ 41; Resp. to GSOF ¶ 5. There is no dispute that no one at the Jail prescribed or gave Awalt any Topamax, *see* Resp. to CSOF ¶¶ 33, 40, and as (at least the County) Defendants acknowledge, there is a genuine dispute

---

[1] "Resp. to GSOF" refers to Plaintiff's Response to the Grundy County Defendants' Statement of Facts; "Resp. to CSOF" refers to Plaintiff's Response to the CHC Defendants' Statement of Facts; and "PSOF" refers to the Plaintiff's Additional Statement of Material Facts.

over whether Awalt received any Dilantin during his detention at the Jail from September 14-19, 2010. Resp. to CSOF ¶ 40; PSOF ¶ 40; Dkt. 321 at 15.[2] Awalt's medical records from after he was taken to the hospital on September 19 show that his Dilantin levels were so low as to be undetectable, and Plaintiff's experts have opined that given the half-life of Dilantin, this means that Awalt received no Dilantin since at least September 15, 2010. Resp. to GSOF ¶¶ 16, 44; Resp. to CSOF ¶¶ 24, 27-28, 33, 40. Awalt died as a result of seizures. Resp. to GSOF ¶ 75.

There is also no dispute that when he was booked into the Jail, Awalt told Defendant Obrochta that he suffered from seizures and needed Dilantin and Topamax twice a day. Resp. to GSOF ¶¶ 4-5. Obrochta noted this in Awalt's inmate medical screening/booking form. Resp. to GSOF ¶ 5. Awalt's serious medical need was also known to Defendant McComas, because Plaintiff, Robert's wife, spoke with McComas twice—once on the evening of September 14 and once in the morning of September 15, 2010—to tell him that her husband had seizures, needed medication including Dilantin, and needed to be on 24-hour watch. Resp. to GSOF ¶ 10. Despite learning this information, neither Obrochta nor McComas did anything to communicate it to anyone. Resp. to GSOF ¶¶ 5, 10. Defendant Matteson also knew that Awalt suffered from seizures and took Dilantin and Topamax twice a day, because he saw Awalt's booking sheet on Friday, September 17, 2010. PSOF ¶ 59. Matteson knew that this meant he should "be aware" because Awalt might have seizures. *Id.* Likewise, despite knowing of Awalt's serious medical need, Matteson did not remember telling anyone that Awalt might have seizures and did not tell anyone about Awalt's medications. *Id.* Nor did Matteson look at Awalt's MAR before September 19, to see if it indicated whether he got any medications, *id.*, and he did not check

---

[2] All page references to docket numbers are to the docket entry page number, not the number at the bottom of the brief.

with anyone to see if Awalt got his medications when Matteson was on duty on September 17-18, 2010, *id.* Matteson did not provide any medication to Awalt on September 17-19, 2010. *Id.*

More significantly, many detainees testified that during the time that McComas, Matteson, Obrochta, and Clauson were on duty at the Jail on various days from September 15-19, 2010, Awalt had numerous seizures, asked loudly and repeatedly for medication, filled out request slips to see the nurse and asked to see the nurse, and lined up for medication but was never given any. Resp. to CSOF ¶¶ 35-37, 41-42; Resp. to GSOF ¶¶ 21-22. Detainees witnessed Awalt having these seizures in full view of security cameras while he (and they) were in Section A of the Jail, which is also only five feet from the control room. Resp. to GSOF ¶¶ 21-22; PSOF ¶ 56. Detainees told officers about Awalt's seizures, and because officers were not provided any health training or training on seizures, the officers would have reported an detainee's seizures to medical personnel—i.e., Clauson and Cullinan. PSOF ¶¶ 11, 16; Resp. to CSOF ¶¶ 35-38.

Clauson and Cullinan both admit that they knew Awalt suffered from seizures and required Dilantin twice a day. Resp. to CSOF ¶¶ 32-33. Clauson also admits that she knew Awalt needed Topamax twice a day but instead of getting a prescription for it after interviewing him on September 15, she decided to immediately stop Awalt's Topamax and let him go at least five days (until September 20) without it. Resp. to CSOF ¶¶ 32, 34. Unfortunately, Awalt died as a result of seizures in the interim. Resp. to CSOF ¶ 27; Resp. to GSOF ¶ 75. Cullinan and Clauson discussed Awalt's medical progress note, on which Awalt's need for Dilantin and Topamax twice a day for his seizures was noted. Resp. to CSOF ¶¶ 34, 38. Cullinan also discussed it with Van Cleave. Resp. to CSOF ¶ 38. Cullinan has provided no explanation for abruptly stopping Awalt's Topamax. It is well-known—and admitted by Defendants—that suddenly withdrawing seizure medications creates a serious risk of seizures or injury. Resp. to CSOF ¶¶ 46-47.

4

Furthermore, there is sufficient evidence that Cullinan and Clauson were informed of the seizures that Awalt was having at the Jail. Resp. to CSOF ¶¶ 36-38.

Plaintiff has substantial evidence on her *Monell* claims. As discussed in detail below and in her facts, CHC and the County had express policies that caused the unconstitutional denial of care to Awalt, PSOF ¶¶ 38-40; they failed to provide any health care training to officers, PSOF ¶¶ 11-20; they consciously decided not to have any policies for tracking grievances, overseeing medical personnel, or weaning detainees off medication, PSOF ¶¶ 10, 21-36; and they had a widespread practice of denying adequate medication or medical care to detainees, PSOF ¶¶ 42-55. Furthermore, McComas, Cullinan and Clauson committed constitutional violations and were either final policymakers or delegated final policymaking authority. PSOF ¶¶ 4-8.

Finally, Plaintiff has presented sufficient evidence of failure to intervene, conspiracy, spoliation, *see* PSOF ¶¶ 61-69, and her other state law claims.

## LEGAL STANDARD

In reviewing Defendants' motions, the court must view the facts in the light most favorable to Plaintiff and leave credibility issues to a jury. *Williams v. City of Chicago*, 733 F.3d 749, 752 (7th Cir. 2013). Plaintiff is entitled to every reasonable inference. *Hansen v. Fincantieri Marine Group, LLC*, 763 F.3d 832, 836 (7th Cir. 2014). A non-moving party does not need "abundant evidence" to create a jury question. *Id.* "Deciding which inference to draw from [a] conversation is the task of a fact finder." *Miller v. Gonzalez*, 761 F.3d 822, 828 (7th Cir. 2014).

To the extent they arose prior to the time that Awalt received his *Gerstein* hearing on September 15, 2010, Plaintiff's claims are evaluated under the reasonableness standard of the Fourth Amendment. *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011); *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007). Four factors determine whether a defendant's

response to Awalt's medical needs was objectively unreasonable: (1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns. *Ortiz*, 656 F.3d at 530. After his *Gerstein* hearing, Robert Awalt's claims arose from the Fourteenth Amendment's Due Process Clause; under current law, he must show that Defendants were deliberately indifferent to a serious medical need. *Estate of Miller v. Tobaisz*, 680 F.3d 984, 989 (7th Cir. 2012); *Kingsley v. Hendrickson*, 744 F.3d 443, 450 (7th Cir. 2014).

## ARGUMENT

### I.    There Is Sufficient Evidence For A Reasonable Jury To Conclude That The County Defendants Were Deliberately Indifferent To Awalt's Serious Medical Need[3]

The Grundy County Defendants contend that they relied on the judgment of medical professionals (i.e., Cullinan and Clauson) to treat Awalt and that they were not on notice of any seizures or requests for medication or medical attention. But nonmedical officials cannot use this kind of reliance defense if they ignore obvious medical emergencies. King, 680 F.3d at 1018 (officers were only "entitled to defer to the judgment of jail health professionals so long as [they] did not ignore [the prisoner].")

Here, however, the Defendant Officers cannot reasonably rely on the actions of medical staff because Plaintiff has evidence that each of them knew that Awalt was suffering seizures at the Jail, knew that he repeatedly asked to see a nurse and for medications, and evidence that, despite this knowledge, the Defendants ignored him. Resp. to GSOF ¶¶ 21-23, 27, 33; Resp. to CSOF ¶ 36; PSOF ¶¶ 56-59. Defendants "'cannot simply ignore an inmate's plight' where they

---

[3] Plaintiff does not object to the dismissal of Marketti in his individual capacity on Plaintiff's federal claims, or to the dismissal of unknown defendants.

are on notice that there is a risk to the inmate's health or safety." *Martinez v. Garcia*, 2012 WL 266352 (N.D. Ill. Jan. 30, 2012), at *5 (quoting *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011)). Because these defendants did, a jury could reasonably conclude that they were deliberately indifferent.

### A. McComas

Plaintiff spoke with McComas twice prior to Awalt's death. In a telephone conversation with McComas on the evening of September 14, 2010, Plaintiff told him that Awalt had a seizure condition, required the medication Dilantin, and needed to be on 24-hour watch because he had very bad seizures. Resp. to GSOF ¶ 10. Plaintiff called the Jail again on the morning of September 15, 2010 and spoke with McComas. *Id.* She asked if Awalt was getting medical treatment. *Id.* Despite his knowledge that Awalt had a serious seizure condition and required medication, McComas did not tell Clauson about his conversation with Plaintiff. Resp. to GSOF ¶ 10. There is a genuine dispute on this point: McComas claims that he told Clauson, but Clauson stated that she did not have any communications with anyone about Awalt other than as reflected in certain documents. *Id.* None of those documents reference a communication with McComas. *Id.* Nor did McComas ask Clauson about Awalt's medical treatment or whether she gave him his medication.

McComas argues that because he told Clauson what Plaintiff told him about Awalt's condition, he had no further responsibility for Awalt's care. *See* Dkt. 321 at 17 (citing *Hayes v. Snyder*, 546 F.3d 516 (7th Cir. 2008)). But, this fact is disputed. Resp. to GSOF ¶ 10. Moreover, *Hayes* is distinguishable because not only did the non-medical defendants investigate Hayes's complaints and refer them to the medical providers, but they also "request[ed] reports and summaries about the care that Hayes had received in order to ensure themselves that his

complaints did not require further action." *Id.* at 527. McComas did no such thing. McComas did not check to make sure that Awalt was receiving any medication, and he did not speak with Clauson about Awalt's treatment or medication. Resp. to GSOF ¶ 10. In addition, McComas's actions on September 14 and 15 took place before Awalt's *Gerstein* hearing at approximately 1:35-1:55 p.m. on September 15. Thus, his actions must be evaluated under the Fourth Amendment. McComas was on notice of a serious medical need, a reasonable jury could conclude that he failed to take reasonable action to ensure that Awalt was receiving treatment, and there were no penological concerns that could be weighed against providing the requested treatment.

