ELIZABETH AWALT, as Administrator of
the Estate of Robert Awalt,

       Plaintiff,

       v.

RICK MARKETTI, as Administrator of the
Estate of Terry Marketti; KEVIN
CALLAHAN, in his official capacity as
Sheriff of Grundy County; DUANE
MCCOMAS, individually and in his
official capacity as Superintendent of
Grundy County Jail; MELANIE VAN
CLEAVE; PATRICK SEALOCK; MATTHEW
WALKER; KIM LEAR; ROGER THORSON;
ROBERT MATTESON; DAVID OBROCHTA;
COUNTY OF GRUNDY; CORRECTIONAL
HEALTH COMPANIES, INC.; HEALTH
PROFESSIONALS, LTD.; DR. STEPHEN
CULLINAN; MARJORIE CLAUSON;
unknown employees of Correctional
Healthcare Companies, Inc. and Health
Professionals, LTD; unknown Grundy
County Correctional Officers; unknown
Medical Personnel,

       Defendants.

No. 11 C 6142

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Elizabeth Awalt ("Plaintiff"), as administrator for the estate of her husband Robert Awalt ("Awalt"), alleges that Grundy County and the Grundy County Sheriff's Office, directly and doing business through its prison medical services providers Correctional Health Companies, Inc. ("CHC"), and Health Professional,

Ltd. ("HPL"), caused Awalt's death by being deliberately indifferent to his medical needs while he was in custody at the Grundy County Jail. R. 120. Plaintiff also alleges that former Grundy County Sheriff, Terry Marketti ("Sheriff Marketti"), Duane McComas, individually and in his official capacity as Superintendent of Grundy County Jail, and correctional officers Melanie Van Cleave, Patrick Sealock, Matthew Walker, Kim Lear, Roger Thorson, Robert Matteson, David Obrochta (the "Correctional Officers"), along with CHC employees Dr. Stephen Cullinan and Nurse Marjorie Clauson, are liable for Awalt's death. *Id.* Specifically, Plaintiff alleges the following claims: **Count I** for unreasonable and deliberately indifferent denial of medical care, in violation of the Fourth and Fourteenth Amendments, as to the conduct of both the individual defendants' actions and the policies and practices of the entity defendants under the doctrine of *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658 (1978); **Count II** for conspiracy to commit the civil rights violations alleged in Count I; **Count III** for failure to intervene to prevent the civil rights violations alleged in County I; **Count IV** under the Illinois Survival Act for intentional infliction of emotional distress in violation of Illinois law; **Count V** under the Illinois Wrongful Death Act for intentional battery in violation of Illinois law; **Count VI** under the Illinois Survival Act for intentional battery in violation of Illinois law; **Count VII** under the Illinois Wrongful Death Act for negligent or willful and wanton conduct in violation of Illinois law; **Count VIII** under the Illinois Survival Act for negligent or willful and wanton conduct in violation of Illinois law; **Counts IX and X** against CHC/HPL and Sheriff Marketti

in his official capacity for respondeat superior liability for the state law Counts; **Count XI** for indemnification of any judgment against County employees by the County; and **Count XII** for spoliation of evidence in violation of Illinois law. Grundy County, the Sheriff's Office, Sheriff Kevin Callhan, Rick Marketti (as administrator for Sheriff Marketti's estate), Superintendent McComas, and the Correctional Officers (collectively, the "County Defendants"), have moved for summary judgment, R. 309, on all counts, *excluding* the issues of "whether [Officers] Sealock, Walker, Lear, and Thorson gave Awalt his medications as they say they did, and whether [Officer] Van Cleave knew Awalt had suffered seizures in the Jail, but took no action." R. 321 at 7. CHC, HPL, Dr. Cullinan, and Nurse Clauson (collectively, the "Medical Defendants"), have also moved for summary judgment on all counts. R. 312.

On November 17, 2014, the Court entered an order stating that the motions were denied in part, granted in part, and continued with respect to Plaintiff's theory of liability based on a failure to train. R. 394. On November 18, 2014, the Court partially vacated the November 17 order with respect to Count XII against the Medical Defendants only. R. 402. This memorandum opinion and order states the reasons for the Court's prior orders, and additionally, denies Defendants' motions for summary judgment with respect to Plaintiff's failure to train theory of liability, and denies the Medical Defendants' motion with respect to Count XII.[1]

---

[1] Plaintiff does not object to summary judgment on the federal claims against Sheriff Marketti in his personal capacity, or summary judgment on the claims against unknown defendants. R. 339 at 6 n.3. Therefore, summary judgment on

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Background

### I.     Awalt's Detention and Death

The Grundy County Jail (the "Jail") is not a large facility. In 2010 it had a capacity of 72 detainees. R. 311-2 at 87:22–88:8. The Jail is divided into sections A through L, *see* R. 336-6 at 349-53, with each section having approximately three or

---

Counts I, II, and III is granted in Sheriff Marketti's favor in his personal capacity, and summary judgment is granted in Defendants' favor as to all claims against unknown defendants. Plaintiff's counsel also stated on the record during a status hearing on November 6, 2014, that Plaintiff's purposefully failed to oppose Defendants' motions for summary judgment on Plaintiff's battery allegations in Counts V and VI, and thus, summary judgment is granted in Defendants' favor on Counts V and VI.

four cells, containing single or bunk beds, *id.*, and a common area, *see generally* R. 311-2, where the detainees spend most of their waking hours. *See* 336-4 at 197 (15:21–16:10). Section A is immediately adjacent to the guard station, while Section C is 15 feet from the guard station. R. 311-3 at 138:13-21; 142:2-6. The Jail has a video surveillance system that records activity in the common areas and the hallways leading to the cells, but not inside all of the individual cells themselves. R. 311-2 at 224:2-3, 229:21-23, 231:8-15. Correctional officers are required to conduct security cell checks every 30 minutes. R. 311-42 at 31:21-22, 32:1-3. Correctional officers have access to the video monitors from the guard station, and there are also video monitors in the superintendent's office. R. 336-6 at 477 (121:12-16).

Awalt was arrested and taken to the Grundy County Jail on September 14, 2010, at about 10:34 p.m. R. 329 ¶¶ 3-4. Officer Obrochta completed Awalt's intake form, noting that he suffered from seizures and was taking the medications Dilantin and Topamax.[2] R. 311-6 at 4. Awalt was initially placed in Section A, which was immediately adjacent to the guard station. *See* R. 336-6 at 349.

The next morning at 9:00 a.m., Awalt saw Nurse Clauson and he told her that he was taking Dilantin and Topamax for seizures. R. 311-6 at 50. Nurse Clauson testified that she told Awalt he needed to have the proof that he required these medications brought to the jail. R. 311-14 at 88:9-21. Plaintiff testified that

---

[2] It is undisputed that "Dilantin is a common primary antiseizure medication," and "Phenytoin is the generic equivalent." R. 334 ¶ 9. The Court will refer to both as "Dilantin." It is also undisputed that "Topamax is approved by the United States Food and Drug Administration . . . as an adjuvant or additional antiseizure medication." *Id.* ¶ 10.

Awalt told her he had seen a nurse, but he never asked Plaintiff to bring him proof of his medications. R. 336-2 at 279:16–281:12.

At 3:00 p.m., after Awalt was not released after his preliminary hearing (which took place from approximately 1:35 to 1:55 p.m. on September 15), Nurse Clauson told a correctional officer at the jail to call Dr. Cullinan to order Dilantin for Awalt. R. 329 ¶ 8. Officer Thorson contacted Dr. Cullinan, and Dr. Cullinan ordered that 400 mg of Dilantin be given to Awalt immediately and two daily doses of 200 mg thereafter. *Id.* ¶ 9. There is no record of what information Dr. Cullinan had about Awalt's condition when he decided to prescribe this medication for Awalt. R. 336-3 at 109:19-22. Officer Thorson does not remember what he told Dr. Cullinan, R. 311-8 at 88:11-21, and Dr. Cullinan does not remember either. R. 336-3 at 32 (109:5-11). But Dr. Cullinan testified that it was his "usual and customary" practice to inquire what medications a new detainees was reportedly taking. R. 336-3 at 112:2-4.

Nurse Clauson did not secure a Topamax prescription for Awalt. Nurse Clauson testified that she did not tell Thorson to request a prescription for Topamax for Awalt from Dr. Cullinan because she "had forgotten about it." R. 311-14 at 129:13. Nurse Clauson also testified that she had never heard of Topamax, id. at 82:4-9, and "wanted to check it out before [she] had anybody call on it." *Id.* at 129:14-15. Nurse Clauson decided to research Topamax and planned to discuss it with Awalt on September 20, knowingly depriving him of the drug during his time at the Jail. *See* R. 311-14 at 119:6–120:7, 108:1-5. The 2010 Nursing Spectrum

Handbook that Nurse Clauson consulted regarding Topamax includes a graphically-emphasized warning stating, "Don't stop therapy suddenly. Dosage must be tapered." R. 336-8 at 347.

Dr. Cullinan testified that he cannot remember if he was ever told that Awalt was taking Topamax, R. 336-3 at 116:1-8, and he has "no record of being told that [Awalt] took Topamax." R. 336-3 at 115:4-6. However, the Jail's records show that Dr. Cullinan reviewed the note on Awalt's chart stating that Awalt reported he was taking Topamax. R. 311-6 at 14. Dr. Cullinan also testified that Awalt's chart indicates that he discussed Awalt's intake form with Nurse Clauson. R. 336-3 at 53:11-18. Yet, he also testified that he did not call Nurse Clauson to ask her any questions about Awalt, R. 336-3 at 429:8-18. In any case, Dr. Cullinan also testified that he was "not really familiar with [Topamax]," and he has "never really prescribed it independently." R. 336-3 at 114:14-16.

Plaintiff's expert, Dr. Laura Pedelty, testified that Topamax is not a well-known, or frequently abused medication, making it likely that a patient who claims to be taking the medication is actually taking it. R. 336-1 at 50 (191:8-14). Dr. Pedelty also testified that the risk from abrupt withdrawal of Topamax is far greater than the risk of any negative drug interaction with Dilantin. *Id.* at 51 (194:21–196:15).

The evening of September 14, Plaintiff called the jail and spoke with Superintendent McComas. R. 336-2 at 266:9-17. Plaintiff told Superintendent McComas that Awalt suffered from seizures and was taking Dilantin. R. 336-2 at

266:9-17; R. 311-2 at 125:1-5. Superintendent McComas told Plaintiff to bring the medication to the jail, R. 311-2 at 125:10-21, and that if she could not do that the Jail would get the medication for Awalt. R. 336-2 at 266:21–267:7. Plaintiff spoke to Superintendent McComas the next morning and asked whether Awalt was receiving his medication. R. 336-2 at 269:4-10. Superintendent McComas assured Plaintiff that there was a nurse on site and Awalt would receive his medication. R. 336-2 at 271:4-7, 272:22–273:4. Superintendent McComas testified that he told Nurse Clauson about his conversation with Plaintiff on September 15, R. 311-2 at 127:22–131:4, and the Sheriff's Office testified by interrogatory that Superintendent McComas told Nurse Clauson about his call with Plaintiff. R. 336-6 at 279 (¶ 5). Nurse Clauson, however, did not include any communications with Superintendent McComas in a list she produced during discovery of communications she had regarding Awalt's health. R. 336-4 at 19 (¶ 5).