A reasonable jury could also infer that McComas knew that Awalt was having seizures at the jail and ignored him: McComas was on duty in the Jail on September 15-17; the Jail was small; during this time, Awalt had seizures both in the dayroom and at the mouth of the hallway to Section A, all in full view of the cameras; each time Awalt had a seizure, the detainees notified the guards, including on the morning of September 17. Resp. to GSOF ¶¶ 10, 19, 21-23, 33; Resp. to CSOF ¶ 6; PSOF ¶¶ 56, 60, 63-64. Detainees testified that Awalt had numerous seizures directly in front of security cameras in the jail, and McComas had the ability to view the cameras from his computer when he was on duty on September 15-17, 2010. Resp. to GSOF ¶¶ 10, 33; *see* PSOF ¶¶ 61, 63. McComas and the other guards could also view the cameras from the control room. PSOF ¶¶ 56, 61. Awalt also asked the guards to see the nurse, asked repeatedly for medication, and lined up for his medications but was never given any. Resp. to CSOF ¶ 36; Resp. to GSOF ¶¶ 21-23, 27, 33. The door to Section A was only five feet from the control room. PSOF ¶ 56. If McComas was on notice that Awalt was having seizures in the jail or that he was repeatedly asking for medication or to see a nurse, that is sufficient notice that he was not being

8

adequately cared for by the medical staff, and McComas's failure to do anything was deliberately indifferent. *Martinez*, 2012 WL 266352, at *5; *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) ("[A] prison official may evidence deliberate indifference by failing to treat or delaying the treatment of a serious medical need.").

## B. Obrochta

There is sufficient evidence for a reasonable jury to conclude that (1) Obrochta knew that Awalt was not receiving his seizure medications or was suffering seizures, and (2) Obrochta did not do anything to ensure that Awalt was provided medication or medical attention.

Obrochta learned that Awalt had seizures and took Topamax and Dilantin twice a day when he processed Awalt into the jail on the evening of September 14, 2010. Resp. to GSOF ¶ 5. Yet, he does not remember if he told the doctor or nurse about Awalt's condition or if he passed the information about Awalt's medication to the next shift. *Id.* He does not remember putting a copy of Awalt's booking form in Clauson's office, and this was not his normal practice. *Id.* Obrochta did nothing to ensure that Awalt would get medication the next day, *id.*, even though it was his duty to ensure that detainees received their medication, PSOF ¶ 58. Obrochta also did not see anyone give Awalt Dilantin or Topamax during the time that Awalt was in the jail. *Id.*

Moreover, Obrochta was on duty during the night shift (7:00 p.m. to 7:00 a.m.) on September 17-19, 2010. PSOF ¶ 57. During his shifts, he conducted as many cell checks as the other correctional officers. *Id.* During this time period, Awalt was repeatedly asking for medication, asking to see a nurse, and lining up for his medication (but not receiving any). Resp. to GSOF ¶¶ 21-23. On the evening of September 18, Obrochta was working in the control room, where he could see the video feeds from the security cameras. PSOF ¶¶ 57, 61. There were cameras in all the sections of the jail where Awalt was housed. PSOF ¶ 63. Detainees testified

that on September 17 and 18, Awalt experienced numerous seizures, which were in full view of the cameras, and which the detainees reported to the guards. Resp. to GSOF ¶¶ 21-13, 33. Significantly, detainee M.H. testified that on the evening of September 18, Awalt began yelling for medication at 10:00 p.m. Resp. to GSOF ¶ 22. He was still in Section A at that point, and the door of Section A was only five feet from the control room, where Obrochta was sitting. PSOF ¶¶ 56-57. Furthermore, Obrochta was on duty on the morning of September 19, during which time he and Defendant Walker moved Awalt to Section C of the jail. Resp. to GSOF ¶¶ 23-24.

There is a genuine dispute over what Awalt was agitated about and why: Defendants claim he was asking for a beer and cigarettes, but according to detainees, Awalt was yelling for his medications. Resp. to GSOF ¶¶ 21-24. Obrochta claims that the officers moved Awalt to Section C to calm him down. But construing the facts in the light most favorable to Awalt, Obrochta knew that in the two days before being moved to Section C, Awalt was asking for his medications, asking to see a nurse, and had seizures. Instead of responding in a manner that would address Awalt's medical needs, Obrochta simply moved him to Section C. There is sufficient evidence for a reasonable jury to conclude that Obrochta was deliberately indifferent.

### C.  Matteson

Matteson was on duty from 7:00 a.m. to 7:00 p.m. on September 17-19, 2010. Resp. to GSOF ¶ 33. Like Obrochta and McComas, Matteson knew that Awalt suffered from seizures and took medications twice a day. PSOF ¶ 59. However, he did not tell anyone about Awalt's medications (which he learned about from looking at his inmate medical screening/booking form on September 17), and he did not give Awalt medication or check to see if anyone else did. *Id.* Moreover, he conducted numerous cell checks during this time period. Resp. to GSOF ¶ 33. When he was not conducting cell checks, he was in the control room where he watched Awalt

through the video monitors. *Id.* Detainees testified that during this time period, Awalt had numerous seizures, including in full view of the Section A camera. Resp. to GSOF ¶¶ 21-23, 33. The detainees told the guards about Awalt's seizures, and one of the detainees, T.F., recalled telling an older male guard—likely Matteson—about Awalt's seizures. Resp. to GSOF ¶ 33. During the day shift on September 17, detainee D.D. told Officer Van Cleave and the other officers working with her at the time (which included Matteson) about Awalt suffering a seizure. *Id.* This seizure occurred in the hallway of Section A, which was also in line of sight of the camera. *Id.* The next day, on September 18, another detainee, J.P., told a male officer on the day shift that Awalt had another seizure and that he was continuing to have seizures. Both Officers Selock and Matteson worked the day shift on September 18. Moreover, Awalt repeatedly asked the guards for medication, asked to see a nurse, and lined up for medications but did not receive any. Resp. to GSOF ¶¶ 21-23, 33.

In light of this evidence, Matteson knew that Awalt was suffering seizures and that he was not receiving his needed medications. A jury could reasonably conclude that failing to act under these circumstances was deliberate indifference.

### D. Defendants are not entitled to qualified immunity

Defendants' argument for qualified immunity boils down to an assertion that they did not violate the Constitution because they were not on notice of Awalt's need or denials of care that might have occurred, *see* Dkt. 321 at 19; Dkt. 313 at 19-20, and for the reasons explained above, those are disputed facts. This is, therefore, not a basis for qualified immunity. *See Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) ("[A] plaintiff claiming an Eighth Amendment violation must show the defendant's actual knowledge of the threat to the plaintiff's health or safety, the defendant's failure to take reasonable measures, and the defendant's subjective intent

to harm or deliberate indifference. If there are genuine issues of fact concerning those elements, a defendant may not avoid trial on the grounds of qualified immunity.").

To the extent that the Defendants are arguing that the law in this area was not clearly established in 2010, the argument is without merit—the Supreme Court and the Seventh Circuit have held repeatedly in the jail context that denial of medication or medical care for a serious medical condition violates the Fourth and Fourteenth Amendments. *See, e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (prison authorities' failure to treat prisoner's medical needs or provide access to medical care violates the Eighth Amendment); *Walker*, 293 F.3d at 1040 (standard for liability under Eighth Amendment for denial of medical care or medication "well-established"); *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003) (guarantee of protection against deliberate indifference under Fourteenth Amendment is at least as strong as the guarantee provided by the Eighth Amendment).

To the extent that the Defendants' argument is that this is a novel factual situation, it is not: wholesale denials of medical and medication that cause actual harm (i.e., death) were the basic factual premises facing the Court in *Estelle* and its progeny. And even if it were, the Supreme Court has said that it does not matter. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011) ("there is no need that the very action in question have previously been held unlawful.") (quoting *Safford Unified Sch. Dist. v. Redding*, 557 U.S. 364 (2009)) (internal quotation marks omitted). "Officials can still be on notice that their conduct violates established law … in novel factual circumstances." *Hope*, 536 U.S. at 741. The question is whether Defendants had "fair warning" that their conduct was unconstitutional. *Id.* at 859. Defendants had fair warning as of September 2010 that it was unconstitutional to

12

ignore a detainee's repeated requests for medication and medical attention when they knew he suffered from a seizure disorder, required medications, and was having seizures.

## II. There Is Sufficient Evidence For A Reasonable Jury To Conclude That Defendants Spoilated Evidence

Collectively, Defendants raise three arguments against Plaintiff's claim that they despoiled evidence. None succeeds. First, as explained below, the County Defendants are not entitled to discretionary immunity from this claim under 2-201 of the Tort Immunity Act. Second, their argument that they owed no duty to preserve jail surveillance video fares no better. The duty was there. Finally, all Defendants take aim at Plaintiff's claim that they lost or destroyed grievances complaining about their five-day failure to treat Awalt. The County Defendants claim that there is no evidence the grievances were written, while the Medical Defendants claim that no evidence establishes that Clauson ever saw them. Yet there is.

### A. The Grundy County Defendants had a duty to preserve surveillance video

In Illinois, a spoliation claim is a negligence claim. *Boyd v. Travelers Ins. Co.*, 652 N.E.2d 267, 270 (Ill. 1995). One element of the claim is that the defendant had a duty to preserve the missing evidence. *Id*. To establish that duty, a plaintiff must satisfy a two-part test. *Jones v. O'Brien Tire & Battery*, 871 N.E.2d 98, 105-06 (Ill. App. Ct. 2007). First, the plaintiff must show that a duty to preserve evidence arose from agreement, contract, statute, another special circumstance, or by the defendant's voluntary assumption of the duty to preserve evidence. *Boyd*, 652 N.E.2d at 270-71. Second, "a reasonable person in the defendant's position should have foreseen that the evidence was material to a potential civil action." *Id.* at 271.

Here, both special circumstances and voluntary assumption give rise to the requisite duty. The special circumstances doctrine is not "precisely defined." *Schaefer v. Universal Scaffolding & Equip., LLC*, 2014 WL 509344 (S.D. Ill. Feb. 10, 2014). But this case shares key similarities

13

with a long line of special circumstances cases, in which a duty to preserve evidence was found where: (1) the plaintiff somehow puts the defendant on notice of the importance of the ultimately lost evidence; (2) the defendant reacts to that notification; (3) the defendant has possession and control over the ultimately lost evidence; and, finally, (4) the evidence is lost or destroyed.