Jail records indicate that Awalt was given Dilantin on a regular schedule while he was in the Jail. R. 311-15. Several people detained at the Jail with Awalt, however, testified that Awalt suffered seizures multiple times each day while he was in the Jail, R. 329 ¶ 21, and was constantly asking the jail staff for his medication and to see a doctor. R. 329 ¶ 22. One detainee testified that he told a correctional officer that Awalt was having seizures, and that the officer told the detainee the officer would contact Nurse Clauson. R. 336-4 at 206 (53:8-11), 207 (56:15–57:12). Another detainee testified that he saw Awalt complete grievance and medical request forms that were collected by the correctional officers. R. 336-5 at

237 (30:7-9). Nurse Clauson, Superintendent McComas, and the correctional officers testified it was their practice to forward medical request forms to Nurse Clauson. R. 311-25 at 129:13-17; R. 311-2 at 296:16-19; R. 336-10 at 231 (356:8-357:18). Nurse Clauson's practice whenever she learned that a detainee was not reacting well to seizure medication was to tell Dr. Cullinan. R. 336-10 at 197 (220:16–221:1). Sheriff Marketti admitted during discovery that it was the Jail's practice to file detainees grievance and medical request forms, R. 336-9 at 11 (¶¶ 46-49), and Nurse Clauson testified that she placed such forms in a file. R. 336-10 at 231 (356:8-357:18).

In addition to disputing whether the correctional officers gave Awalt Dilantin as prescribed (which will be an issue at trial but is not relevant to these motions), the parties also dispute whether the Jail had sufficient Dilantin in stock to satisfy Awalt's need. CHC/HPL's representative testified that its nurses are responsible for determining when to order medication for a correctional facility, and that CHC/HPL's policy is that the pharmacy's manual governs when it is appropriate for the nurse to order additional medication. R. 311-12 at 332:22–335:3. CHC/HPL's representative also testified that she believed that "the pharmacy" does not permit a reorder of any given medication until the facility's stock was less than seven-days' worth of the medication. R. 311-12 at 327:6-15, 335:8-18.

Nurse Clauson testified that she ordered medications for the Jail from Diamond Pharmacy Services, and that Diamond's rules prevented her from ordering additional stock of a particular medication until only eight pills of that particular medication remained in the Jail's stock. R. 311-14 at 150:5–152:19. Diamond's

manual states that "reorders will be sent up to a quantity needed to reach the cut date," but it does not explain what a "cut date" is or how to calculate the cut date in order to understand when reorders were permitted. R. 351-17 at 3. Diamond's manual is part of the record but Plaintiff has not cited any provision in the manual that requires a nurse to wait to order additional pills until there are only eight pills in stock. *See id.* Nurse Clauson also testified that she could order medication from an alternate pharmacy, Health Mart Pharmacy, R. 311-14 at 166:6-14, and that CHC/HPL did not give her any instruction about when she should or could reorder medications. R. 311-14 at 152:20-22.

Nurse Clauson ordered 30 Dilantin pills from Diamond on May 19, 2010, and did not place another order until she ordered 30 more pills on September 3. R. 336-7 at 126, 128. There is no evidence that Nurse Clauson placed any other orders for Dilantin during that time period, whether from Diamond, Health Mart, or any other pharmacy. The Medical Defendants cite a chart created by Plaintiff's counsel to contend that no detainees received Dilantin between May 19 and September 3, meaning that the Jail had 30 Dilantin pills in stock on September 3. R. 334 ¶ 44 (citing R. 317-11). Plaintiff contends to the contrary that if Nurse Clauson could not order more Dilantin until there were only eight pills left in the Jail's stock (as she testified), then when Nurse Clauson ordered more Dilantin on September 3 there could not have been more than eight Dilantin pills remaining in the Jail's stock that day. R. 334 at 17-18.

Based on the Jail's record showing Dilantin usage between September 3 and September 15, if Plaintiff's re-order scenario is correct there were 30 Dilantin pills in stock at the beginning of the day on September 15. *See* R. 334 ¶ 24. By contrast, if the Medical Defendants' re-order scenario is correct there were 42 Dilantin pills in stock at the beginning of the day on September 15. *See* R. 334 ¶ 44. There was one other detainee receiving Dilantin while Awalt was in the Jail. R. 336-7 at 134. The Jail's records also show that both Awalt and the other detainee received a total of 26 Dilantin pills from September 15 through September 17. *See* R. 336-7 at 134; R. 311-15. If Plaintiff's re-order scenario is correct, and the Jail had only 30 Dilantin pills in stock on September 15, and Awalt and the other detainee used 26 of those pills through September 17, then by the morning of September 18 the Jail had only four Dilantin pills left in stock. Awalt and the other detainee each required four pills every day. *See* R. 311-15; R. 336-7 at 134. Nurse Clauson ordered more Dilantin on September 17, but it did not arrive at the Jail until September 20, after Awalt had already died. There is no evidence in the record that Nurse Clauson ordered Dilantin from any pharmacy other than Diamond while Awalt was in the Jail.

Officer Obrochta was on duty at the Jail on September 14, 17, 18, and 19 from 7:00 p.m. to 7:00 a.m. R. 311-3 at 165:3-21. Officer Obrochta testified that he did not do anything to ensure that Awalt received his medication. R. 311-3 at 196:15-21. Officer Obrochta also testified that he never saw anyone give Awalt any medication. R. 311-3 at 153:1-8.

Superintendent McComas was on duty at the Jail for various shifts on September 14, 15, 16, and 17. R. 336-6 at 340. Despite his conversation with Plaintiff regarding Awalt's medical condition, and his assurances that Awalt would receive the medication he required, Superintendent McComas testified that he did not ever personally see Awalt receive any medication. R. 311-2 at 112:3-7. Superintendent McComas was able to view the footage from the jail's security cameras on his computer whenever he wanted. R. 311-2 at 90:19-21.

Officer Matteson was on duty at the Jail from 7:00 a.m. to 7:00 p.m. on September 17, and for six hours on September 18. R. 336-6 at 342. Officer Matteson knew that Awalt required medication to treat seizures. R. 311-13 at 207:7–212:16. Officer Matteson, however, never provided any medication to Awalt, *id.* at 218:10-13, and Officer Matteson never checked to make sure that another correctional officer had given Awalt his medication. *Id.* at 213:1-9, 215:19–216:16.

On the morning of September 19, Awalt was moved to Section C in the Jail. R. 311-33 at 137:8-9. Later that day, at about noon, Officer Van Cleave called Dr. Cullinan to tell him that Awalt was being belligerent and Officer Van Cleave was afraid Awalt might hurt himself. R. 311-25 at 208:11-15. According to the County and Sheriff Marketti, Officer Van Cleave and Dr. Cullinan discussed "Awalt's physical and/or medical health condition." R. 336-6 at 280 (¶ 5). Dr. Cullinan asked whether Awalt had acted like this before, and if Awalt was allergic to Benadryl. R. 311-25 at 207:3–209:12. Dr. Cullinan prescribed Benadryl to calm Awalt down. See R. 336-3 at 1.

On September 19, at about 4:30 p.m., Awalt was found unconscious and not breathing in his cell. R. 329 ¶¶ 34-35. He was taken to the hospital where he died shortly after midnight on September 20. *Id.* ¶¶ 41-42. The coroner found that Awalt suffocated because he put a sock in his mouth during a seizure. R. 311-48 at 212:21–213:8. Plaintiffs' experts testified that the level of Dilantin in Awalt's blood at the time of his death demonstrates that he had not been given Dilantin while he was in the Jail. R. 336-3 at 185; 336-3 at 147-48; 336-3 at 159.

Shortly after Awalt was taken to the hospital, Superintendent McComas and Sheriff Marketti had a conversation on the phone about the surveillance video. R. 344 ¶ 66. The County and Sheriff's Officer's representative testified that "a death investigation" would "fall within that category where the Sheriff's Department and the jail would have a practice of retaining the video." R. 336-6 at 164:5-19. After speaking with Marketti, Superintendent McComas preserved certain excerpts of video from September 19 (the day Awalt was taken to the hospital). R. 344 ¶ 66. Superintendent McComas did not preserve video from any day other than September 19. *Id.* Twenty-two days later, the video Superintendent McComas did not preserve was recorded over due to the regular functioning of the surveillance system. *Id.*

Superintendent McComas testified that he did not preserve the video for the purposes of the investigation into Awalt's death. R. 311-2 at 360:6–361:7. He now states in an affidavit, however, that he did preserve the video for the purposes of the investigation into Awalt's death. R. 311-33 ¶ 5. Superintendent McComas also

states in his affidavit that he did not preserve the video in anticipation of litigation regarding Awalt's death. R. 311-33 ¶ 5.

## II. Health Care Policies and Practices at the Grundy County Jail

Beginning on December 1, 2008, Grundy County had a contract with HPL (a wholly owned subsidiary of CHC, R. 334 ¶ 3) to provide "health care services and related administrative services at the JAIL." R. 336-4 at 94 (¶ 1.0) (emphasis in original). The contract required HPL to provide a nurse at the jail ten hours per week, a doctor at the jail one hour per week or two hours every other week, and "an on-call physician and/or nurse 24 hours per day and seven days per week." *Id.* at 98 (¶¶ 2.0.1-2, 2.0.4). The contract also provided that "HPL shall provide monitoring of pharmacy usage as well as development of a Preferred Medication List." *Id.* at 96 (¶ 1.14).

The contract further provides that "HPL shall conduct an ongoing health and mental health education and training program for the COUNTY Deputies and Jailers in accordance with the needs mutually established by the COUNTY and HPL." *Id.* at 99 (¶ 3.0) (emphasis in original). The County and the Sheriff's Office, however, determined that they did not need HPL to provide "health training for correctional officers," because the Jail "covers training for [correctional officers] and is determined by the jail not only by HPL." R. 336-8 at 533. Superintendent McComas testified that HPL provided training. R. 311-2 at 142:23–146:16. Officers Obrochta and Sealock testified, however, that they were not trained to distribute medications and document their distribution. R. 311-3 at 90:10-23; R. 311-43 at

15:1-3, 21:11-13. The Sheriff's Office could not identify any records documenting training of its correctional officers. R. 336-4 at 251-52 (52:9–55:19).

The correctional staff at the jail retained responsibility for administering medication and for reporting medical conditions requiring the attention of the medical staff. R. 311-42 at 205:3-13; R. 311-13 at 25:10-26-9; R. 311-03 at 100:8-14; *see also* R. 336-8 at 533 ("ALL security staff has responsibility for making sure inmates healthcare needs are addressed when nurses are not on site."). Superintendent McComas, Officers Obrochta, Thorson, Peterson, and Matteson, and Nurse Clauson all testified that CHC/HPL policy was for correctional officers to record medication administration on the appropriate form. R. 329 ¶ 15.