This line of cases starts with *Miller v. Gupta*, 672 N.E.2d 1229 (Ill. 1996). In *Miller*, the Illinois Supreme Court "hinted" that special circumstances would exist where "a medical malpractice plaintiff's attorney requested X rays from the plaintiff's doctor [notice]. The doctor complied and obtained the X rays [response & possession]. Before taking the X rays to the hospital to copy them, he placed them on the floor of his office near the wastebasket. The X rays disappeared [loss]. A housekeeping employee who cleaned the doctor's office guessed that she disposed of the X rays, which were later incinerated." *Dardeen v. Kuehling*, 821 N.E.2d 227, 232 (Ill. 2004) (discussing *Miller*).

*Brobbey v. Enterprise Leasing Co.*, 935 N.E.2d 1084 (Ill. App. Ct. 2010), was similar. There, the plaintiffs rented a van from the defendant rental car company and immediately complained about the brakes [notice]. *Id.* at 1087-88. Later, following a terrible accident, the defendants obtained and tested the wrecked van's brakes [possession and reaction]. *Id.* at 1088. They then had the van scrapped [loss]. *Id.* Finally, in *Combs v. Schmidt*, 976 N.E.2d 659 (Ill. App. Ct. 2012), the plaintiff-tenants all complained to the defendant-landlord about the rental house's electrical system [notice]. *Id.* at 662. The house burned down, killing the plaintiffs' family. *Id.* The defendants repossessed the property [possession], inspected the faulty electrical system [reaction], and then demolished the house [loss]. *Id.* at 662-63.

The present case fits comfortably with this precedent. Plaintiff, Awalt, and his fellow detainees complained repeatedly before and after Awalt's death about Awalt's seizures and lack

14

of medication [notice]. Resp. to GSOF ¶¶ 21-23, 33. Defendants had, for as long as it existed, sole possession and control over video documenting every minute of Awalt's detention at the Grundy County Jail [possession]. PSOF ¶¶ 60-63. They reacted by reviewing the video and by selectively preserving only a tiny portion of that video, which showed them making checks on Awalt's cell and Awalt's frustration on the final day of his life [reaction]. PSOF ¶¶ 64-65. And ultimately, the Defendants deleted the remaining video. PSOF ¶¶ 63-67. These special circumstances gave rise to a duty to preserve this important evidence.

And so did the voluntary assumption doctrine: "A party's voluntary undertaking to preserve evidence for its own benefit does impose a duty to continue to exercise due care to preserve the evidence for the benefit of any other potential litigants." *E.g.*, *Gerard v. ConAgra Foods, Inc.*, 2010 WL 1710820, at *3 (N.D. Ill. Apr. 28, 2010) (quoting *Jones*, 871 N.E.2d at 107-08). Here, Marketti and McComas spoke about the surveillance video within hours of Awalt being found blue and unresponsive in his cell. They then selectively preserved just a bit of it. PSOF ¶¶ 64-65. A reasonable jury could easily find that they did so for their own benefit. *See* PSOF ¶¶ 66-67. And this would not be the first case to apply the voluntary assumption doctrine to a case of videotape left to be automatically erased under suspicious circumstances. *See Stoner v. Wal-Mart Stores, Inc.*, 2008 WL 3876077, at *3 (C.D. Ill. Aug. 18, 2008) ("Wal-Mart's employees knew of the tape and took steps to preserve the tape and knew it contained footage relevant to Stoner's fall, I find that the Complaint adequately raises the existence of a duty to preserve that tape.").

Defendants' case, *Martin v. Keely & Sons, Inc.*, 979 N.E.2d 22 (Ill. 2012), is unavailing. In *Martin*, an I-beam fell and injured the construction worker plaintiffs. The court held that the construction company defendants did not voluntarily assume a duty to preserve the I-beam

15

because they did nothing "evincing" any intent to preserve it. *Id.* at 28. Rather, they left the I-beam where it had fallen and then, just a few days later, smashed it to pieces and carted it off. *See Schaefer*, 2014 WL 509344, at \*4 (distinguishing *Martin* on this ground). What separates *Martin* from this case is McComas rushing off to save snippets of favorable video as Awalt lay dying at the hospital. PSOF ¶ 65. McComas's rush to the tape triggers a duty because it evinces the intent to preserve that was absent in *Martin*.

Turning to the second part of the test, all that is required to show a duty to preserve evidence under Illinois spoliation law is that "a reasonable person in the defendant's position should have foreseen that the evidence was material to a potential civil action." *Boyd*, 652 N.E.2d at 271. Being "in the defendant's position" means having the same special skills as the defendant. *See Jones*, 871 N.E.2d at 108. Thus, here, the question is whether reasonable prison administrators (a superintendent and sheriff), with decades of experience in law enforcement and prison administration—who had personal knowledge of Awalt's seizures, his requests for medications, his complaints, and his death in their facility—would reasonably foresee that video of Awalt's seizures and treatment at the jail would be material in a lawsuit over his death. The answer is yes. Prisons and jails are routinely sued for maltreatment resulting in death. And a reasonable person would foresee litigation over a preventable death like this. Indeed, a reasonable prison administrator would take extra special care to preserve such objective evidence of what had happened in the facility.

Defendants' claim that McComas was not thinking of litigation at the time that he preserved portions of the jail video misses the point. The inquiry is objective, not subjective. *Boyd*, 652 N.E.2d at 271. Whether McComas was as naïve as he now claims is irrelevant. A reasonable prison administrator with his experience and knowledge of Awalt's condition would

16

have realized the significance of the video. Accordingly, Defendants had a duty to preserve this video, and summary judgment cannot be granted against Plaintiff on her spoliation claim.

**B.      A reasonable jury could conclude that Awalt's complaints existed and were seen by the Defendants**

Defendants argue only that there is no evidence, but the opposite is true. Detainees saw Awalt fill out medical complaint forms and saw officers collect them. PSOF ¶¶ 68, 73. All Defendants have policies dictating that these medical complaint forms are given to Clauson. PSOF ¶¶ 68-69. And all Defendants contend that they followed their policies. PSOF ¶¶ 37, 69. Assuming that Defendants' contentions are true, the officer Defendants and Clauson should have seen and possessed Awalt's medical complaint forms, and they should have been produced. PSOF ¶ 69. A reasonable inference that arises from the fact that they were not produced, despite Plaintiff's direct request for them, is that they were spoliated. *Id.*

**III.   There Is Sufficient Evidence For A Reasonable Jury To Conclude That Clauson And Cullinan Were Deliberately Indifferent To Awalt's Serious Medical Need**

Defendants do not (and cannot) dispute that Robert Awalt had a serious medical need: he suffered from seizures. The only dispute is over whether, on this record, a reasonable jury could conclude that Defendants Cullinan and Clauson "knew of a substantial risk of harm to [Robert Awalt] and acted or failed to act in disregard of that risk," *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006), and their treatment (or non-treatment) of Awalt was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that [they] actually did not base the decision on such a judgment." *Roe*, 631 F.3d at 857. A detainee is not required to show that he was "literally ignored," *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010), although, as discussed below, there are sufficient facts for a reasonable jury to conclude that Awalt was ignored by Cullinan and Clauson.

17

### A. Cullinan

On September 15, Officer Thorson called Cullinan, told him that Awalt suffered from seizures, and obtained a prescription for Dilantin for Awalt. Resp. to CSOF ¶ 33. Cullinan was aware that seizures are a serious medical condition and can cause death. *Id.* It is undisputed that Cullinan did not prescribe Awalt any Topamax, and that Awalt did not receive any Topamax while at the jail. Resp. to CSOF ¶¶ 33, 40. Cullinan has not provided any explanation for why he suddenly stopped Awalt's Topamax, and as Plaintiff's experts have opined, the abrupt withdrawal of seizure medication from a seizure patient can cause seizures and serious injury. Resp. to CSOF ¶ 47. Cullinan has provided no reason for abruptly stopping Awalt's Topamax.

In light of these incontrovertible facts, Cullinan's only defense is to claim that he did not know that Awalt was on Topamax. But this fact is genuinely disputed. First, Cullinan testified at his deposition that in treating Awalt, he followed his usual and customary practice, which was to ask the nurse or correctional officer what medicines the detainee said they were on and whether they knew how much they were taking and how often. Resp. to CSOF ¶ 43. The answer that Awalt had provided to those questions was that he took Dilantin and Topamax twice a day. *Id.* Second, Cullinan admitted discussing Awalt's medical progress note with Clauson, and that note contained information about Awalt's Topamax. Resp. to CSOF ¶ 34. Third, Officer Thorson testified that when he spoke with Cullinan on the phone, he was looking at Awalt's inmate medical screening form, and he could not think of any reason why he would not have told Cullinan about the information contained on that form (which included Topamax). Resp. to CSOF ¶ 33. Finally, as discussed below, Clauson knew that Awalt was suffering seizures, and Clauson's practice whenever she learned that a detainee was suffering seizures or reactions to their medications, was to inform Cullinan. Resp. to CSOF ¶¶ 42-43.

In addition, there is sufficient evidence that Cullinan knew about Awalt's seizure condition and his need for his seizure medications on September 19 around noon, when Van Cleave called Cullinan and told him that Awalt was behaving erratically, but that Cullinan responded by simply prescribing Benadryl to sedate Awalt. Resp. to CSOF ¶ 38. During this conversation, Van Cleave discussed Awalt's physical and mental health with Cullinan, *id.*, which, one can reasonably infer, included discussion of Awalt's seizure condition and the two medications he reported taking since Van Cleave was a non-medically trained guard seeking advice and instruction from a medical doctor. Cullinan followed his usual practice, which was to ask about an detainee's medications, dosage and frequency, which he would have already learned from Thorson on September 15, and discussed again with Van Cleave on September 19. Resp. to CSOF ¶¶ 33, 34, 38, 43. Cullinan therefore knew that Awalt was a seizure patient, needed Dilantin and Topamax, and that he was having seizures. Resp. to CSOF ¶¶ 33, 35-37, 38, 43. Instead of ensuring that Awalt was provided appropriate medication or treatment for his seizures on the 19th, however, Cullinan prescribed Benadryl to "calm" him. Resp. to CSOF ¶¶ 38-39. In fact, Cullinan prescribed 100 mg of Benadryl twice daily, which was two to four times the average adult dose, consistent with his practice of using Benadryl liberally to sedate the detainee population. *Id.* There is also evidence in the record that Awalt had been given Benadryl as early as September 15. Resp. to CSOF ¶ 39.