The correctional officers were not trained to recognize or attend to detainees suffering seizures. R. 336-4 at 124:11–125:8. A detainee testified that he overheard Officer Van Cleave say to Awalt as he was being taken to the hospital, "stop faking seizures, that's not what they look like." R. 336-6 at 253-54 (113:24–115:3-15; 117:1-18), 257 (127:2-16). Besides this lack of training, the Jail had no written policy regarding when an officer should call for medical assistance. Rather officers had discretion to decide what medical issues required medical assistance. R. 344 ¶ 16.

Neither the Jail nor CHC has a written policy or procedure for monitoring or retaining grievances filed by detainees. R. 344 ¶ 22; R. 350 ¶ 22. At the request of the Sheriff's Office, CHC removed the grievance policy it normally includes in its contracts. R. 350 ¶ 22; R. 336-8 at 532. The practice at the Jail was to give medical grievances to Nurse Clauson. R. 311-25 at 129:13-17; R. 311-2 at 296:16-19; R. 336-

10 at 231 (356:8-357:18). According to Plaintiff's expert and the testimony and affidavits of several detainees, delays in responses to grievances and provision of medical care were commonplace at the Jail. *See* R. 336-7 at 61-62 (¶ 146); R. 336-5 at 243-44 (52:22–56:15); R. 335-6 at 2; R. 336-6 at 184 (250:7–252:7); R. 336-9 at 96 (¶ 7); R. 336-9 at 100 (¶ 10); R. 336-9 at 103 (¶ 10); R. 336-9 at 107 (¶ 13). Detainees also testified that the Jail staff did not explain how to file a grievance. R. 336-9 at 78 (84:17–85:24); R. 336-5 at 304-05 (10:17–11:6); R. 336-6 at 17-18 (57:6–59:17). One detainee testified that Officer Van Cleave threatened retaliation if he asked for grievance forms too often. R. 336-9 at 254-55 (45:2–46:5).

Plaintiff's expert, Dr. Greifinger, testified that Dr. Cullinan's standard of care fell below the standard of care for a correctional facility. R. 336-8 at 381 (128:22–129:5). Dr. Greifinger's review of all inmate and medical files produced by the Sheriff and CHC/HPL reveals that 24 of the detainees booked at the Jail in the three months leading up to and including Awalt's incarceration, identified a medical issue at intake. R. 336-7 at 51-52 (¶¶ 114), 60 (¶ 143c). Of those 24 individuals, seven detainees (including Awalt), or 29%, were denied timely access to care or received care that fell far below the standard for correctional health care. *Id.*; *id.* at 65-70. In Dr. Greifinger's opinion, based on his experience and visits to several hundred jails across the United States, this was a high rate of substandard care that suggested systemic failures in the policies and practices of the County, Sheriff's Office, and CHC/HPL. R. 336-7 at 63-64 (¶ 153).

The following is a summary of Dr. Greifinger's analysis of the records of the six detainees (besides Awalt) who, in his opinion, received a level of medical care that fell below the standard of care for a correctional facility:

- Detainee M.B. arrived at the Jail on August 24, 2010 and reported that he had a history of asthma, arthritis, high blood pressure, and ulcers, and that he had previously been hospitalized for mental and/or emotional problems. M.B. was not provided a medical evaluation or medication. The Jail's "refusal to provide care" for M.B. "put him at risk of serious harm." *See* R. 336-7 at 65-66.

- Detainee T.C. arrived at the Jail on August 16, 2010, and reported suffering from a cracked tooth and a hernia. Despite T.C.'s complaints of extreme pain, he was not examined by the Jail's medical staff until October 4, 2010, and was provided only Motrin and Benadryl on September 7-8. T.C. was not examined by the Jail's staff after October 4, and he was released on October 27. The Jail's failure to provide T.C. with dental care put him "at risk of harm from infection," and the Jail's "den[ial] or timely access to care for [T.C.'s] cracked tooth and for his acute back pain . . . . falls far below the standard of correctional care." *See* R. 336-7 at 66.

- Detainee J.D.S. arrived at the Jail on September 4, 2010, and reported high blood pressure and asthma. Two days later he reported severe abdominal pain, chest pain, and a history of hypertension. The medical staff prescribed aspirin and an anti-hypertension medication, but did not examine J.D.S. J.D.S. continued to complain of abdominal pain, but was only given what Dr. Greifinger describes as incomplete examinations by Jail medical staff on September 21, October 15, and October 29. On February 10, 2011, J.D.S. was taken to the hospital where he was diagnosed with a bowel obstruction that required surgery. J.D.S. returned to the Jail on February 13, but he was not examined by the Jail medical staff before his release from the Jail on May 2, 2011. J.D.S.'s condition was diagnosed late due to the inadequate examinations he was given at the Jail. *See* R. 336-7 at 66-68.

- Detainee D.D. arrived at the Jail on June 21, 2010, after being transferred from the hospital with "advice to institute 'suicide precautions.'" D.D. reported to the Jail's staff that he was taking Xanax and Depakote. The medical staff prescribed this medication for him, but it was administered in an inconsistent fashion—notably D.D. went for a month without receiving Xanax—such that D.D. began to suffer withdrawal symptoms. These withdrawal symptoms included severe agitation and anger, which caused D.D. to be placed on lockdown. *See* R. 336-7 at 68-69.

- Detainee G.G. was admitted to the Jail with a preexisting vertebra fracture. Dr. Greifinger notes that there is no record that G.G. received his prescribed pain medication during the 19 hours he was in the Jail. *See* R. 336-7 at 69.

- Detainee S.P. arrived at the Jail on September 2, 2010, and reported a variety of medical issues, including seizures, high blood pressure, mental health problems, and an allergy to Haldol. The medical staff prescribed Dilantin for S.P.'s seizures, but administered it inconsistently, thereby "put[ting] her at risk of harm." S.P. remained at the Jail until November 22, and made several requests for medical attention that were not addressed. For instance, she reported that she had not had a bowel movement in over three weeks, and that a tampon was lodged in her vagina. The medical staff decided to wait for the tampon to come out "on its own," thereby placing S.P. at risk of harm because "that prolonged presence [of the tampon] in the vagina can lead to conditions such as toxic-shock syndrome." *See* R. 336-7 at 69-70.

In addition to S.P., there is evidence in the record that two other people who suffered from seizure conditions received sub-standard medical care while they were detainees at the Jail:

- K.M. testified that when she arrived at the Jail on November 2, 2009, she told the Jail staff that she suffered from seizures and required certain medication. She also testified that the guard repeatedly ignored her requests for medication over the first night she was at the Jail. R. 336-7 at 7 (16:24–17:15), 9 (23:15-20). K.M. began vomiting due to withdrawal. *Id.* at 8 (19:13-24). Hours later, the medical staff visited K.M., but still refused to provide her with any medication. *Id.* at. 10-11 (27:10–31:22); R. 335-16. The next day, K.M. had a seizure during a court appearance and was taken to the hospital. R. 336-7 at 5 (8:1-23).

- N.W. is another former detainee who suffered from seizures. A person who was a detainee with N.W. testified that the medical staff failed to refill his prescriptions. R. 336-6 at 153 (125:24–126:16); R. 336-9 at 144 (147:20–148:5). Other fellow detainees testified that the correctional officers ignored N.W.'s complaints of headaches. R. 336-5 at 314 (47:20–48:14); R. 336-5 at 283-84 (149:21–150:2). Detainees also testified that N.W. subsequently suffered seizures while in the Jail, which the detainees brought to the officers attention. R. 336-5 at 282 (143:4-7, 144:13); R. 336-6 at 92 (204:9-11), 94 (209:2-4). N.W.'s fellow detainees testified that the officers ignored the

seizures and N.W. did not receive medical attention. R. 336-5 at 282-83 (144:12-18, 145:23-146:7); R. 336-6 at 92 (204:12-205:2).[3]

Plaintiff also cites the following additional evidence in the record regarding medical treatment detainees have received at the Jail in the past:

- D.T. suffers from Type 2 diabetes and was detained at the Grundy County Jail from January 26, 2010 to February 24, 2010. R. 335-18; R. 335-19. D.T. testified that he saw a nurse one time while at Grundy County Jail, about one week after he was booked into the Jail, R. 336-9 at 175 (36:1–13), and he never saw a doctor while at the Jail. *Id.* at 176 (38:12-14). D.T. also testified that Officer Van Cleave accused him of faking his symptoms, and frequently provided him with an incorrect or untimely dose of insulin. *Id.* at 179-80 (51:19–56:15). According to D.T., he experienced disorientation and trouble speaking while at the Jail because his diabetes was not under control. *Id.* at 187 (82:15-85:16).

- D.B. suffers from bipolar disorder and manic depressive disorder, and has been detained at Grundy County Jail four times, once each in 2005, 2007, 2009, and 2012. R. 336-9 at 105 (¶¶ 3-4). D.B. takes the medications Seroquel, Lithium, Prozac, and Ambien. *Id.* In 2005, 2007, and 2009, the Jail staff either did not provide D.B. medication at all, or failed to provide him care such that he suffered discomfort and withdrawal during his time in the Jail, and he had to immediately visit a doctor upon release to stabilize his mental health. *Id.* at 106 (¶¶ 6-11). D.B. did receive his medications during his 2012 stay at the Jail because he hired a private attorney to obtain a court order allowing him to bring his medications into the Jail. *Id.* (¶ 10).

- D.W. was detained at the Jail from May 2010 to January 2011. R. 336-6 at 45 (16:3-13). Upon arrival at the Jail, D.W. reported that he had broken his jaw three weeks prior, suffered severe weight loss as result, and suffered from high blood pressure and Hepatitis C. R. 335-21 at 3. D.W. states that he had a prescription for Percoset. R. 335-22 at 13. Instead of Percoset, D.W. received the medications Trazodone, Benadryl, and Ibuprofen during his time at the Jail. Id. at 1-5.

---

[3] Defendants argue that Plaintiff's citation to a complaint in another lawsuit regarding N.W.'s experiences at the Jail cannot constitute admissible evidence in this case. However, Plaintiff also cites deposition testimony about N.W.'s experiences at the Jail that is admissible.

- C.D. states in an affidavit that when he was detained at the Jail in 2007, he told the guards he was taking medication for depression, but he was never provided any medication. *See* R. 336-9 at 163.

- A.R. states in an affidavit that she was detained at the Jail from December 2008 through early January 2009. She states that she reported to the correctional officers that she was taking several medications to treat mental health conditions, including Seroquel, but did not receive any medication for the first three to five days she was in custody. When she did receive medication she received different medication from those she had been prescribed. A.R. states that she suffered anxiety and an inability to sleep from lack of proper medication. *See* R. 336-9 at 101-02.

- B.M. states in an affidavit that he was detained at the Jail for four months beginning in December 2009. He states that he reported to the correctional officers that he was taking several medications for a variety of ailments. He states that he ran out of his medications while he was in the Jail and the Jail did not provide him with additional medication. He states that the denial of his medications caused him pain and withdrawal symptoms. R. 336-10 at 41-42.