On these facts, a jury could reasonably conclude that Cullinan did not exercise medical judgment in abruptly withdrawing Awalt's Topamax from him, especially when abrupt withdrawal of seizure medication from a patient presents a serious risk of seizures, and Cullinan knew that seizures are serious and can cause death if repeated or constant. Resp. to CSOF ¶¶ 33, 47. A jury could also reasonably conclude that Cullinan's prescription of Benadryl in lieu of

seizure medication or treatment on September 19 was deliberate indifference. This is "analogous to the hypothetical nurse who knows that an inmate faces a serious risk of appendicitis, but nevertheless gives him nothing but aspirin." *King v. Kramer*, 680 F.3d 1013, 1019 (7th Cir. 2012).

Cullinan's actions were not an exercise of medical judgment, and even if they were, that judgment was not within accepted professional standards. As *Lieberman v. Budz*, 2013 WL 157200, at *2 (N.D. Ill. Jan. 15, 2013), explained in the context of a physician who stopped treating an inmate's disease with medication, simply stating that an inmate "did not need" the medication is not enough. The doctor acted reasonably only if he "actually exercised a medical judgment to determine whether the prescriptions were medically indicated *and* that judgment is within accepted professional standards." *Id.*; *see also Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012) ("[a] prison physician, as the inmate's acting primary care doctor, is free to make his own, independent medical determination as to the necessity of certain treatments or medications, *so long as* the determination is based on the physician's professional judgment and does not go against accepted professional standards."). "But simply stating that treatment isn't necessary is not in itself indicative of a medical judgment: Physicians cannot escape liability simply by refusing to verify underlying facts regarding the potential need for treatment." *Id.* (citation and internal quotation marks omitted).

And finally, even if the Court were to decide that there is insufficient evidence for a jury to find that Cullinan knew about Awalt's Topamax, there is still sufficient evidence of Cullinan's deliberate indifference. Even accepting that Cullinan did not know Awalt was taking Topamax (which is disputed), the reason he did not know is because he failed to ask. All of the individuals he spoke with: Clauson, Van Cleave, and Thorson knew that Awalt was taking Topamax because

it was documented in his screening form, medical progress note, and/or Awalt told them. Resp. to CSOF ¶¶ 38, 43. It was not an exercise of medical judgment—or at least an appropriate exercise of medical judgment—for Cullinan to prescribe Awalt Dilantin, at a dose and frequency chosen without any consideration of Awalt's medical history, and without asking any questions about the severity or complications of Awalt's seizure condition, or inquiring what specific seizure medications he said he was taking. *Cf. King*, 680 F.3d at 1021 (holding that plaintiff survived summary judgment against the County where HPL policy allowed plaintiff to be "prescribed dramatic changes in his medication by an 'on-call' physician [Cullinan] nearly 300 miles away who took no steps to educate himself about King's condition. These policies caused King to suffer severe seizures that ultimately contributed to his death.").

### B. Clauson

Clauson knew from her interview with Awalt on September 15 that Awalt suffered from seizures, that seizures were a serious medical condition, and that he took two medications twice a day to treat those seizures: Dilantin and Topamax. Resp. to CSOF ¶¶ 32, 41. Yet, Clauson inexplicably—and in violation of professional standards—decided not to give (or consult with Cullinan about giving) Topamax to Awalt. Resp. to CSOF ¶¶ 32-33; PSOF ¶¶ 71-75. Clauson did not obtain any dosage or compliance information from Awalt, asked him no questions about his Topamax (or Dilantin) usage, did not inquire about his medical history, how bad his seizures were, how long it had been since his last seizure, when he last dose of Dilantin or Topamax was, or who his prescribing doctors were. Resp. to CSOF ¶¶ 33, 41; PSOF ¶¶ 71-75. Clauson had a professional obligation to obtain proper background information from Awalt about his condition and his medications, and yet, after her interview with him on September 15, she went home. PSOF ¶ 72. Even though she knew of Awalt's seizure history and his need for both medications,

Clauson decided to wait until September 20, five days later, to conduct a history and physical. *Id.* This fell below the minimum standard of care for epilepsy patients and constituted a failure to exercise medical judgment. *Id.*; Resp. to CSOF ¶¶ 34, 47, 50, 51.

Clauson also failed to consult with Dr. Cullinan about Awalt's Topamax, which violated professional nursing standards regarding inmate medications, because nurses are not allowed to unilaterally stop a patient's medication. PSOF ¶ 73. Clauson claims that because she was unfamiliar with Topamax, she wanted to wait five days until September 20 to ask Awalt about it. Resp. to CSOF ¶ 33. Clauson knew that this decision would force Awalt to go five days without a seizure medication that he said he needed. *Id.* Clauson's explanation for why she did not arrange for Topamax to be prescribed to Awalt is that she looked up Topamax in a nursing drug handbook and saw a note about a potential interaction between Dilantin and Topamax. Resp. to CSOF ¶¶ 33-34. This explanation does not allow Clauson to be dismissed on summary judgment.

First, unilaterally deciding that Awalt should go five days without Topamax because she saw a note in a handbook about a potential interaction between Topamax and Dilantin was not a decision based on medical judgment. Significantly, the handbook Clauson claims to have consulted also contained a large warning stating, "Don't stop therapy suddenly. Dosage must be tapered." Resp. to CSOF ¶ 34. Clauson's abrupt discontinuation of Awalt's Topamax put him at serious risk for breakthrough and withdrawal seizures, which is a well-known risk. Resp. to CSOF ¶ 47. In addition, Clauson was aware of this risk from her review of the handbook. Resp. to CSOF ¶ 34. As Dr. Pedelty has opined, potential negative drug interactions between Dilantin and Topamax are rare, and they are not a basis to withhold Topamax from a patient reporting that he takes both. Resp. to CSOF ¶ 47. Moreover, the risk from abrupt withdrawal of Topamax is far greater than the risk of any negative drug interaction with Dilantin: abrupt withdrawal of

Topamax creates a risk of withdrawal seizures. *Id*. In any event, Clauson does not claim to have weighed a risk of negative drug interaction against a risk of withdrawal seizures and made any kind of informed judgment about choosing one course of action over another. Instead, the evidence shows that she stopped Awalt's Topamax suddenly, with no tapering, because she was "unfamiliar" with the medication.

Second, a jury could also reasonably conclude from the evidence that Clauson did not, in fact, consult the handbook as she claims to have done, because if she had, she would have seen the large warning advising against stopping therapy suddenly and tapering dosages. If Clauson did not review the handbook as she claimed, then she unilaterally decided to stop therapy without consulting anyone or anything. Either way, a jury could find that Clauson was deliberately indifferent: either she did not consult anything before abruptly withdrawing a seizure medication from a seizure patient, or she consulted the handbook, saw the large warning and ignored it. At bottom, Clauson cannot escape liability simply by refusing to verify the underlying facts regarding Awalt's potential need for treatment with Topamax. Her decision to abruptly withdraw one of Awalt's seizure medications without consulting a doctor and in the face of the known risk of withdrawal seizures was not a judgment made within accepted professional standards—if it could be characterized as a medical judgment at all. *See Lieberman*, 2013 WL 157200, at *2.

There is sufficient evidence that Clauson was on notice of Awalt's seizures and requests for medical attention at the Jail. There is a genuine dispute of facts: Detainees reported Awalt's seizures to guards, including on September 17, when Clauson was at the Jail, Resp. to CSOF ¶¶ 35-37; Resp. to GSOF ¶¶ 21-23, 33, and guards reported seizure activity and medication requests to the nurse, whether by phone or in person at the Jail, Resp. to CSOF ¶¶ 35-37, 41-42. Clauson also admitted that guards generally told her about requests for medication and seizure activity.

*Id.* Specifically on September 17, detainee J.P. reported to a guard that Awalt was having a seizure, and the guard told the detainee that he would contact Clauson about Awalt. Resp. to CSOF ¶ 36. Detainees also testified that during his detention, Awalt sent request slips asking to see the nurse, asked for medication, and asked to see the nurse, and Clauson did not do anything in response even though she was at the jail on September 17. Resp. to CSOF ¶¶ 35-37. Clauson's knowledge that Awalt had a history of seizures, required Dilantin and Topamax twice a day, and that he was having seizures should have caused her to investigate or inquire whether Awalt needed medication. *See Fox ex rel. Fox v. Peters*, 2011 WL 6378826, at *6 (N.D. Ill. Dec. 19, 2011) (holding that inmate's comment to defendant medical technician that "I take Dilantin," when viewed favorably to plaintiff, should have caused the defendant to investigate or at a minimum inquire of him whether he needed Dilantin).

Clauson should have performed a prompt examination of Awalt to identify the precipitating or exacerbating factors of his seizures and assessed the levels of medication in Awalt's blood. PSOF ¶¶ 71-75. Clauson did none of these things. Clauson's failure to treat Awalt's seizures as medical emergencies fell below the minimum standard of care and did not reflect the exercise of medical judgment. *Id.*[4]

---

[4] A final word on Defendants Cullinan and Clauson: although they admit that the sudden withdrawal of antiseizure medication from a seizure patient can result in recurrent seizures, *see* CSOF ¶ 46, they argue that they could not have been deliberately indifferent to Awalt's serious medical needs because Awalt was not (regularly) taking Topamax (or Dilantin) prior to entering the Jail, and they point to some of Awalt's medical records predating September 14, 2010. *See* CSOF ¶¶ 11-21, 52-53. Of course, these facts are disputed, *see* Resp. to CSOF ¶¶ 11-21, 52-53, but there is a more significant reason for disregarding these medical records: they are after-acquired evidence that will not be admissible at trial. What Cullinan and Clauson knew when they decided to suddenly stop Awalt's Topamax is that Awalt suffered from seizures and reported taking Dilantin and Topamax twice a day. Neither Cullinan nor Clauson knew of Awalt's medical records when they made their treatment decisions, and they did not even acquire them until this litigation. Thus, they do not have any bearing on the question of whether Cullinan and Clauson were deliberately indifferent; i.e., that they knew of and consciously disregarded the risk of harm to Awalt *prior to his death*. *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998) (knowledge of defendants at the time is the relevant inquiry, not knowledge with benefit of hindsight); *see also Schaub v. Vonwald*, 638 F.3d 905, 915 (8th Cir. 2011) (deliberate indifference "measured by the official's

## IV. There Is Sufficient Evidence For A Reasonable Jury To Conclude That The County And CHC's Policies And Practices Caused Awalt's Injury

Grundy County[5] and CHC may be directly liable under § 1983 for constitutional violations caused by (1) an express municipal/corporate policy, (2) a widespread, though unwritten custom or practice, or (3) a decision by a municipal or corporate agent with final policymaking authority. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978); *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009). There are several ways in which both the County and CHC are liable for each other's policies and practices. First, the County and CHC contracted to adopt the same policies. *See* PSOF ¶¶ 2, 11, 22, 28-29, 34-35. The contract provided that CHC would operate within the County or the Sheriff's policies and procedures. PSOF ¶ 2. But then the County and CHC jointly decided that some of CHC's boilerplate or standard policies would apply at the Jail, and that others would be removed. PSOF ¶¶ 11, 22, 28-29, 34-35. Together, CHC and the County decided that there would be no health care training for correctional officers, no continuous quality improvement program, no tracking of grievances, and no oversight at the Jail. PSOF ¶¶ 1-2, 7, 11-36. CHC's contract manager discussed the removal of certain policies with McComas, who signed off on them. PSOF ¶ 28.