In addition to this evidence that the correctional officers and medical staff did not respond to the detainees' verbal requests for medical attention, at least five detainees also specifically testified or stated in their affidavits that they filed grievance or medical request forms that went unanswered, or that they were not told how to file such forms. *See* R. 336-7 at 65 (M.B.); R. 336-9 at 164 (C.D.); R. 336-9 at 78 (84:17–85:24) (T.C.); R. 336-5 at 304-05 (10:17–11:6) (D.D.); R. 336-6 at 17-18 (57:6–59:17) (M.H.).

**Analysis**

**Count I – Deliberate Indifference**

    **A.    The Correctional Officers**

        **1.    Liability**

In Count I, Plaintiff alleges that the correctional officers violated Awalt's civil rights because they knew he was suffering from seizures and ignored him. "Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display deliberate indifference to serious medical needs of prisoners." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (internal quotation marks omitted). This standard also applies to pre-trial detainees once they have received a preliminary hearing, "though pursuant to the Fourteenth Amendment rather than the Eighth Amendment." *Estate of Miller v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012). To establish a deliberate indifference claim under this standard premised upon inadequate medical treatment a plaintiff must show (1) that the plaintiff suffered an objectively serious risk of harm and (2) that the defendant acted with a subjectively culpable state of mind in acting or failing to act in disregard of that risk. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). For a medical condition to satisfy the objective element, the condition must be "diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The "condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary

and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). To satisfy the subjective element, the plaintiff must demonstrate that the defendant knew of a substantial risk of harm to the plaintiff and either acted, or failed to act, in disregard of that risk. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011).

The County Defendants (wisely) do not argue that Awalt's medical condition was not objectively serious. *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) ("Medical conditions much less serious than seizures have satisfied the standard."); *see also Roe*, 631 F.3d at 857 ("A medical condition is considered sufficiently serious if the inmate's condition has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention."). Instead, the County Defendants argue that there is no evidence that Superintendent McComas, Officer Obrochta, or Officer Matteson knew of Awalt's condition and ignored his seizures.

There is simply no question, however, that both Officers and Superintendent McComas knew that Awalt suffered from seizures and required medication for that condition. That information was contained in Awalt's prison records which Officer Obrochta created; Superintendent McComas spoke with Awalt's wife on the phone about his medical condition; and Officer Matteson testified that he was aware of this information.

Despite their knowledge of Awalt's medical needs, Officer Obrochta, Superintendent McComas, and Officer Matteson all deny that they knew that Awalt

was not receiving his medication or that he was suffering seizures while he was in the Jail. There is enough evidence, however, for a reasonable juror to find that they were aware of those circumstances, and ignored them. Several other detainees have testified that Awalt suffered seizures while he was in the Jail, and that correctional officers were aware this was happening because Awalt was constantly complaining that he required medical attention. One detainee testified that he specifically told a correctional officer that Awalt was suffering seizures. Furthermore, the Jail is not a very large facility, and Awalt was in a part of the Jail only five feet from the guard station until September 19 when he was moved to a section only 15 feet away. Additionally, all the correctional officers were either assigned to make rounds checking on detainees or had access to the video monitors. This evidence is a sufficient basis for a reasonable juror to find that Officer Obrochta, Superintendent McComas, or Officer Matteson were deliberately indifferent to Awalt's medical needs.[4]

---

[4] To the extent Plaintiff's claims arose prior to the time of Awalt's preliminary hearing the afternoon of September 15, her claims are evaluated under the reasonableness standard of the Fourth Amendment. *See Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011) ("Our cases thus establish that the protections of the Fourth Amendment apply at arrest and through the *Gerstein* probable cause hearing, due process principles govern pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction."). The following four factors are relevant to determining whether an officer's response to a detainee's medical needs was "objectively reasonable": "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Id.* Since this standard is lower than that for deliberate indifference under the Eighth and Fourteenth Amendments, and the Court has found that there is evidence sufficient to defeat summary judgment under the

## 2. Qualified Immunity

The factual disputes the Court has identified also prevent the Court from granting summary judgment to Superintendent McComas and Officers Obrochta and Matteson on the basis of qualified immunity. "Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013); *see also Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct."). A "plaintiff seeking to defeat a defense of qualified immunity must establish two things: first, that she has alleged a deprivation of a constitutional right; and second, that the right in question was 'clearly established.'" *Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "In undertaking this analysis . . . . [i]t is not enough . . . to say that it is clearly established that those operating detention facilities must not engage in cruel or unusual punishment." *Miller*, 698

---

deliberate indifference standard, there is necessarily sufficient evidence to defeat summary judgment under the lower reasonableness standard of the Fourth Amendment.

Additionally, to the extent that the Court has held that the individual correctional officers' liability can be based on a jury's finding that the officers knew or should have known that Awalt was not receiving the medical care and medications he needed, the Court has found that the officers' liability is based on a "failure to intervene," and thus, summary judgment is denied as to Plaintiff's claim for a failure to intervene in Count III with respect to Officer Obrochta, Superintendent McComas, and Officer Matteson. See *Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004) ("[A]n official satisfies the personal responsibility requirement of § 1983 if she acts or *fails* to act with a deliberate or reckless disregard of the plaintiff's constitutional rights.") (emphasis in original).

F.3d at 962. "The way that the right is translated into the particular setting makes a difference." *Id.* "The plaintiff must show that the contours of the right are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The County Defendants contend that the Officers are entitled to qualified immunity "in light of the limited and, in some cases, non-existent information available to them." R. 321 at 11. The County Defendants argue that because the Officers "lacked the requisite degree of personal involvement with, or knowledge of, any failure to dispense medication to Awalt," *id.* at 12, they have immunity for any rights violation they may have committed. As the County Defendants have themselves conceded, however, whether Awalt received his medication is not at issue on this motion. Rather, as the Court discussed, the question is whether there is sufficient evidence for a reasonable juror to conclude that the Officers knew that Awalt was suffering seizures while he was in the Jail and failed to take appropriate action. There is no question that the right to medical assistance for a seizure is "clearly defined," such that a reasonable officer would know that he is violating the detainee's rights by failing to provide medical attention in such circumstances. *See King*, 680 F.3d at 1018 ("Medical conditions much less serious than seizures have satisfied the standard."). Since the Court has found that there are genuine questions of material fact on this issue, the Court will not grant summary judgment to Superintendent McComas, Officers Obrochta, or Officer Matteson on the basis of qualified immunity.

## B.    Dr. Cullinan and Nurse Clauson

### 1.    Liability

In addition to the deliberate indifference allegation against the correctional officers, Plaintiff also alleges in Count I that Dr. Cullinan and Nurse Clauson violated Awalt's civil rights because of their reckless response to (1) Awalt's claim that he was taking Topamax and (2) Awalt's worsening condition while he was in the Jail. In the prison context, "medical professionals . . . are entitled to deference in treatment decisions unless no minimally competent professional would have so responded under the circumstances at issue." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013). "When a medical professional acts in his professional capacity, he may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.*; *see also Youngberg v. Romeo*, 457 U.S. 307, 323 (1982). This standard—"akin to criminal recklessness," *Williams v. Fahim*, 572 Fed. App'x, 445, 448 (7th Cir. 2014)—is high enough such that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner," but is not so high that the plaintiff is "required to show that he was literally ignored." *King*, 680 F.3d at 1019. A prison doctor may exhibit deliberate indifference to a known condition (i) "through inaction," (ii) "by persisting with inappropriate treatment," or (iii) "by delaying necessary treatment and thus

aggravating the injury or needlessly prolonging an inmate's pain." *Gatson v. Ghosh*, 498 Fed. App'x 629, 631-32 (7th Cir. 2012) (citations omitted).

A reasonable juror could find that neither Dr. Cullinan nor Nurse Clauson made a reasoned medical judgment not to prescribe Topamax to Awalt. It is undisputed that Nurse Clauson knew Awalt said he was taking Topamax, and that this information was in Awalt's records at the Jail. Nurse Clauson also testified that she decided that she needed five days in order to research Topamax before she again planned to discuss Awalt's Topamax use with him. Yet, the reference book Nurse Clauson says she planned to consult only has a little more than two pages about Topamax and emphasizes that Topamax use should not be stopped suddenly. Nurse Clauson's testimony does not explain why she needed five days to review this material and why she ignored a significant recommendation in the authority she chose to rely upon. A reasonable juror could find that Nurse Clauson's decisions exhibited deliberate indifference.

Dr. Cullinan cannot remember if he knew that Awalt said he was taking Topamax. Evidence in the record, however, indicates that he reviewed records containing this information and discussed them with Nurse Clauson. Moreover, if Dr. Cullinan did not have this information, it was due to his own failure to thoroughly review Awalt's records and communicate with Nurse Clauson. Dr. Cullinan and Nurse Clauson are the only two medical professionals responsible for the detainees in the Jail. Awalt's records and Nurse Clauson's knowledge were the only two sources of professional medical information that Dr. Cullinan had to

consult. Dr. Cullinan does not argue that the fact that Awalt said he was taking Topamax accidently slipped through the cracks, and with such a small universe of information sources it would be difficult to maintain such a contention. If Dr. Cullinan did not know that Awalt said he was taking Topamax, a reasonable juror could conclude that Dr. Cullinan was being deliberately indifferent to Awalt's medical condition in failing to acquire this information.

If Dr. Cullinan knew that Awalt was taking Topamax, a reasonable juror could also conclude that Dr. Cullinan was deliberately indifferent because he failed to prescribe that medication for him. The evidence in the record—both Plaintiff's expert, Dr. Pedelty, and the medical text Nurse Clauson testified she consulted—emphasized that abrupt or sudden withdrawal of Topamax involves great risk to the patient. Further, there is no evidence in the record that Dr. Cullinan or Nurse Clauson would not have been able to acquire Topamax for Awalt if they had tried. A reasonable juror could find that failing to prescribe Topamax under these circumstances exhibited deliberate indifference.

A Fourteenth Amendment violation, however, also requires that the "indifference caused [the plaintiff] some injury." *Gayton*, 593 F.3d at 620. The County Defendants contend that "Awalt's medical records establish that he had never previously been prescribed Topamax." The County Defendants argue that this evidence is "relevant to causation," because "if Awalt had not been taking Topamax when he arrived at the jail, there can be no failure to taper him from that medication." R. 349 at 7-8. As an initial matter, the fact that the medical records

that are in the record for this case do not show that Awalt was prescribed Topamax does not necessarily mean that Awalt was never prescribed Topamax. Awalt would have been the only person who could confirm whether the medical records in evidence reflects the totality of his contact with medical professionals and the medications they prescribed for him. Thus, the fact that there are no medical records in evidence that Awalt was prescribed Topamax is not a basis to find that no reasonable jury could determine that he was taking Topamax.