Second, the County delegated final authority for any decisions on detainee medical care and medication to CHC. Resp. to GSOF ¶ 12; PSOF ¶¶ 1-2, 38. "The County cannot shield itself from § 1983 liability by contracting out its duty to provide medical services." *King*, 680 F.3d at 1020. "[T]he private company's policy becomes that of the County if the County delegates final

---

knowledge at the time in question, not by hindsight's perfect vision" (internal quotation marks omitted)); *Wells v. Bureau Cnty.*, 723 F. Supp. 2d 1061, 1074 (C.D. Ill. 2010) ("[A]fter-acquired information is simply irrelevant to establishing what was in [the defendants'] minds at the time they are alleged to have been deliberately indifferent . . . .").

[5] On her *Monell* claim, Plaintiff sues the Sheriff in his official capacity, which is a suit against the governmental entity, the County. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Belbachir v. County of McHenry*, 726 F.3d 975, 982 (7th Cir. 2013). Plaintiff uses "Sheriff" and "County" interchangeably.

decision-making authority to it." *Valentino*, 575 F.3d at 674. In denying the County's motion for summary judgment in *King*—another case of a county hiring HPL—the Seventh Circuit held, "[t]he County's express policies as embodied in the contract show that the County delegated to HPL final authority to make decisions about inmates' medical care." 680 F.3d at 1021. Because HPL had an unconstitutional policy of routinely switching patients off prescribed medications without appropriate oversight by a physician, and this policymaking authority had been delegated to HPL by the County, the County ran "afoul of the Constitution," under plaintiff's version of events. *Id.* at 1021-22. Here, as in *King*, "[n]othing in the record as of now suggests that the County had higher aspirations for the care it was providing, but that those standards were not met." *Id.* at 1020.

Third, CHC cannot escape *Monell* liability by attempting to shift responsibility back to the County. CHC is responsible for its own policies and practices: "Private corporations acting under color of state law may, like municipalities, be held liable for injuries resulting from their policies and practices." *Rice ex rel. Rice v. Correctional Medical Servs.*, 675 F.3d 650, 675 (7th Cir. 2012); *Woodward v. Correctional Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) ("[A] corporate entity violates an inmate's constitutional rights 'if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners.'").[6] For instance, CHC had an express policy that would not allow Clauson to reorder

---

[6] *Shields v. Illinois Department of Corrections* suggested recently that a private corporation can be liable under § 1983 on a theory of *respondeat superior* liability. 746 F.3d 782 (7th Cir. 2014). None of the reasons set out in *Monell* for rejecting *respondeat superior* liability for municipalities applies to corporations. On the contrary, vicarious liability of private employers for the torts of their employees is an old feature of American law; the text and legislative history of § 1983 support such liability; and binding Supreme Court precedent has assumed that *respondeat superior* liability is available for constitutional violations in the private employer context. *See id.* at 790-95. Plaintiff advances a *respondeat superior* theory of liability against CHC in this case and preserves her arguments in support of that theory here. As the *Shields* panel noted, however, Circuit precedent dictates that such a theory is unavailable until the *en*

medications until there were only eight pills left, which meant that Awalt did not receive his needed Dilantin and caused seizures which resulted in his death. PSOF ¶¶ 39-41. Because this was a policy of CHC and the County delegated to CHC the authority to make this policy, both CHC and the County would be liable for harm caused by this policy.

Similarly, there is sufficient evidence for a reasonable jury to conclude that both the County and CHC are responsible for a widespread practice of denying adequate medication and medical care to detainees at the jail and final policymakers were on notice of this practice. PSOF ¶¶ 42-55. And, McComas, Cullinan and Clauson were either final policymakers or were delegated final policymaking authority, and their unconstitutional actions make the County and CHC directly liable.

Despite Plaintiff's clearly-defined *Monell* theories, of which Defendants had ample notice from the fact and expert discovery conducted on these theories, the Second Amended Complaint, and Plaintiff's supplemental interrogatory response, *see* Resp. to GSOF ¶¶ 17-18, Defendants make only conclusory assertions about why Plaintiff's *Monell* claims fail. *See* Dkt. 321 at 24-28; Dkt. 313 at 11-13. The County Defendants discuss only some of Plaintiff's theories. And CHC makes only two arguments: (1) that it cannot be liable unless Cullinan and Clauson are found liable, which Plaintiff disputes as a factual and legal matter, and (2) that "Plaintiff's … demanding the conduct of a formal continuous quality improvement program for a small local jail, cannot be seriously argued in the context of the facts of this case to equate to the moving force behind the individual medical defendants' conduct relative to providing Awalt with Dilantin or Topamax." Dkt. 313 at 13. The entirety of CHC's second argument, pertaining to whether any of the policy failures caused Awalt's death, is contained in this one sentence. *Id.*

---

*banc* Seventh Circuit decides otherwise. *Id.* at 795-96 (citing *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)).

Defendants' conclusory assertions are insufficient to shift the summary judgment burden to Plaintiff. *See Fox*, 2011 WL 6378826, at *8 (denying summary judgment to Wexford on plaintiff's *Monell* claim of failure to have written policy, due to its conclusory assertions). As the Seventh Circuit has explained:

> The moving party bears the initial burden of demonstrating that [summary judgment] requirements have been met. … The defendants, the moving party on the summary judgment motion, never fulfilled the obligation of setting forth the basic facts and law which, in their view, warranted summary judgment on this claim. The burden of defeating summary judgment did not shift to the plaintiffs on this issue simply because, without citation to relevant facts or authority … defendants sought summary judgment on all claims against all parties.

*Carmichael v. Village of Palatine, Ill.*, 605 F.3d 451, 460 (7th Cir. 2010). Nor can Defendants now raise new arguments in reply that they did not raise in their motions. *See Fox*, 2011 WL 6378826, at *8 (rejecting Wexford's new argument in reply as waived); *Nelson v. LaCrosse Cty. Dist. Atty.*, 301 F.3d 820, 836 (7th Cir. 2002).

### A.    McComas, Cullinan, and Clauson were final policymakers or were delegated final policymaking authority

When a constitutional violation is committed by those who set municipal or entity policy, the municipality or entity is responsible under § 1983, even if the action in question is undertaken only once. *Valentino*, 575 F.3d at 675 (citing *Pembaur v. City of Cinncinati*, 475 U.S. 469, 480-81 (1986)). The determination of whether a person has final policymaking authority is a question of state or local law, and is to be decided by the court. *Id.* The question is "not whether an official is a policymaker on all matters for the municipality, but whether he is a policymaker 'in a particular area, or on a particular issue' …." *Id.*; *McMillian v. Monroe Co.*, 520 U.S. 781, 785 (1997). Whether a person has final policymaking authority turns on whether his decisions are subject to meaningful review by a higher official or other authority; lack of constraints by policies made by others; and is within the realm of the official's grant of authority. *Vodak v. City*

*of Chicago*, 639 F.3d 738, 748 (7th Cir. 2011) ("it doesn't matter what *form* the action of the responsible authority that injures the plaintiff takes. … The question is whether the promulgator, or the actor, as the case may be—in other words, the decisionmaker—was at the apex of authority for the action in question.") (citation omitted).

### 1. McComas

Here, Superintendent McComas was either the final policymaking authority or delegated final policymaking authority for the jail on all health care-related matters. McComas did not have to report to anyone, including Marketti, regarding Grundy County's policies and practices in the Jail, the administration of the Jail, or the administration of medical care in the Jail. PSOF ¶ 4. McComas was not required to report detainee grievances to Marketti. *Id.* McComas's actions were not subject to meaningful review by Marketti, and his administration of the Jail was within the authority granted to him by Marketti. For instance, McComas decided how to handle grievances and complaints concerning medical care. PSOF ¶ 23. "Customary practices having the force of law may be considered as proof of delegation …" *Kujawski v. Bd. Of Comm'rs of Bartholomew*, 183 F.3d 734, 737 (7th Cir. 1999) (holding that there was an issue of fact regarding whether there was a delegation of personnel responsibilities from county board to a chief probation officer).

Nor was McComas constrained in his administration of medical care in the Jail by any policies made by others: the Jail had no grievance policy or mechanism for tracking grievances, PSOF ¶¶ 21-26, 36; no policy on continuous quality improvement, PSOF ¶¶ 28-31; no policy for overseeing doctors and nurses or auditing their work, PSOF ¶¶ 32-35; no policy on how detainee medical needs are communicated, PSOF ¶ 27; no policy on weaning detainees from seizure (or other) medications, PSOF ¶ 9; and no policy on what an officer should do during an detainee's

seizure activity or when to call for medical assistance, PSOF ¶ 16. In fact, when CHC decided to change its boilerplate policies and procedures to conform with the County's desire not to have any training, grievance policy, or oversight, CHC discussed those changes with McComas and he approved them. PSOF ¶¶ 11, 22, 28-29. It is McComas's name, not Marketti's, that appears on CHC's change sheet for the Grundy County-approved site-specific policies and procedures. PSOF ¶ 29. Hence, under the *Vodak* factors, McComas was "at the apex" of authority for the action in question.

Because McComas was the final policymaker, and there is sufficient evidence for a reasonable jury to conclude that McComas was deliberately indifferent to Awalt's serious medical needs (as discussed above), the County cannot be dismissed. Municipal liability attaches where the final policymaker acts "with deliberate indifference as to … known or obvious consequences." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997).