Moreover, Awalt's statement, memorialized in the Jail's records, that he was taking Topamax is evidence that this is true, at least at this stage of the case. There is no reason to believe that Awalt was lying since it is highly unlikely that he was anticipating his own death and plotting this litigation. The reliability of Awalt's statement is further corroborated by Dr. Pedelty's testimony that Topamax is not a well-known drug, and that Awalt's statement that he was taking Topamax makes it likely that it had in fact been prescribed for him. Thus, there is sufficient evidence of causation for this question to go to the jury.[5]

### 2. Qualified Immunity

Dr. Cullinan and Nurse Clauson also argue that they are entitled to qualified immunity. However, "[i]t is all but certain in this circuit that private doctors

---

[5] As with the correctional officers' liability under Plaintiff's claim for "failure to intervene" in Count III, to the extent that the Court has held that Dr. Cullinan and Nurse Clauson can be liable based on a jury's finding that they knew or should have known that Awalt was not receiving the medical care and medications he needed, the Court has found that their liability is based on a "failure to intervene," and thus, summary judgment is denied as to Count III with respect to Dr. Cullinan and Nurse Clauson. *See Fillmore*, 358 F.3d at 506.

providing medical services to inmates are not entitled to assert qualified immunity." *Ford v. Ghosh*, 2014 WL 4413871, at *9 (N.D. Ill. Sept. 8, 2014) (citing *Currie v. Chhabra*, 728 F.3d 626, 631-32 (7th Cir. 2013)). Without "definitively decid[ing] the issue," the Seventh Circuit has noted that it finds persuasive the Sixth Circuit's holding, and application of recent Supreme Court precedent, that "a doctor providing psychiatric services to inmates at a state prison is not entitled to assert qualified immunity." *Currie*, 728 F.3d at 632. This is certainly a strong enough statement from the Seventh Circuit for this Court to find that qualified immunity is not available for Dr. Cullinan and Nurse Clauson.

In any event, it cannot be denied that Awalt's right to the medication he needed to control his seizure condition is "clearly established." The Court has found that questions of fact exist regarding whether Dr. Cullinan and Nurse Clauson were deliberately indifferent to Awalt's medical needs. Thus, neither Dr. Cullinan nor Nurse Clauson are entitled to qualified immunity.

### C. The County, the Sheriff's Office, CHC and HPL

Beyond the deliberate indifference allegations against Dr. Cullinan, Nurse Clauson, and the individual correctional officers, Plaintiff also alleges in Count I that the Sheriff's Office and CHC/HPL were deliberately indifferent to Awalt's medical condition for the following reasons: (1) Superintendent McComas, Dr. Cullinan, and Nurse Clauson were final policymakers or were delegated final policymaking authority, and their actions caused Awalt's death; (2) the Sheriff's Office and CHC/HPL's failure to institute (a) a grievance mechanism, (b) an

oversight or continuous quality improvement program, and (c) a policy of weaning detainees off of medications, caused Awalt's death; (3) the Sheriff's Office and CHC/HPL's failure to provide health care training to the correctional officers caused Awalt's death; (4) the Sheriff's Office and CHC/HPL have a widespread practice of denying medical care to detainees at the Jail that caused Awalt's death; and (5) the Sheriff's Office and CHC/HPL's policy of limiting reordering of medication caused Awalt's death.

Although "a municipality cannot be held liable under § 1983 on a respondeat superior theory," "municipalities and other local government units [are] included among those persons to whom § 1983 applies." *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 690-91 (1978); *accord Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). "A local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by": (1) "an official with final policy-making authority"; (2) "a governmental practice or custom that, although not officially authorized, is widespread and well settled"; and (3) "an official policy adopted and promulgated by its officers." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Plaintiff argues that the Sheriff's Office and CHC/HPL are liable under all three theories and the Court addresses Plaintiff's arguments under each theory in turn.

### 1. Policymaker Theory

Plaintiff argues that Superintendent McComas, Dr. Cullinan, and Nurse Clauson each "was either the final policymaking authority or delegated final

policymaking authority for the [J]ail on all health care-related matters." R. 339 at 29. To create liability for the corporate entity—whether municipal or private—the official in question does not have to be "a policymaker on all matters for the [entity], but . . . [only] a policymaker in [the] particular area, or on [the] particular issue." *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009). The Seventh Circuit has held that the following factors are "helpful in determining whether an official is a final decisionmaker": "(1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Vodak v. City of Chicago*, 639 F.3d 738, 748 (7th Cir. 2011). "But simply because a municipal employee has decisionmaking authority, even unreviewed authority, with respect to a particular matter does not render him a policymaker as to that matter." *Ball v. City of Indianapolis*, 760 F.3d 636, 643 (7th Cir. 2014); *see also Valentino*, 575 F.3d at 675 ("The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."). Rather, a "municipality must have *delegated* authority to the individual to make policy on its behalf." *Ball*, 760 F.3d at 643 (emphasis added). Whether a particular official is a policymaker can be a question of fact for a jury. *See Kujawski v. Bd. of Comm'rs of Bartholomew Cnty.*, 183 F.3d 734, 739 (7th Cir. 1999).

Plaintiff contends that Superintendent McComas was a policymaker for the Jail, whereas the County Defendants argues that "Plaintiff has adduced no evidence that anyone other than Sheriff Marketti was a 'policymaker' for the [J]ail." R. 321 at 17. The County Defendants, however, cannot dispute that the document revising the Sheriff's Office's agreement with CHC/HPL to remove a number of services CHC/HPL generally provides to its clients lists Superintendent McComas as the signatory on behalf of the Sheriff's Office. *See* R. 336-8 at 532-35; R. 333 ¶ 28. Additionally, Superintendent McComas testified that his practice was to forward medical complaints to Dr. Cullinan or Nurse Clauson, and that he could not recall a meeting of a grievance committee at the Jail. Superintendent McComas's decision to pass medical grievances on to the medical staff creates a question of fact as to whether Superintendent McComas created a de facto grievance policy for the Jail. Moreover, Superintendent McComas was the superintendent of the Jail, and the County Defendants have not put forward any evidence to show that Sheriff Marketti exercised any meaningful review of Superintendent McComas's control of the Jail's medical policies. This evidence is sufficient for a reasonable juror to find that the Sheriff's Office delegated policymaking responsibility with respect to the Jail's medical policies to Superintendent McComas.

Although the Medical Defendants do not address the theory that Dr. Cullinan or Nurse Clauson could be policymakers for CHC/HPL, CHC's Chief Operating Officer, Dr. Larry Wolk, testified that he was final policymaker with respect to "inmate complaints regarding health care" at the Jail. R. 336-4 at 137 (87:6-14). Dr.

Cullinan testified by interrogatory, however, that he did not have a supervisor. R. 336-8 at 500 (¶ 12). Dr. Cullinan also testified at his deposition that he could not remember any information he reported to Dr. Wolk regarding the Jail, and that he did not remember any specific or general practice he had of making such reports. R. 336-3 at 30:21–31:10. This evidence is sufficient for a reasonable juror to conclude that Wolk delegated policymaking for medical practices at the Jail to Dr. Cullinan.

Plaintiff highlights the discretion Nurse Clauson wielded in her position to argue that she was a policymaker. But there is no dispute that Nurse Clauson was supervised by Dr. Cullinan. Furthermore, Nurse Clauson's decisions regarding how to handle detainee grievances and treat detainee medical conditions are not policymaking decisions. Rather, these decisions are discrete exercises of discretion that nearly all professionals make every day. *See Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir. 2001) ("Every public employee, including the policeman on the beat and the teacher in the public school, exercises authority ultimately delegated to him or her by their public employer's supreme governing organs. . . . [But] if a police department or school district were liable for employees' actions that it authorized but did not direct, we would be back in the world of respondeat superior."). There is no evidence in the record that the County, the Sheriff's Office, CHC/HPL, or Dr. Cullinan intended to delegate any policymaking authority to Nurse Clauson beyond her discretion to make day-to-day decisions regarding the detainees' medical care. Thus, Nurse Clauson's actions cannot be a basis for liability of the Sheriff's Office or CHC/HPL.

## 2. Widespread Custom or Practice Theory

"To demonstrate that [a municipal entity] is liable for a harmful custom or practice, the plaintiff must show that [the municipal entity's] policymakers were 'deliberately indifferent as to [the] known or obvious consequences.'" *Thomas*, 604 F.3d at 303 (quoting *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002)). "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Thomas*, 604 F.3d at 303. "[T]here is no clear consensus as to how frequently [certain] conduct must occur to impose *Monell* liability [under the custom and practice theory], except that it must be more than one instance, or even three." *Id.* (internal quotation marks and citations omitted). While the number of incidents is relevant to whether an implicit policy exists, the Seventh Circuit has made clear that, absent an express policy, *Monell* liability is only appropriate where the "plaintiff [can] introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006) (the evidence must be such that the plaintiff can "weave . . . separate incidents together into a cognizable policy"). Additionally, for a municipality to be liable, the causal relationship between the policy or practice and the harm must be such that the policy was the "moving force behind the constitutional violation." *City of Canton v. Harris*, 489 U.S. 378, 379 (1989); *accord Teesdale v. City of Chicago*, 690 F.3d 829, 833 (7th Cir. 2012).

Furthermore, the Seventh Circuit has held that a municipal defendant "cannot shield itself from § 1983 liability by contracting out its duty to provide services." *King*, 680 F.3d at 1020. "[T]he private company's policy becomes that of the County if the County delegates final decision-making authority to it." *Id.*

Like municipalities, "[p]rivate corporations acting under color of state law may . . . be held liable for injuries resulting from their policies and practices." *Rice v. Correctional Med. Servs. of Ill., Inc.*, 675 F.3d 650, 675 (7th Cir. 2012); *see also Shields v. Ill. Dep't of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014) ("Most defendants under § 1983 are public employees, but private companies and their employees can also act under color of state law and thus can be sued under § 1983."). "[A] corporate entity violates an inmate's constitutional rights if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." *Woodward v. Correctional Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004).

### a.     Failure to Implement a Grievance Mechanism

Plaintiff argues that the Sheriff's Office and CHC/HPL's decision not to implement a standardized grievance mechanism led to a widespread practice at the Jail of ignoring or delaying response to grievances and medical requests made by detainees. R. 339 at 36. Plaintiff contends that the Sheriff's Office's successful endeavor to convince CHC/HPL not to implement a grievance mechanism is evidence of deliberate indifference to detainee medical needs on the part of both the Sheriff's Office and CHC/HPL. The County Defendants and the Medical Defendants

argue that there is no evidence that grievances and medical request forms were not reviewed. *See* R. 349 at 18; R. 348 at 11.

Contrary to the Defendants' denials, however, several detainees testified that officers at the Jail routinely failed to respond to grievance and medical request forms. One detainee also testified that he saw Awalt submit "a lot" of medical request forms which were collected by officers. R. 311-18 at 30:5-6. The County Defendants argues that "Plaintiff has produced no evidence of a widespread custom or practice that put the Sheriff's Office on notice that there were such problems with these topics, or that such problems directly caused Awalt's death." R. 348 at 11. There is sufficient evidence, however, in the deposition testimony and affidavits of detainees at the Jail that Jail officers routinely ignored grievances. Further, Plaintiff's expert testified that a failure to routinely address detainee grievances created a substantial risk of injury. R. 336-7 at 61-62 (¶ 146). *See also Thomas*, 604 F.3d at 304 ("The dangers of delayed responses to medical requests are readily apparent . . . ."). This is sufficient evidence for a reasonable jury to find a "cognizable policy," *Phelan*, 463 F.3d at 790, of failing to establish a reliable grievance process.