## 2.      Cullinan and Clauson

Similarly, Cullinan and Clauson were final policymakers or were delegated final policymaking authority by CHC.[7] CHC claims that Larry Wolk was the final policymaker, but Wolk delegated final policymaking authority to Cullinan. PSOF ¶ 5. Cullinan was not required to and did not report anything about his work at the Jail to Wolk. *Id.* Cullinan had no supervisor. *Id.* He did not report to CHC/HPL contract managers. *Id.* With respect to grievances and complaints about medical care, CHC delegated authority to resolve those to the staff at the jail—namely, Clauson and Cullinan, even though they would be the targets of any complaints. *Id.* Moreover, CHC's policies were just guidelines, many of which had no application to the Jail based on the contract. PSOF ¶ 7. CHC delegated to Cullinan and Clauson the authority to use their discretion

---

[7] As an initial matter, CHC makes no argument whatsoever about this theory of *Monell* liability, *see* Dkt. 313 at 11-13, and so they have not met their burden on summary judgment and any argument they raise in reply should be deemed waived. *See Fox*, 2011 WL 6378826, at *8.

to decide whether and when to follow a written policy. *Id.* In fact, Cullinan did not even know anything about CHC's written policies or whether he had ever seen them. *Id.* Furthermore, CHC's policy was not to circumscribe a doctor or nurse's decisions on what information they had to share with each other or what information to review in order to decide the medication needs of a new detainee. PSOF ¶ 8.

Cullinan's decision not to provide Awalt with Topamax and to give him several times the normal dose of Benadryl instead was not subject to meaningful review by a higher official or other authority; was not constrained by policies made by others (and in fact, was an implementation of CHC's policy that doctors had sole, unreviewable and final discretion to make decisions regarding patient care); and was within the realm of his grant of authority. Similarly, CHC gave final authority regarding grievances and detainee complaints about medical care to Clauson. PSOF ¶¶ 6-7, 23-24.

In addition, when Clauson decided that she would not share her knowledge about Awalt's Topamax with Cullinan, she was "implement[ing] rather than frustrat[ing] the [entity]'s policy," *Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir. 1992), since CHC's policy was that doctors and nurses could decide on their own what information to share and review, PSOF ¶ 8. When Clauson and Cullinan decided that she would suddenly stop Awalt's Topamax, this was an implementation of CHC's policy because neither CHC nor the County had a policy of weaning detainees off medications such as seizure medications. PSOF ¶ 10. *See also* PSOF ¶ 37 (all of the individual defendants conceded acting consistently with the County and CHC's policies).

### B. The County and CHC's policy limiting reordering of medication

The County delegated to CHC the responsibility under the contract to ensure that there was an adequate supply of medication at the Jail. PSOF ¶ 38; *see King*, 680 F.3d at 1020 (noting

that county delegated to HPL the responsibility to make final decisions over detainees' access to physicians and medications and citing contractual provision similar to one in this case). There is no dispute that Awalt never received any of the Dilantin from the supply that Clauson specifically ordered for him, because she did not place that order until September 17, 2010, and she did not open that order of medication at the Jail until after Awalt died. PSOF ¶ 40. Defendants imply that Awalt was provided Dilantin from the Jail's stock medication supply, but the Jail was already out of Dilantin by September 17. PSOF ¶ 40; Resp. to CSOF ¶ 24. The reason for this medication shortage was CHC's policy that Clauson could not reorder medication until only eight pills were left. PSOF ¶ 39; Resp. to CSOF ¶ 24. This policy created a situation where the Jail was out of its stock supply of Dilantin before Awalt's specific supply of Dilantin arrived at the Jail. PSOF ¶¶ 39-40; Resp. to CSOF ¶ 24.

CHC fails to address this claim at all,[8] and Grundy County argues cursorily that there were no previous problems with the policy, and it did not cause Awalt's death. Dkt. 321 at 24. These arguments should be rejected. First, a jury could reasonably conclude that this policy was the moving force behind Awalt's death: it could decide that, whether or not Clauson was herself deliberately indifferent, her hands were tied by a policy that limited the medication that she could order and when she could order it. Likewise, a jury could decide that the correctional officers did not give Awalt Dilantin when they said they did, but they could also decide that, due to the County and CHC's reorder policy, there was no Dilantin available for them to give. *Cf. King*, 680 F.3d at 1021 (holding that there was sufficient evidence that the County's policies violated

---

[8] Oddly, CHC cites to *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293 (7th Cir. 2010), to support its argument that it cannot be held liable if neither Cullinan nor Clauson are held individually liable, *see* Dkt. 313 at 11, even though *Thomas* holds the exact opposite. *See* Dkt. 306 (Pl.'s Resp. to Bifurcation Mots.) at 16-21. This is not true because of CHC's reorder policy.

detainee's constitutional rights where nurse was required to abide by HPL's policy of switching detainee to a drug on the formulary). Second, Plaintiff need not show that there were other incidents where the reorder policy caused denial of medication to detainees. As Defendants concede, this is an express policy, Dkt. 321 at 16, and the County (and CHC) are liable for an express policy "where [it] violates a constitutional right when enforced." *Calhoun v. Ramsey*¸408 F.3d 375, 379 (7th Cir. 2005). "Under this type of claim, *one application* of the offensive policy resulting in a constitutional violation is sufficient to establish municipal liability." *Id.* at 379-80 (citing *City of Oklahoma v. Tuttle*, 471 U.S. 808, 822 (1985)) (emphasis added).

### C.   The County and CHC's policy not to track grievances, institute oversight, have continuous quality improvement, or wean detainees off medications

The Supreme Court has distinguished between a county's "deliberate or conscious choice" not to have a policy, "which can fairly be characterized as a municipal policy, and the city's occasional negligent administration of an otherwise sound program." *Armstrong v. Squadrito*, 152 F.3d 564, 578 (7th Cir. 1998). In *Armstrong*, the court noted that the plaintiff's complaint about the jail's "will call" policy—a policy under which the jail could not identify those detainees without court dates unless the jail checked each individual's file, resulting in detainees being held for far longer than constitutionally permissible—was a complaint about "a nonpolicy—a conscious choice not to have a policy," or a failure to make policy in a situation that demanded policy. *Id.* at 578; *see also Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986) ("In situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable."). Here, the County and CHC deliberately and consciously decided not to have certain essential programs and policies.

### 1. No grievance mechanism

The County and CHC deliberately decided not to track detainee grievances or complaints regarding medical care. PSOF ¶¶ 21-24, 36. Peterson (for CHC) and McComas (for the Jail) decided that CHC would remove its boilerplate grievance policy from its site-specific policy that would be implemented at the Jail. PSOF ¶ 21. CHC removed this policy even though it knew that this policy was "essential." *Id.* Instead, the County decided that the only place detainee grievances and complaints regarding medical care would be kept is in a detainee's individual file, and there would be no systematic tracking of such complaints. PSOF ¶ 22. It did not investigate any detainee complaints. PSOF ¶ 21. It did not have any policies regarding written communication of requests for medical care. PSOF ¶ 27. Nor did CHC make any effort to determine whether there were any problems with detainees not getting their medications at the Jail, PSOF ¶ 23, nor did it keep track of any grievances or complaints against Cullinan or Clauson, PSOF ¶ 36. The only thing CHC and the County did was give complaints and grievances to Clauson, even though Clauson was the only nurse at the Jail and the likely target of any complaints regarding medical care. PSOF ¶ 24.

This policy created an atmosphere in which officers, Cullinan, and Clauson understood that detainee complaints about receipt of medication or sufficiency of medical care were not taken seriously, were ignored, and delays in responses to grievances and provision of medical care were commonplace. PSOF ¶¶ 25-26. Numerous other detainee witnesses testified that their medical grievances, complaints, and/or requests were ignored. *Id.* Furthermore, detainees were not told how to fill out grievances, and officers, such as Defendant Van Cleave, threatened retaliation if detainees asked for grievance forms repeatedly. *Id.* Detainees sometimes had to wait

hours or days just to get grievance forms from the jail staff, and guards sometimes refused to pick up grievance or request forms once they were filled out. *Id.*

There is sufficient evidence for a reasonable jury to conclude that the County and CHC's conscious policy choice was the moving force behind Awalt's denial of care. One detainee, T.F., testified that he saw Awalt fill out a lot of request forms, which the guards collected, but he never saw any response to Awalt's forms. PSOF ¶ 26. Nor did Clauson ever examine Awalt again after September 15.

Furthermore, CHC and County were aware that it is important (or, in CHC's own words in its boilerplate policy, "essential") to have a mechanism for addressing detainee grievances and complaints about medical care. *See* PSOF ¶ 22. The Jail had request slips and complaint forms that it provided to detainees, although the Jail did not take the forms seriously, provided no instruction to detainees on how to fill them out, and threatened retaliation for filing repeated grievances. PSOF ¶ 25. *Armstrong* is instructive on this point: "The complaint forms demonstrate an understanding on the jail's part that detainees need an avenue to address prolonged, improper confinement. In other words, the complaint forms show an awareness on the part of jail officials that a danger exists and an attempt to avert an injury from that danger." 152 F.3d at 579. Furthermore, here, as in *Armstrong*, there is sufficient evidence showing that the refusal to accept (or respond to) complaint forms creates a serious risk of constitutional injury. *Id.* at 580 ("A policy of refusing to accept a complaint seems to us analogous to a policy of refusing to act upon a reasonable request for medical assistance.").

### 2.  No oversight or continuous quality improvement program

Similarly, CHC and the County consciously decided not to have any continuous quality improvement (CQI) program at the jail or any oversight of Cullinan or Clauson. PSOF ¶¶ 28-35.

CHC contract manager Peterson discussed the removal of CQI with McComas and they agreed that the Jail would not have the program. PSOF ¶ 29. CHC and the County made this decision even though this was, like the grievance policy, labeled by CHC as "essential." *Id.* The County could not discipline a doctor or nurse for inadequately providing services that had been contracted for, McComas never kept track of what Clauson was doing (or not doing), and CHC never disciplined any nurse or doctor, and there were no audits. PSOF ¶¶ 32, 33, 34, 36.

As Dr. Greifinger opined, it is not appropriate for a jail the size of Grundy County Jail to have an informal CQI process. PSOF ¶ 30. Performance measurement, as part of a quality management program, is an integral part of assuring quality of care. *Id.* The County and CHC's joint, conscious decision to avoid self-critical analysis is tantamount to a deliberate decision to blind themselves to ongoing medical care failures at the Jail. *Id.* This breeds an environment where the jail staff (both County and CHC staff) know that there are no consequences or accountability. PSOF ¶ 31. These are known or obvious consequences of not having a quality improvement or oversight program.