Furthermore, this evidence is also a sufficient basis for a reasonable jury to find that this failure was the moving force behind Awalt's death. A reasonable jury could conclude that if the Jail had a practice of routinely following up with grievances and medical requests that Awalt's condition would have been addressed. And furthermore, a reasonable jury could also find that if Awalt's condition had

been addressed, the seizure that led to his death would have been prevented or treated such that it would not have caused his death.

      **b.**     **Failure to Implement a Continuous Quality Improvement Program**

Plaintiff argues that the Sheriff's Office and CHC/HPL's decision not to implement a continuous quality improvement program led to widespread practices at the Jail of failing to engage in "self-critical analysis . . . tantamount to a deliberate decision to blind themselves to ongoing medical care failures at the Jail." R. 339 at 36. As with her argument regarding the lack of a grievance policy, Plaintiff contends that the Sheriff's Office's successful endeavor to convince CHC/HPL not to implement an improvement program is evidence of deliberate indifference to detainee medical needs on the part of both the Sheriff's Office and CHC/HPL.

Unlike the evidence relevant to the Jail's grievance mechanism, a reasonable juror could not conclude that the Sheriff's Office and CHC/HPL's failure to implement a quality improvement program at the Jail caused Awalt's death. Although Plaintiff's expert testified that the Jail should have a quality control program, he did not testify that the lack of such a program created a substantial risk of injury, as he did with respect to the lack of a grievance mechanism. Furthermore, unlike the evidence that Awalt submitted grievance forms that went unaddressed, there is no evidence that a quality control program would have caused any of the individual defendants to take different actions that would have resulted in Awalt receiving different medical care. The patently serious nature of seizures is

such that both the correctional officers and Dr. Cullinan and Nurse Clauson should have addressed Awalt's condition if they knew about it. There is no reason to believe that a quality control program would have added anything to the relevant individuals' ability to address Awalt's needs. Thus, there is no basis for a reasonable juror to conclude that the lack of a quality control program caused Awalt's death.

### c. Failure to Properly Wean Detainees Off of Medication

Plaintiff argues that "[t]he County and CHC/HPL had no policy for weaning detainees off medication." R. 339 at 37. Plaintiff, however, has not explained why the Sheriff's Office and CHC/HPL should have a general policy in this area when common sense says that changes to a detainee's medication regimen should be individually tailored to each detainee, as they are when initially prescribed. As the Court discussed above, there are questions of fact regarding whether Nurse Clauson and Dr. Cullinan appropriately responded to Awalt's statement at in-take that he was taking Topamax, including consideration of the proper process for weaning him from that drug if necessary. But there is no evidence (from Plaintiff's experts or otherwise) that it would have been medically appropriate for the Sheriff's Office or CHC/HPL to have a general policy for weaning detainees off medication, or that the lack of such a general policy caused Awalt's death. Absent such evidence, a reasonable juror could not conclude that the Sheriff's Office or CHC/HPL is liable for Awalt's death for failing to implement such a policy. *See Fitzgerald v. Greer*, 324 Fed. App'x 510, 515 (7th Cir. 2009) (a deliberate indifference analysis does not call for the court to "second-guess [doctors' treatment] decisions"). Thus, summary

judgment is granted in the Sheriff's Office and CHC/HPL's favor on Plaintiff's theory that they were deliberately indifferent to Awalt's medical needs by failing to have a policy for weaning detainees off medications.

### d.    Failure to Train

"The failure to provide adequate training to its employees may be a basis for imposing liability on a municipality or private corporation, but as with any other policy or practice for which the plaintiff seeks to hold the municipal or corporate defendant liable, the plaintiff must show that the failure to train reflects a conscious choice among alternatives that evinces a deliberate indifference to the rights of the individuals with whom those employees will interact." *Rice*, 675 F.3d at 675.

There is a dispute as to the extent of the medical training the officers at the Jail received. R. 329 ¶¶ 71-72. Plaintiff cites testimony by the County's representative and correctional officers to the effect that there either was no training or minimal training. *See id.* ¶ 71. The County Defendants and the Medical Defendants point to a three ring binder with information regarding documentation of medication distribution, and a copy of a power point presentation that could be used for training correctional officers. *Id.* ¶ 71-72. Plaintiff argues, however, that there is no evidence that this power point presentation was ever used. *Id.* ¶ 72. Although the evidence the Medical Defendants rely on indicates that some training may have taken place, the testimony from correctional officers that they did not receive training, the failure by the Sheriff's Office to produce any records of

training, and CHC/HPL's agreement to remove the training provision from its contract with the Sheriff's Office is sufficient to create a question of fact regarding whether there was training, and thus, whether the Sheriff's Office and CHC/HPL were deliberately indifferent to the medical needs of detainees at the Jail.

It is not clear, however, that more comprehensive training would have necessarily saved Awalt's life. Plaintiff's own expert testified that the "corrections officers did not need any special training to determine whether Robert Awalt was having a seizure if he was having seizures as described by the [other detainees at the Jail]." R. 316-9 at 89:4-10. And as Plaintiff's expert noted, other detainees have testified that they noticed Awalt having seizures and thought it appropriate to seek assistance from the correctional officers. Even if the officers could not immediately or accurately identify Awalt's condition as a seizure, they would certainly have known that Awalt required medical attention and that they should call for that attention (and ensure that he did not choke on a sock).

Nevertheless, correctional officers must be permitted a certain level of discretion in determining which medical conditions merit alerting medical professionals. Not every pain is a sign of a more dangerous medical condition and correctional officers likely need to be trained to determine which conditions warrant professional medical attention. A reasonable jury could find that the lack of training at the Jail was so stark that the correctional officers were left without any reasonable frame of reference to determine when the attention of a medical professional was required. Common sense says that more training would create in

the correctional officers a heightened awareness of, and sensitivity to, the detainees' medical needs. Regardless of whether training could change the correctional officer's ability to determine when a medical condition required professional attention, a reasonable jury could conclude that more extensive training would simply have made it more likely that a correctional officer would have been motivated to alert a medical professional to Awalt's condition in time to prevent his death. Although it is a close question on this factual record, the Court finds that there is sufficient evidence for a reasonable jury to find that the Sheriff's Office and CHC/HPL's failure to train the correctional officers caused Awalt's death.[6]

###   e.   Failure to Provide Necessary Medical Care or Medication

Plaintiff argues that the Sheriff's Office and CHC/HPL's motions for summary judgment on Plaintiff's *Monell* claims should be denied because the Sheriff's Office and CHC/HPL had a widespread custom or practice of failing to provide necessary medical care or medication to detainees at the Jail. The County Defendants and the Medical Defendants argue that there is an insufficient number of incidents in the record to establish a custom or practice, and the incidents in the record are not sufficiently similar to Awalt's case.

---

[6] Plaintiff also argues that the failure to train could have left the correctional officers without the ability "to understand the importance of providing timely medication to Awalt." R. 339 at 39. This argument is not viable. If the officers were told to give Awalt certain medication at certain times, no other training was required than that the officers be trained to follow the instructions of the medical professionals. Plaintiff does not argue that the officers were not trained to do so.

Plaintiff has highlighted evidence showing that three detainees besides Awalt had seizure conditions, and were either not provided the medication they required or were ignored by the correctional officers while they suffered seizures at the Jail. Plaintiff has also identified six other detainees who did not receive the medical care or medication they needed while they were at the Jail. Furthermore, Plaintiff's expert has testified that of the 24 detainees booked at the Jail during the three months leading up to Awalt's booking, seven (including Awalt) identified a medical issue at intake, but were denied timely access to medical care or received medical care that fell far below the standard for correctional health care. Plaintiff's expert also testified that this rate of failure to provide medical care indicated that there was a systemic failure to provide medical care at the Jail. This is sufficient evidence for a reasonable jury to find that the Sheriff's Office and CHC/HPL had an implicit policy of deliberate indifference to the medical care provided to detainees.

The County Defendants also contend that the denials of medical care Plaintiff cites are not "sufficiently similar" to Awalt's experience. The County Defendants argue that Awalt must show that the Sheriff's Office and CHC/HPL have a widespread practice of causing detainee deaths by denying them anti-seizure medication. The County Defendants cite *Hahn v. Walsh*, 762 F.3d 617 (7th Cir. 2014), in which the plaintiff claimed that his wife's death was caused by a jail's failure to have a policy to treat a diabetic detainee who refused to participate in her own care. The plaintiff in *Hahn* relied of evidence that seven other detainees had died in the defendant's jail from causes unrelated to diabetes. The court held the

seven deaths were insufficient to alert the jail to any problem with its policy (or lack of a policy) for treating detainees like the plaintiff's wife. *Id.* at 637. Here, by contrast, Plaintiff does not claim merely that the Sheriff's Office and CHC/HPL have a policy of specifically denying detainees anti-seizure medication. Rather, Plaintiff argues that the Sheriff's Office and CHC/HPL are reckless in their medical care of detainees generally, and Awalt's death was caused by this general recklessness. In this case, evidence that detainees did not receive proper medical attention or were denied their medication is sufficiently similar to Awalt's experience because he too did not receive proper medical attention or medication.

The County Defendants also argues that even if CHC/HPL was deliberately indifferent to the detainees medical care, the Sheriff's Office cannot be liable for CHC/HPL's practices unless the Sheriff's Office was "on notice" that CHC/HPL's practices were deficient. R. 348 at 11. The County Defendants cite *King v. Kramer*, 763 F.3d 635 (7th Cir. 2014), in support of its argument, but in that case (in two separate opinions) the Seventh Circuit also held that it was proper to deny summary judgment to the defendant county because the jury could find that it delegated decision-making authority to the medical provider. *See King*, 763 F.3d at 648 ("We were concerned about the Sheriff's Office's potential delegation of final decision-making authority to HPL . . . . Even if the County retained final decisionmaking authority, we noted that the County 'was on notice that HPL's physician- and medication-related policies were causing problems at the jail' . . . ."); *King*, 680 F.3d at 1021 ("The County's express policies as embodied in the contract

44

show that the County delegated to HPL final authority to make decisions about inmates' medical care. . . . Even if the County had not delegated final decision-making authority to HPL, it was on notice that HPL's physician- and medication-related policies were causing problems at the jail."). Notably, HPL was also the medical provider in *King*, and the language in the contract between the county and HPL in *King* that formed the basis for the Seventh Circuit's affirmance of the district court's denial of summary judgment to the county, is identical to the language in the contract between the Sheriff's Office and CHC/HPL in this case: "HPL shall provide monitoring of pharmacy usage as well as development of a Preferred Medication List." R. 311-11 at 9 (¶ 1.14). Moreover, the County Defendant's more general argument—citing the language of the contract—that the Sheriff's Office did not "delegate final policymaking authority for medical care to HPL," but "only 'responsibility for administering, managing, and supervising the health care delivery system,'" R. 348 at 13 (citing R. 311-11 at 26), is a distinction without a difference, especially in light of the additional contractual language that CHC/HPL was responsible for "monitoring pharmacy usage." The contract is a sufficient basis for a jury to find that the Sheriff's Office delegated policymaking authority for medical care to CHC/HPL, such that Plaintiff is not required to demonstrate notice to survive summary judgment. *See King*, 680 F.3d at 1020 ("[T]he private company's policy becomes that of the County if the County delegates final decision-making authority to it.").