CHC argues in one sentence that the lack of a continuous quality improvement program cannot be the moving force behind Awalt's denial of care. *See* Dkt. 313 at 13. This conclusory assertion is insufficient to shift the burden to Plaintiff on summary judgment. *See Fox*, 2011 WL 6378826, at *8. Even if it were, the argument should be rejected. The decision not to have any CQI at the Jail created an atmosphere where Cullinan and Clauson knew that their actions would not be scrutinized and they would not be held accountable for any denials of care. This is borne out by the numerous other detainees who complained that they were not provided with medication or adequate medical care at the Jail. *See* PSOF ¶¶ 45-54.

36

### 3.     No policy of weaning detainees off medication

The County and CHC had no policy for weaning detainees off medication, including seizure medication. PSOF ¶ 10. Both Cullinan and Clauson were also given complete discretion on what information to review and obtain before deciding what medication to give a detainee. PSOF ¶ 8. Sudden withdrawal of seizure medication from patients presents a serious risk of withdrawal seizures. Resp. to CSOF ¶ 10. The known or obvious consequence of not having any policy advising medical personnel in weaning detainees off medication, combined with the unfettered discretion given to Cullinan and Clauson, is that detainees' medication will be abruptly stopped, resulting in harm or injury to the detainees. This is what happened to Awalt.

### D.     Failure to provide health care training

"The failure to provide adequate training to its employees may be a basis for imposing liability on a municipality or private corporation, but as with any other policy or practice for which the plaintiff seeks to hold the municipal or corporate defendant liable, the plaintiff must show that the failure to train reflects a conscious choice among alternatives that evinces a deliberate indifference to the rights of the individuals with whom those employees will interact. *Rice*, 675 F.3d at 675; *see also City of Canton v. Harris*, 489 U.S. 378, 388 (1989) ("only where a failure to train reflects a deliberate or conscious choice can a city, county or other municipality be liable for such a failure under § 1983") (internal quotation marks omitted). Furthermore, single-incident liability is available in the circumstance where the need for more or deficient training is so obvious that a plaintiff's injury is a "highly predictable consequence" of any such deficient training. *Connick v. Thompson*, __ U.S. __ 131 S. Ct. 1350, 1361 (2011); *Canton*, 489 U.S. at 390. "Liability under this theory depends on the 'likelihood that the situation will recur

and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." *Bd. of Cnty. Comm'rs*, 520 U.S. at 409-10.

CHC does not make any argument about Plaintiff's failure-to-train claim besides stating in conclusory fashion that failure to train against CHC cannot succeed without individual liability of Cullinan and Clauson. Dkt. 313 at 11 (citing to unpublished district court opinion, *Demouchette v. Dart*, 2011 WL 679914 (N.D. Ill. 2011)). The opinion cited by CHC, *Demouchette*, in turn cites to *Sallenger v. City of Springfield*, 630 F.3d 499 (7th Cir. 2010), which does not discuss *Thomas*, cites only to cases that predated *Thomas*, and is an excessive-force case that is distinguishable on its facts. For the reasons discussed in Plaintiff's response to Defendants' bifurcation motion, Dkt. 306 at 19-20, Plaintiff could succeed on a failure-to-train without a jury finding of liability against any individual defendant.

For its part, Grundy County argues that, to succeed on a failure-to-train claim, Plaintiff must show a pattern of similar violations because there was not a complete failure to train. *See* Dkt. 321 at 26-28. This is wrong for several reasons. First, there is a genuine dispute of fact over whether there was a complete failure to train. The County points to a PowerPoint presentation from CHC contract manager Peterson, *id.* at 27, but Plaintiff has contrary evidence: Superintendent White (the County's Rule 30(b)(6) witness), testified that he was not aware of any training and could not locate any records of any training by CHC/HPL. Resp. to GSOF ¶ 71. CHC's contract managers testified that the County and CHC eliminated all health-care related training. PSOF ¶ 11. The officers gave varying testimony on what training they received or if they received any training at all. Resp. to GSOF ¶¶ 71-72. Several of the officers testified that they did not receive any training on how to respond to seizure patients. *Id.* No training was provided on how to properly fill out MARs, Resp. to GSOF ¶¶ 13, 15; PSOF ¶ 17, even though

CHC knew this policy was "essential." PSOF ¶ 19. Contrary to Defendants' contention, Clauson's daily interaction with the officers at the jail was not a form of training. PSOF ¶ 12. Thus, because there is a dispute of fact over whether there was a complete failure to train, Plaintiff need not show a pattern of similar violations.

And even if Plaintiff had to show a pattern of similar violations, she has presented sufficient evidence of that. *See infra*, Section IV.E.

A jury could reasonably conclude that the County and CHC's failure to train the officers in how to handle seizure patients and respond to detainees who are having seizures was the moving force behind Awalt's death. For instance, on September 19, detainee R.W. heard Van Cleave say to Awalt, "stop faking seizures, that's not what they look like." PSOF ¶ 13. One inference from this fact is that Van Cleave was deliberately indifferent to Awalt's serious medical needs. However, another possible inference from this fact is that Van Cleave did not know what seizures looked like due to her lack of training. This is one way that the jury could return a verdict against CHC and the County would not be inconsistent with a verdict for the individual officers. Furthermore, a jury could also reasonably conclude that the failure to provide any seizure (or any health care-related) training to the officers resulted in the officers' failure to understand the importance of providing timely medication to Awalt. And finally, the evidence could support a finding that the failure to train the officers on how to properly fill out MARs resulted in Awalt not getting his medication as he was supposed to. PSOF ¶ 20.

E. **Widespread practice**

In *Thomas*, the Seventh Circuit explained that there is no "bright-line rule" defining how many incidents constitute a "widespread custom or practice," only that it must be more than three. *Id.* at 303. Plaintiff need only demonstrate that "there is a policy at issue rather than a

39

random event," and this may take the form of "a series of violations to lay the premise of deliberate indifference." *Id.* Beyond that, it is a factual question for the jury whether the evidence shows that the County (or CHC) had a widespread practice that caused the alleged constitutional harm. *Id.* (holding that the plaintiff presented evidence of a widespread practice of failing to review inmates' timely filed medical requests). Furthermore, as the Seventh Circuit explained in *Woodward*:

> CMS does not get a "one free suicide" pass. The Supreme Court has expressly acknowledged that evidence of a single violation of federal rights can trigger municipal liability if the violation was a "highly predictable consequence" of the municipality's failure to act. Here, there was a direct link between CMS's policies and Farver's suicide. That no one in the past committed suicide simply shows that CMS was fortunate, not that it wasn't deliberately indifferent. Moreover, we note that CMS's liability is based on much more than a single instance of flawed conduct, such as one poorly trained nurse. It was based on repeated failures to ensure Farver's safety … well as a culture that permitted and condoned violations of policies that were designed to protect inmates like Farver.

368 F.3d at 929.

Here, Plaintiff has presented sufficient evidence for a reasonable jury to conclude that there was a widespread practice or custom of denying necessary medical care or medication to detainees at the Grundy County Jail. CHC makes no argument that Plaintiff has insufficient evidence of a widespread practice of denial of medical care. *See* Dkt. 313 at 12-13. Summary judgment should be denied as to CHC on this ground alone. Relying on *Hahn v. Walsh*, 762 F.3d 617 (7th Cir. 2014), Grundy County argues that because Plaintiff has not adduced more than two other incidents of detainees with seizures being denied their medication, she has not provided sufficient evidence of other similar incidents to show a widespread practice. Dkt. 321 at 14-15. But *Hahn* does not stand for the proposition that no plaintiff can show a widespread practice or custom unless she points to other constitutional violations that occurred in the exact same way.

In *Hahn*, the plaintiff pursued a *Monell* theory that the municipality was deliberately indifferent for failing to have a "written policy or procedure for diabetic detainees whose blood sugar was not being measured and who refused to eat." 762 F.3d at 636. The plaintiff's wife, Janet Hahn, was a diabetic with mental illness who died of diabetic ketoacidosis because her blood sugar was not being measured and she refused to eat. *Id.* at 621-26. In order to prevail under the claim as thus defined, Hahn had to present evidence that the municipality was on notice that failing to have a written policy to deal with diabetics who fit these precise categories posed a significant risk of harm to them. *Id*. Hahn was not arguing that the county had express policies that caused his wife's death. *Id.* at 636-37. He was arguing only that the jail should have had a written policy to deal with the specific circumstances: his wife was a diabetic who refused to participate in her own care by refusing to eat and refusing to have her blood sugar monitored. *Id*. at 637. Given these unusual circumstances, the Seventh Circuit held that the prior incidents of deaths at the jail "would not have put Sheriff Walsh on notice that he might need a policy for handling diabetic inmates who refuse to participate in their own care." *Id.* at 637-38. This was not a situation where it was obvious that the county should implement a policy on the topic.

Here, however, Plaintiff's claim is much more straightforward and more like *King v. Kramer*, which was contrasted in *Hahn*. *See id.* at 638. Here, like in *King*, the County and CHC's deliberate indifference stems from broader failures, such as the failure to ensure that the Jail had adequate medication supplies (i.e., the reorder policy), the failure to have a mechanism for addressing detainee complaints about medication or medical care, and the failure to have a policy on weaning detainees off medications. Moreover, as discussed above, the evidence shows that CHC and the County made a conscious decision to forgo these policies, which makes them

41

express policies. *See Armstrong*, 152 F.3d at 578. Thus, a single incident is sufficient to establish liability. *Calhoun*, 408 F.3d at 379-80.

Even if Plaintiff were required to show a pattern of violations and notice to policymakers, she has sufficient evidence of that. *See* PSOF ¶¶ 42-55. First, there were at least three other seizure patients in the Grundy County Jail near the time that Awalt was, who were also denied their medications and suffered injury as a result: detainees S.P., K.M., and N.W. PSOF ¶¶ 47, 50, 51. S.P. had a seizure disorder which she reported to the booking officer when she arrived at the Jail. PSOF ¶ 47. She was prescribed Dilantin, but the Jail staff repeatedly failed to give her medication consistently. *Id.* Moreover, she was in the Jail and needed Dilantin at the same time as Awalt, and the eight-pill reorder policy caused her not to receive her Dilantin on several days. PSOF ¶¶ 40, 47; Resp. to CSOF ¶ 24. S.P. also repeatedly requested medical attention, which the Defendants ignored. PSOF ¶ 47. Dr. Greifinger opines that Defendants' failure to provide appropriate treatment for S.P. placed her at severe risk of harm.