### 3. Express Policy Theory

The parties dispute whether the Sheriff's Office and CHC/HPL had an express policy that prevented Nurse Clauson from restocking a particular medication until there were only eight pills left in stock. Nurse Clauson testified that it was Diamond Pharmacy's rules that prevented her from restocking a medication until the pill count fell to eight, and the Medical Defendants argue on that basis that CHC/HPL was merely complying with pharmacy policy, not creating its own policy. But CHC/HPL's representative also testified that CHC/HPL told its nurses to follow pharmacy rules when restocking medication. In so instructing its nurses, CHC/HPL abdicated its responsibility to ensure that the Jail had sufficient medication to satisfy the needs of the detainees in the Jail at any given time, in favor of a policy that assumed that eight pills of any given medication would be sufficient to satisfy whoever happened to be detained at the Jail from the time the order was placed until it was filled. The evidence suggests that re-ordering did not result in an immediate delivery, even if a detainee's needs were immediate. And why a medical provider would abdicate its responsibility to provide timely medication because of a private pharmacy's "policy" is inexplicable. Perhaps an explanation will be made at trial. Nurse Clauson's testimony is a sufficient basis for a reasonable juror to conclude that CHC/HPL had a medication reordering policy that constituted deliberate indifference to Awalt's medical needs.

The Medical Defendants also argue that this policy was not the moving force behind Awalt's injuries because the Jail had sufficient Dilantin in stock while Awalt

was in the Jail. But the parties dispute whether the Jail ran out of Dilantin while Awalt was there. The Medical Defendants highlight the fact that Nurse Clauson ordered 30 pills of Dilantin in May and that the Jail's records do not reflect that these pills were used until September, in which case there would have been sufficient Dilantin for Awalt and the other detainee taking Dilantin while Awalt was in the Jail. Plaintiff, however, argues that Nurse Clauson testified that she was prevented from ordering additional stock of a particular medication until only eight pills of the medication were remaining, so that when Nurse Clauson reordered Dilantin on September 17, there must have been only eight pills remaining in stock, which would have been insufficient to satisfy the needs of both Awalt and the other detainee until September 20, the day the September 17 order was delivered (both Awalt and the other detainee required four pills per day). Nurse Clauson's testimony is a sufficient basis for a reasonable juror to conclude that the Jail ran out of Dilantin while Awalt was there, and that was the moving force behind Awalt's death.

The County Defendants argues that even if CHC/HPL had a policy of not restocking a medication until there were only eight pills left, the Sheriff's Office cannot be liable for this policy because "the County [did not have] 'notice' that HPL's policies 'were causing problems at the jail.'" R. 348 at 16-17. This argument fails because, as the Court discussed above with reference to Plaintiff's allegations that the Sheriff's Office and CHC/HPL had practice of failing to provide medical care or medication to detainees, there is sufficient evidence for a reasonable jury to

conclude that the Sheriff's Office delegated policy making authority regarding medical care and medication distribution to CHC/HPL.

## Counts II: Conspiracy

"[T]o prevail on [a] Section 1983 conspiracy claim, [a plaintiff] must prove: (1) an express or implied agreement among defendants to deprive [the plaintiff] of his constitutional rights, and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Cook v. City of Chicago*, 2014 WL 4493813, at *6 (N.D. Ill. Sept. 9, 2014) (citing *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988)). Plaintiffs argue that summary judgment should be denied because "Cullinan and Clauson talked. So did Cullinan and Van Cleave. And so did Clauson and Thorson." R. 339 at 45. After all of the extensive discovery in this case, this evidence amounts to nothing more than "speculation and conjecture," which is not enough to survive summary judgment. *See Sow v. Fortville Police Dep't*, 636 F.3d 293, 304-05 (7th Cir. 2011); *see also Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013) ("[V]ague and conclusory allegations of the existence of a conspiracy are not enough to sustain a plaintiff's burden at summary judgment[.]"); *Cook*, 2014 WL 4493813, at *6 ("The fact that [the defendants] worked together over an extended period of time and that [one defendant] previously approved illegal conduct by [the other defendant] are not alone proof of an agreement . . . ."). Therefore, summary judgment is granted in Defendants' favor on Count II.

**Count IV: Intentional Infliction of Emotional Distress**

Plaintiff also alleges that the Correctional Officers intentionally inflicted emotional distress on Awalt in violation of Illinois law. Under Illinois law, for an intentional infliction of emotional distress claim to be successful, the following elements must be proven: "(1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress." *Swearnigen–El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir. 2010) (citing *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992)). "To meet the 'extreme and outrageous' standard, the defendants' conduct 'must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community.'" *Swearnigen–El*, 602 F.3d at 864 (quoting *Kolegas*, 607 N.E.2d at 211). In determining whether conduct meets the "extreme and outrageous" standard, courts consider three main factors: (1) "the more power or control the defendant has over the plaintiff, the more likely the conduct will be deemed extreme"; (2) "whether the defendant reasonably believed its objective was legitimate"; and (3) "whether the defendant was aware the plaintiff was 'peculiarly susceptible to emotional distress, by reason of some physical or mental peculiarity.'" *Franciski v. Univ. of Chi. Hosp.*, 338 F.3d 765, 769 (7th Cir. 2003) (quoting *McGrath v. Fahey*, 533 N.E.2d 806, 811 (Ill. 1998)). The Illinois Supreme Court has explained, "Conduct is of an extreme and outrageous character where 'recitation of the facts to an average member of the community would arouse his resentment

against the actor, and lead him to exclaim, 'Outrageous!'" *Doe v. Calumet City*, 641 N.E.2d 498, 507 (Ill. 1994) (quoting Restatement (Second) of Torts § 46, cmt. D, at 73 (1965)).

The Court has found that there are questions of fact regarding whether the Officers knew Awalt was suffering seizures and ignored his suffering, such that they can be liable for violating his civil rights. The evidence creating these questions of fact is also a sufficient basis for a reasonable juror to conclude that the Officers are liable for intentional infliction of emotional distress. Assuming that the Officers knew Awalt was suffering from seizures while he was in the jail—as the Court must in considering the evidence in the light most favorable to the Plaintiff— there is no question that their conduct caused Awalt severe emotional distress, since he in fact died. There is also no question that the Officers knew that there was a high probability that ignoring a seizure would cause severe emotional distress. And a reasonable juror could find that ignoring a patently severe medical condition such as a seizure is "extreme and outrageous" conduct, especially because the Officers "had complete authority over [Awalt] because [he] was incarcerated as a pretrial detainee." *See Cobige v. City of Chicago*, 752 F. Supp. 2d 860, 871 (N.D. Ill. 2010).

Additionally, the Officers are not entitled to immunity under the Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/4-105. Under the Act, public employees like the Officers are not "liable for injury proximately caused by the failure of the employee to furnish or obtain medical care

for a prisoner in his custody," unless the employee "knows . . . that the prisoner is need of immediate medical care and, through willful and wanton conduct, fails to [act]." The Seventh Circuit has noted that the "willful and wanton standard is remarkably similar to the deliberate indifference standard." *Pittman v. County of Madison*, 746 F.3d 766, 781 (7th Cir. 2014); *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007). Further, the Seventh Circuit has held that a genuine question of fact regarding whether certain conduct constitutes deliberate indifference also serves as a genuine question of fact regarding whether that conduct was willful and wanton. *See Pittman*, 746 F.3d at 781 ("Accordingly, if [either of the defendant officers] is determined to have been deliberately indifferent to the immediate medical needs of [the plaintiff], the district court also will have to address the liability of these individuals under state law . . . ."). Thus, the Officers are not immune to Plaintiff's intentional infliction of emotional distress claim under 745 ILCS 10/4-105.

The Correctional Officers and the Sheriff's Office are also not entitled to immunity under 745 ILCS 10/4-103, as the County Defendants contend. Under 745 ILCS 10/4-103, "[n]either a local public entity nor a public employee is liable for failure to provide a jail, detention or correctional facility, or if such facility is provided, for failure to provide sufficient equipment, personnel, supervision or facilities therein. Nothing in this Section requires the periodic inspection of prisoners." Plaintiff seeks redress, however, not for a "failure to provide sufficient equipment, personnel, supervision or facilities," but for Awalt's death, which was

caused by such failures. Section 4-103 provides immunity for claims about substandard correctional facilities per se, not claims for injuries those substandard conditions may cause. Thus, 745 ILCS 10/4-103 does not serve to provide immunity to Defendants in this case.

Under 745 ILCS 10/6-105, "[n]either a local public entity nor a public employee acting within the scope of his employment is liable for injury caused by the failure to make a physical or mental examination, or to make an adequate physical or mental examination of any person for the purpose of determining whether such person has a disease or physical or mental condition that would constitute a hazard to the health or safety of himself or others." As discussed with reference to  745 ILCS 10/4-103, however, Plaintiff alleges a failure to address patent medical conditions, whether because the symptoms were obvious or the detainees told the Jail staff that they suffered from certain conditions or requires certain medication. The failure to conduct examinations, to the extent such failures occurred, may be relevant to show that the Sheriff's Office and CHC/HPL had a policy of providing insufficient medical care which caused Awalt's death. But Plaintiff does not allege that the lack of medical examination per se caused Awalt's death. Thus, 745 ILCS 10/6-105 is inapplicable here. *See Harrison v. County of Cook*, 2011 WL 4036115, at *10 n.1 (N.D. Ill. Sept. 12, 2011) ("Section 6-105 speaks to liability flowing from a failure to examine, not to a failure to react to injuries that are patent.") (internal quotation marks and citation omitted).

Under 745 ILCS 10/2-204, "a public employee, as such and acting within the scope of his employment, is not liable for an injury caused by the act or omission of another person," "[e]xcept as otherwise provided by statute." This statute does not abrogate respondeat superior liability, but only grants immunity to public employees in their personal capacity. *See Lopez v. Dart*, 2008 WL 4889088, at *5 n.8 (N.D. Ill. July 17, 2008) ("745 ILCS 10/2-204 . . . protects employees of public entities from being individually liable on a vicarious basis for the conduct of other employees. . . . and does not apply to a public entity's liability for the conduct of one of its employees who is subject to liability.") Plaintiff, however, asserts claims against all Defendants directly, except for claims against the Sheriff in his official capacity, which is the equivalent of suing the Sheriff's Office itself, and CHC/HPL as a corporate entity. Thus, 745 ILCS 10/2-204 does not provide immunity from any of the claims to any of the Defendants.

The County Defendants also cite 745 ILCS 10/2-201 as providing them immunity. Section 2-201 provides that "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." Plaintiff, however, does not claim that any of the individual defendants who are policymakers caused Awalt's death by their policymaking. Rather, the individual defendants are alleged to have caused Awalt's death by their individual conduct. Thus, 745 ILCS 10/2-201 does not serve to provide immunity to any of the Defendants here.