Similarly, K.M. was a seizure patient who entered the Jail in November 2009. PSOF ¶ 50. She told the booking officer that she had seizures and took various medications (including Lamictal for seizures). *Id.* Once she was placed into a cell, she repeatedly told the guards that she needed medication, but they ignored her. *Id.* An older male guard—Matteson was around 70 years old at the time—told her that there was "nothing wrong with her." *Id.* K.M. was going through withdrawal and vomiting, which was visible on camera. *Id.* Eventually, Clauson saw K.M. the next morning, and K.M. told her about her seizures and need for medication, but Clauson did not do anything for her. *Id.* Clauson did not examine her, let her use the medication that was in her purse, or provide her with any other medication. *Id.* The next day, K.M. had a seizure when she was brought to court. *Id.*

N.W. was also a detainee who entered the Jail in March 2010. PSOF ¶ 51. He required medications for brain injuries. On multiple occasions, Clauson failed to refill his prescriptions and caused him to miss his medications. *Id.* He began having headaches, and he filled out sick call request forms for them, but the guards and medical staff ignored him. *Id.* Shortly afterward, N.W. began having seizures. He had at least three to five seizures in the Jail. *Id.* Detainees alerted the guards every time, but the guards simply stood and watched until N.W. stopped seizing. *Id.* N.W. submitted grievances, but he received no medical assistance. *Id.*

Besides seizure patients, Plaintiff has presented substantial additional evidence of a widespread practice in the Jail of denying medication and adequate medical care to detainees. Dr. Greifinger opined that 24 of the detainees booked at the Jail in the three months prior to Awalt's detention (including Awalt), identified a medical issue at intake. PSOF ¶ 44. His review of a three-month cross-section of detainee files was a representative sample. PSOF ¶ 43. Of those 24 individuals, seven detainees (including Awalt), or 29%, were denied timely access to care or received care that fell far below the standard for correctional health care. PSOF ¶ 44. This was a high rate of problems and it pointed to systemic failures of policies, practices, training, and supervision. PSOF ¶¶ 42, 44; *see also* PSOF ¶¶ 45-49 (Greifinger's discussion of specific detainees). And even if this figure were 15 or 20%, that is substantially higher than the great majority of several hundred jails that Dr. Greifinger has visited in the United States. PSOF ¶ 44.

As the Supreme Court articulated in *Farmer v. Brennan*, 511 U.S. 825 (1994), the obviousness of the risk can itself be sufficient to put a defendant on notice that the conduct posed a risk of serious harm to the plaintiff. *Id.* at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, … and a factfinder may conclude that a prison

43

official knew of a substantial risk from the very fact that the risk was obvious."). In *Hahn*, that simply was not the case—the plaintiff's claim involved a complex and specific medical situation where the plaintiff herself had repeatedly refused various forms of medical care and where the Jail had written policies pertaining generally to checking the blood sugar of diabetics. Awalt's case contains none of those quirks; he was completely denied medication for a serious medical condition, and his repeated requests for help were entirely ignored.

## V.    There Is Sufficient Evidence For A Reasonable Jury To Conclude That Defendants Conspired To Violate Awalt's Rights And Failed To Intervene

The Medical Defendants make conclusory assertions for dismissal of Plaintiff's failure to intervene claim. Dkt. 313 at 10-11. Content-void boilerplate like this is insufficient to shift the summary judgment and force a reply. *See Fox*, 2011 WL 6378826, at *8. It is also wrong. Clauson had the opportunity to compel the officer Defendants to properly care for Awalt when she was at the jail on September 17 and learned of Awalt's seizures. Cullinan had the opportunity to instruct Van Cleave, among others, on the proper care of Awalt after Van Cleave called Cullinan to tell him about Awalt's erratic behavior. Clauson and Cullinan were the medical professionals at the jail, thus they had the medical and patient-specific knowledge and authority to prevent the constitutional violations worked by the County Defendants. *Awalt v. Marketti*, 2012 WL 1161500, *7 (N.D. Ill. Apr. 9, 2012) ("Mrs. Awalt's § 1983 claim for failure to intervene requires that she show that one or more of the Defendants had a realistic opportunity to prevent another state actor from committing a constitutional violation but failed to do so.").

Similarly, the Defendants' conspiracy arguments fail because, like their other arguments, they are insufficient to warrant a response. *See Fox*, 2011 WL 6378826, at *8. They also fail on the merits. First, they argue that they cannot have conspired to be deliberately indifferent because they were not deliberately indifferent. Dkt. 313 at 10. But they were deliberately indifferent, as

44

argued above. Next, they argue that conspiracy is not an independent claim. This argument misapprehends conspiracy's purpose: "[T]he function of conspiracy doctrine is merely to yoke particular individuals to the specific torts charged in the complaint." *Jones v. City of Chicago*, 856 F.3d 985, 992 (7th Cir. 1988). Even if Clauson and Cullinan were not independently liable of deliberate indifference, by acting in concert and agreement with each other and with the County Defendants to violate Awalt's rights, they would still be liable for conspiracy. Finally, Defendants claim there is no evidence of agreement. Not so. Cullinan and Clauson talked. So did Cullinan and Van Cleave. And so did Clauson and Thorson. PSOF ¶¶ 33-34, 38. After each of these conversations, Defendants took actions that were deliberately indifferent to Awalt's medical needs. From this a jury can infer that the involved defendants agreed on the course of action that violated Awalt's rights.

**VI.    Defendants Are Not Entitled To Dismissal Of Plaintiff's Intentional Infliction Of Emotional Distress, Willful And Wanton, Or Negligence Claims**

Cullinan, Clauson, and the County Defendants move to dismiss Plaintiff's intentional infliction of emotional distress (IIED) claim on the ground that she has not adduced sufficient evidence of deliberate indifference, and therefore, she cannot survive summary judgment on her IIED claim. Cullinan and Clauson also argue that Plaintiff has insufficient evidence of state law negligence. *See* Dkt. 313 at 16-17. Because Plaintiff has adduced sufficient evidence of deliberate indifference against these defendants, her IIED and negligence claims survive.

The County defendants also argue that they are entitled to immunity under 745 ILCS 10/4-105. Dkt. 321 at 29. But this section "shall not apply where the employee, … knows from his observation of conditions that the prisoner is in need of immediate medical care and, through willful or wanton conduct, fails to take reasonable action …." *Id.* This provision is not intended to shield defendants "where an act was done with actual intention or with a conscious disregard

45

or indifference for the consequences when the known safety of other persons was involved."
*Murray v. Chicago Youth Center*, 864 N.E.2d 176, 190-191 (Ill. 2007). A claim of intentional
infliction of emotional distress is an intentional tort; as is a claim of deliberate indifference,
*Vance v. Rumsfeld*, 701 F.3d 193, 204 (7th Cir. 2012) (*en banc*) ("Deliberate indifference to a
known risk is a form of intent."). The Seventh Circuit has noted that the standard governing
deliberate indifference is "remarkably similar" to the willful and wanton standard. *Williams*, 509
F.3d at 404; *Chapman v. Keltner*, 241 F.3d 842, 847 (7th Cir. 2001). Accordingly, if there exists
a genuine dispute about whether the defendants committed an intentional tort, then there is a
dispute—as a matter of law—about whether their conduct was willful and wanton and whether
they are entitled to statutory immunity.

As explained above, the County Defendants were all deliberately indifferent to Robert
Awalt's serious medical needs. That deliberate indifference is exactly the kind of willful or
wanton conduct that takes away their claim to immunity. *See* 745 ILCS 10/1-210 (defining
"willful and wanton conduct" as "a course of action which shows an actual or deliberate
intention to cause harm"). Defendants are not entitled to summary judgment on their argument
that they are entitled to immunity from Plaintiff's state-law claims based on 745 ILCS 10/4-105.

Finally, because the individual Defendants are not entitled to dismissal of all Plaintiff's
state law claims, Plaintiff's respondeat superior claim against the County and CHC survives.

## VII. The Grundy County Defendants Are Not Entitled To Tort Immunity

The County Defendants seek "discretionary act" immunity under 745 ILCS 10/2-201
from Awalt's spoliation claims. To win, they must satisfy the "a two-part test to determine which
employees may be granted discretionary immunity under § 2-201. First, an employee may
qualify for discretionary immunity if he holds either a position involving the determination of

46

policy or a position involving the exercise of discretion. Second, however, an employee who satisfies the first prong of the test must also have engaged in both the determination of policy and the exercise of discretion when performing the act or omission from which the plaintiff's injury resulted." *Ponto v. Levan*, 972 N.E.2d 772, 790-91 (Ill. App. Ct. 2012) (internal citations and quotations omitted). Both inquiries are fact-specific. *See Lane v. Dupage Cnty. Sch. Dist. 45*, 2014 WL 518445 (N.D. Ill. Feb. 10, 2014) ("The Illinois Supreme Court has recognized repeatedly that … the determination whether acts are discretionary or ministerial must be made on a case-by-case basis."). And both must be evaluated while keeping in mind that "the Tort Immunity Act is in derogation of the common law and, therefore, must be strictly construed against the public entities involved." *Ponto*, 972 N.E.2d at 790.

Here, Defendants utterly fail on the first part of the test. They never explain how any of them holds a position "involving the determination of policy or exercise of discretion," *id.* at 790-91, and do not even mention this part of the test in their brief. Even if one of the Defendants did hold a position involving the determination of policy, that Defendant's argument would fail the second step of the test because there is no explanation of how destroying surveillance video or Awalt's medical grievances were acts of policy-making and discretion. Again, the defendants have ignored their burden, and their argument for immunity can be rejected outright.[9]

Finally, the County Defendants assert in a footnote an omnibus demand for immunity from all of Plaintiff's state-law claims under §§ 4-103, 6-105, 2-204 and 2-201. Dkt. 321 at 29 n.10. But "argument[s] present[ed] only in undeveloped footnotes" are regularly deemed waived, and this argument should be as well. *Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013) (collecting cases); *De v. City of Chicago*, 912 F. Supp. 2d 709, 735 (N.D. Ill. 2012).

---

[9] Defendants also argue that discretion immunity under 2-201 has no exceptions. Plaintiff disagrees that 2-201 has no exceptions, but they have not established any immunity in the first place, so there is no need to address whether an exception to the statute exists.

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment should be denied.

RESPECTFULLY SUBMITTED,

/s/ Elizabeth Wang

Arthur Loevy                    Elizabeth Wang
Michael Kanovitz                LOEVY & LOEVY
Jon Loevy                       2060 Broadway, Ste. 460
Anand Swaminathan               Boulder, CO 80302
Steven Art                      (720) 328-5642
Cindy Tsai
LOEVY & LOEVY
312 N. May St., Ste. 100
Chicago, IL 60607
(312) 243-5900