**Counts VII & VIII: Wrongful Death and Survival Act Claims**

The County Defendants argue that the Court should grant summary judgment in their favor on Plaintiffs' Wrongful Death and Survival Act claims because "Illinois law does not recognize an independent cause of action for willful and wanton conduct." R. 321 at 22. Defendants in this case made the same "highly conclusory" argument more than two years ago when pursuing a motion to dismiss, and the Court explained that "Counts VII and VIII . . . are not simply claims for willful and wanton conduct[,] [r]ather they are claims arising under the Illinois Wrongful Death Act and the Illinois Survival Act." R. 76 at 8 (*Awalt v. Marketti*, 2012 WL 1161500, at *4 (N.D. Ill. Apr. 9, 2012)). The County Defendants offer no other argument to support summary judgment, thus their motion for summary judgment on Counts VII and VIII is denied.[7]

**Count XII: Spoliation**

Plaintiff argues that Superintendent McComas spoliated evidence when he saved only a portion of the Jail's surveillance video. Plaintiff also argues that Nurse Clauson spoliated evidence when she destroyed Awalt's grievance forms.

Under Illinois law, "a plaintiff claiming spoliation of evidence must prove that: (1) the defendant owed the plaintiff a duty to preserve the evidence; (2) the defendant breached that duty by losing or destroying the evidence; (3) the loss or

---

[7] Since the Court has denied summary judgment on Plaintiff's intentional infliction of emotional distress claim (Count IV), and Plaintiff's Wrongful Death Act and Survival Act claims (Counts VII & VIII), the Sheriff and CHC/HPL can be liable under a respondeat superior theory and summary judgment on Counts IX and X is denied.

destruction of the evidence was the proximate cause of the plaintiff's inability to prove an underlying lawsuit; and (4) as a result, the plaintiff suffered actual damages." *Martin v. Keeley & Sons, Inc.*, 979 N.E.2d 22, 27 (Ill. 2012). "The general rule in Illinois is that there is no duty to preserve evidence." *Id.* "[I]n order to establish an exception to the general no-duty rule," a plaintiff must first show that a relationship such as "an agreement, contract, statute, special circumstance, or voluntary undertaking has given rise to a duty to preserve evidence on the part of the defendant." *Id.* The plaintiff must then show that the "the duty extends to the specific evidence at issue by demonstrating that a reasonable person in the defendant's position should have foreseen that the evidence was material to a potential civil litigation." *Id.*

### A. Illinois Tort Immunity Act

As an initial matter, the County Defendants argue that Superintendent McComas is immune from Plaintiff's spoliation claim under 745 ILCS 10/2-201, which provides that "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." The County Defendants argue that Plaintiff cannot "question whether the decision to view and preserve only a portion of the Jail's video involved the exercise of discretion, since Plaintiff admits there were not Jail policies mandating under what circumstances video had to be preserved." R.

348 at 19. But Plaintiff has admitted only that there was no "written" policy regarding preservation of video surveillance. R. 329 ¶ 52.

Moreover, the Sheriff's Office's representative testified that "a death investigation" would "fall within that category where the Sheriff's Department and the jail would have a practice of retaining the video." R. 336-6 at 164:5-19. This is evidence that the there was a policy or practice at the Jail that Superintendent McComas should have followed in preserving the surveillance tape, meaning that he did not have unfettered discretion to make that decision. Absent such discretion, Superintendent McComas is not entitled to immunity under 745 ILCS 10/2-201. Thus, the testimony of the Sheriff's Office's representative is sufficient evidence for a reasonable jury to find that Superintendent McComas is not entitled to immunity under 745 ILCS 10/2-201.[8]

---

[8] The County Defendants cite *Moore v. City of Chicago*, 2014 WL 2457630 (N.D. Ill. May 30, 2014), in which the court granted summary judgment to the defendants on a spoliation claim where a police investigator retrieved surveillance video from a convenience store of a police shooting and the immediate aftermath of the shooting, but not video of the evidence-collection process after the shooting. The court in that case, however, did not reach the issue of whether the investigator's decision qualified as "determining policy when acting in the exercise of such discretion" under 745 ILCS 10/2-201, because the court held that 745 ILCS 10/2-201 provided immunity to the defendants for *all* negligence claims. The Illinois Supreme Court, however, has interpreted Section 2-201 to "recognize[] a distinction between 'discretionary duties, the negligent performance of which does not subject a municipality to tort liability, and ministerial duties, the negligent performance of which can subject a municipality to tort liability." *Harrison v. Hardin Cnty. Community Unit Sch. Dist. No. 1*, 758 N.E.2d 848, 852 (Ill. 2001); *accord Lane v. DuPage Cnty. Sch. Dist. 45*, 2014 WL 518445, at *3 (N.D. Ill. Feb. 10, 2014). Thus, this Court will not follow *Moore's* holding that Section 2-201 provides broad negligence immunity.

## B.     Duty to Preserve Evidence

The parties argue over whether the circumstances of Awalt's case satisfy the elements for a duty arising due to "special circumstance" or a "voluntary undertaking" as they are articulated in the case law. But the testimony from the Sheriff's Office's representative that it was the Jail's practice to preserve surveillance video in the context of an event like a detainee dying in custody is evidence that the Jail had a duty of preservation to Awalt even absent evidence of the elements of notice and intent relevant to an analysis of "special circumstances" and "voluntary undertakings." Detainees are dependent on the Sheriff's Office's policies and practices to protect their rights and well-being while they are in custody. To the extent that the Jail assumes responsibility for preserving certain evidence under certain circumstances, the Jail has assumed a duty with respect to the detainees. Thus, the testimony of the Sheriff's Office's representative that it was the Jail's practice to preserve surveillance video in circumstances like Awalt's death is sufficient evidence for a reasonable jury to conclude that the Sheriff's Office had a duty to do so.

Similarly, Sheriff Marketti admitted during discovery for this litigation that the Sheriff's Office "kept health-care related grievances filed by an inmate at the Grundy County Jail in that inmate's file but in no other place." R. 336-9 ¶¶ 46-49. Additionally, Nurse Clauson testified that detainees' medical grievances would be brought to her and she would file them. R. 336-10 at 228:1-16; 351:9-13; 356:8–357:18. This evidence suggests that the Jail had a policy of retaining medical

grievances. If a jury were to find that the Jail did have such a policy, the Court finds that such a policy creates a duty for the Jail to preserve the medical grievance forms for the same reasons discussed above with respect to the evidence suggesting that the Jail had a policy of preserving surveillance video in case of a detainee's death.

The facts of this case also satisfy the elements for establishing a duty to preserve evidence under the "special circumstances" and "voluntary undertaking" theories. Illinois appellate courts have held that "special circumstances" create a duty to preserve where the plaintiff (or the potential plaintiff) gave notice or constructive notice to the defendant (or potential defendant) of "the potential for litigation" that "function[ed] as a request to preserve evidence." *Combs v. Schmidt*, 976 N.E.2d 659, 667 (Ill. App. Ct. 2d Dist. 2012); *see also Miller v. Gupta*, 672 N.E.2d 1229, 1231 (Ill. 1996) (the plaintiff's attorney "requested her medical records from [the defendant]"); *Brobbey v. Enterprise Leasing Co.*, 935 N.E.2d 1084, 1097 (Ill. App. Ct. 1st Dist. 2010) (car-renter's complaints about a car's mechanical problems to rental company served to put rental company on notice of potential litigation after car-renter was involved in a car accident). Here, Awalt's grievances and medical complaints functioned to put the Sheriff's Office on notice of potential litigation regarding Awalt's time in the Jail. Indeed, it is not extraordinary or unexpected in a jail setting that medical complaints by detainees lead to lawsuits. This notice combined with the evidence that it was the Jail's policy or practice to preserve grievance forms and surveillance video under these circumstances created a duty for the Jail to preserve the evidence Plaintiff seeks.

Additionally, a duty arose for the Jail to preserve the grievance forms and the surveillance video because the Jail engaged in a "voluntary undertaking to preserve evidence" when Superintendent McComas selectively preserved the video surveillance. Superintendent McComas testified that he was not anticipating litigation when he destroyed part of the video. The timing and circumstances of his actions, however, are such that a jury could find his testimony incredible and that his actions "manifest[ed] an intention to preserve [the excerpts of the video] as evidence or . . . acknowledge the significance of the [video excerpts] as evidence in potential future litigation." *Martin*, 979 N.E.2d at 30. Superintendent McComas failed to preserve video recordings of Awalt's treatment at the Jail the same day Awalt was found unconscious in his cell and taken to the hospital. Clearly, Superintendent McComas was motivated to selectively preserve the video by the event of Awalt's injury, whatever the goal of that action may have been. *See Schaefer v. Univ. Scaffolding & Equip., LLC*, 2014 WL 509344, at *7 (S.D. Ill. Feb. 10, 2014) (summary judgment on spoliation claim denied where evidence "was not destroyed within days of the accident, but rather immediately segregated as evidence and, years later, lost. [The] segregation of the [evidence] was affirmative conduct showing [the defendant's] intent to undertake a duty to preserve the evidence"); *Stoner v. WalMart Stores, Inc.*, 2008 WL 3876077, at *4 (C.D. Ill. Aug.18, 2008) (motion to dismiss spoliation claim denied where Wal–Mart employees segregated and preserved some of the relevant footage, but destroyed the footage that had the most potential to help the plaintiff).

Moreover, if the jury found that the Sheriff's Office was motivated to preserve certain excerpts of the video in anticipation of potential litigation, this motivation also extends to other evidence of Awalt's treatment, including the grievance forms. By preserving part of the video, the Sheriff's Office is not only assuming a duty with respect to the video but to evidence of Awalt's treatment generally. Thus, if a jury finds that Superintendent McComas, and by extension the Sheriff's Office, intended to preserve evidence in anticipation of litigation, the Plaintiff can succeed on her spoliation claim with respect to both the video and the grievance forms.[9]

## Conclusion

For the foregoing reasons, the County Defendants' motion for summary judgment, R. 309, and the Medical Defendants' motion for summary judgment, R. 312, are denied in part, granted in part, and continued in part.

The County Defendants' motion for summary judgment on Counts I, III, IV, VII, VIII, X, and XII is denied, except that the County and Sheriff's Office's liability under Count I cannot be predicated upon a failure to implement a continuous quality improvement program, a failure to properly wean detainees off of medication, or a theory that Nurse Clauson possessed policy-making authority. The County Defendants' motion for summary judgment on Counts II, V and VI is granted.

---

[9] Plaintiff's complaint also included claims for spoliation of a version of the Medical Administration Form that recorded the medications given to Awalt, and tissue paper that purportedly was discovered inside of Awalt's nostrils. Plaintiff failed to respond to Defendants' arguments that summary judgment should be granted on Plaintiff's spoliation claims based on this evidence. R. 321 at 27; R. 313 at 18. Thus, summary judgment is granted on the spoliation claims for the loss of this evidence.

The Medical Defendants' motion for summary judgment on Counts I, III, IV, VII, VIII, IX and XII is denied, except that CHC/HPL's liability under Count I cannot be predicated upon a failure to implement a continuous quality improvement program, a failure to properly wean detainees off of medication, or a theory that Nurse Clauson possessed policy-making authority. The Medical Defendants' motion for summary judgment on Counts II, V, and VI is granted.

ENTERED

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: November 24, 2014