ELIZABETH AWALT, as Administrator of
the Estate of Robert Awalt,

       Plaintiff,

    v.

RICK MARKETTI, as Administrator of the
Estate of Terry Marketti; KEVIN
CALLAHAN, in his official capacity as
Sheriff of Grundy County; DUANE
MCCOMAS, individually and in his
official capacity as Superintendent of
Grundy County Jail; MELANIE VAN
CLEAVE; PATRICK SEALOCK; MATTHEW
WALKER; KIM LEAR; ROGER THORSON;
ROBERT MATTESON; DAVID OBROCHTA;
COUNTY OF GRUNDY; CORRECTIONAL
HEALTH COMPANIES, INC.; HEALTH
PROFESSIONALS, LTD.; DR. STEPHEN
CULLINAN; MARJORIE CLAUSON;
unknown employees of Correctional
Healthcare Companies, Inc. and Health
Professionals, LTD; unknown Grundy
County Correctional Officers; unknown
Medical Personnel,

       Defendants.

No. 11 C 6142

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Plaintiff filed 18 motions *in limine*. R. 386; R. 410. The County Defendants

filed 22 motions *in limine*. Rs. 356-77. The Medical Defendants filed 12 motions *in*

*limine*. Rs. 380-85, 387, 391-93, 415. Plaintiff recently settled her claims against the

County Defendants. *See* R. 449. The Medical Defendants have adopted all of the

County Defendants' motions *in limine* except Nos. 6, 11, and 12. *See* R. 442.[1] The Court heard argument and made rulings on Plaintiff's motions *in limine* Nos. 1-11 on November 26, 2014. R. 420. This opinion and order supplements those rulings, and constitutes the Court's rulings on the motions *in limine* the Medical Defendants filed or adopted.

As a preliminary matter, the Court notes that these rulings are evidentiary in nature. Like any other evidentiary ruling, they are based on the facts and theories of the case as the Court understands them at this point in the proceedings. These rulings do not preclude any party from renewing a request for either admission or exclusion of evidence if the facts as developed at trial make reconsideration appropriate.

Additional comments are necessary in light of the number of motions *in limine* filed in this case. Motions *in limine* are meant to provide a mechanism for the court and parties to resolve particular evidentiary issues prior to trial. A proper motion *in limine* "performs a gatekeeping function and permits the trial judge to eliminate from further consideration evidentiary submissions that clearly ought not be presented to the jury because they clearly would be inadmissible for any purpose." *Jonasson v. Lutheran Child and Fam. Servs.*, 115 F.3d 436, 440 (7th Cir. 1997). They are particularly useful in streamlining a trial so that extensive argument becomes unnecessary after a jury has been impaneled. *See id.* ("The

---

[1] The Court assumes that the Medical Defendants also intend to adopt the County Defendants' arguments in support of their motions. The Court will reference those arguments as though the Medical Defendants made them originally.

prudent use of the *in limine* motion sharpens the focus of later trial proceedings and permits the parties to focus their preparation on those matters that will be considered by the jury."). They also provide economies to the parties such that certain witnesses will not be called to testify. Every party is advantaged by knowing what evidence is likely admissible before trial begins so that proper jury presentation can be made. Finally, an accurate assessment of the admissible evidence may cause parties to reconsider settlement negotiation positions.

However, motions *in limine* should not be so granular that no rational ruling can be made outside of the context of the trial itself. *See Jonasson*, 115 F.3d at 440 ("Some evidentiary submissions . . . cannot be evaluated accurately or sufficiently by the trial judge in [a pretrial] environment."). "In these instances it is necessary to defer ruling until during trial, when the trial judge can better estimate its impact on the jury." *Id.*; *see also Fletcher v. Conway*, 1991 WL 24460, at *1 (N.D. Ill. Feb. 21, 1991) ("Careful exercise of [the court's discretion in determining the admissibility of evidence] is usually best left to trial, when the court is in a position to evaluate the proffered evidence within context."). To the extent potentially improper prejudicial testimony may be elicited, the attorneys as officers of the court are obligated to bring up these issues outside the presence of the jury either at side-bar or during breaks.

Moreover, the fact that a motion *in limine* was not filed as to a particular piece of evidence does not operate as a waiver. Counsel is always free to object to evidence at trial for all of the grounds permissible under the Federal Rules of

Evidence. *See Moore v. General Motors Corp.*, 684 F. Supp. 220, 220 (S.D. Ind. 1988) (Tinder, J.) ("A ruling on a motion *in limine* is not a final ruling on the admissibility of the evidence which is the subject of the motion. An order on a motion *in limine* has been characterized as an advisory opinion subject to change as events at trial unfold.").

PLAINTIFF'S MOTIONS *IN LIMINE*

## No. 1 - To Bar Certain Opinions and Testimony of Dr. Christopher Long

Plaintiff seeks to bar Dr. Christopher Long from testifying to the following opinions: (1) that prior alcohol use caused Mr. Awalt to process Dilantin at an abnormal rate, R. 386 at 1-11; and (2) that Mr. Awalt may have misdiagnosed himself as having a seizure disorder, *id.* at 11-12.

### i.    Rate of Dilantin Metabolization

Plaintiff argues that Dr. Long should be barred from testifying that prior alcohol use caused Mr. Awalt to process Dilantin at an abnormal rate because (1) his report is "devoid of any scientific support for the theory"; (2) "the only scientific literature ever provided in support of Dr. Long's theory was untimely disclosed . . . and not relied upon by Dr. Long in reaching his opinion"; (3) "the single study identified by defense counsel on Dilantin metabolism and alcohol consumption [the Sandor study] is not sufficiently rigorous to support Dr. Long's theory and it actually contradicts him"; and (4) Dr. Long had no basis to testify about Mr. Awalt's alcohol use.

Plaintiff's arguments in her briefs overstate the deficiencies in Dr. Long's report and testimony. Although Dr. Long did not specifically cite scientific studies in

4

his report, he did testify that he relied upon certain studies, and those were turned over shortly before his deposition. Further, Dr. Long testified at his deposition that although he did not specifically reference the studies in his report, he had consulted them and they were in his mind when he drafted his report. This is not the traditional or preferred way an expert report should be prepared, but ultimately, Dr. Long testified that there is a scientific basis to believe Dilantin may metabolize more quickly in a person who is an alcoholic and is in withdrawal.

Plaintiff argues that the Sandor study actually contradicts Dr. Long's opinion. The Court has reviewed the Sandor study and finds that it provides a rational basis for Dr. Long's opinion. Furthermore, even Plaintiff's experts do not dispute that an alcoholic may experience unusual metabolism of Dilantin. Plaintiff's experts dispute Dr. Long's opinion about the timing of changes to an alcoholic's metabolism of Dilantin during the course of withdrawal. But these are at least rational disputes based on the data in the Sandor study and other scientific studies. These disputes may form the basis of rigorous cross-examination, but they are not a basis to bar Dr. Long's testimony.

Moreover, Dr. Long is an experienced forensic toxicologist. He has a double master's degree and doctorate degree in toxicology and related fields. He is board-certified in forensic toxicology, and is routinely called upon to interpret test results from the laboratory at St. Louis University. He has been employed as a toxicologist for over 30 years. He was the chief toxicologist for the Illinois State Police. He serves as the chief toxicologist for St. Louis County, and he is on the faculty at St.

Louis University in the pathology department. These credentials demonstrate that he is qualified to render an opinion about Mr. Awalt's metabolism of Dilantin.

At oral argument Plaintiff's counsel also argued that Dr. Long's opinion fails to account for why drugs in Mr. Awalt's body other than Dilantin were not metabolized faster due to his alcoholism. This is an important assertion. Presumably an increased metabolism rate would apply to all drugs, not just Dilantin. Defense counsel argued that alcoholism has different effects on the rate at which different drugs are metabolized. But Dr. Long's report and testimony do not adequately address this point. Plaintiff will have the opportunity to *voir dire*[2] Dr. Long before he testifies at trial to determine whether his opinion is the product of reliable principles and methods such that a rational explanation can be made as to this seeming anomaly.[3]

### ii.   Seizure Disorder

Dr. Long may not testify regarding his opinion that Mr. Awalt may not have had a seizure disorder. Dr. Long's opinion is based solely on his interpretation of the accounts given by witnesses who testified that they saw Mr. Awalt having what appeared to be seizures. Dr. Long has no basis to contradict the first-hand

---

[2] By *voir dire* the Court means that it anticipates hearing from the witness outside the presence of the jury, likely early or late in the court day so that jury time is not interrupted. The Court typically has done this so that witnesses only have to make one trip to the courthouse. If the parties believe that the process will be facilitated by having such a *voir dire* prior to trial for any witness, they should alert the Court and it will be scheduled.

[3] If after *voir dire* the Court determines that Dr. Long may testify about his opinion regarding the rate of Awalt's Dilantin metabolization, Dr. Long may also testify to the extent of Awalt's alcohol use based on his review of the records of Morris Hospital.

observations made by these witnesses. His opinion that they may have witnessed withdrawal tremors rather than a seizure has no factual basis. Therefore, Dr. Long is barred from testifying on this topic.

## No. 2 - To Bar Certain Fact and Opinion Testimony from Dr. Henry Davis

### i.     Davis's Qualifications

Dr. Davis is certified by the National Commission on Correctional Health Care, and he is a member of the Academy of Correctional Healthcare Professionals. He is currently medical director at the Henderson County Detention Center in Kentucky, and has previously served as medical director at three other jails. In addition to his experience in correctional healthcare, Dr. Davis is also currently Associate Chief of Staff of the Marion Veterans Administration Medical Center in Evansville, Indiana, and was formerly Chairman of the Department of Medicine at St. Mary's Medical Center in Evansville.

Despite these qualifications, Plaintiff argues that Dr. Davis is not qualified to testify about training of correctional officers because he "has never trained correctional officers at any point in his career." R. 386 at 16. Plaintiff argues that Dr. Davis is not qualified to testify about grievance policies or quality improvement and mortality review policies because he "has no experience setting, implementing, or monitoring" or "modifying" such policies. *Id.* at 18-19. Plaintiff also argues that Davis is not qualified to testify about standards of care for nurses in a correctional setting because "[h]e does not supervise or discipline nurses in a correctional setting." *Id.* at 19. Plaintiff also argues that Davis is not qualified to testify about medication ordering policies because "he has no involvement with ordering those

medications . . . and does not monitor the stock of medications at the jails where he has worked." *Id.* at 21. Lastly, Plaintiff argues that Dr. Davis is not qualified to testify about staffing policies because "he has no involvement in the decision as to how many nurses or other medical staff will be present at the facilities" where he has worked. *Id.* at 22. The Medical Defendants contend to the contrary that Dr. Davis's experience as medical director of several correctional facilities qualifies him to testify regarding these subjects, and that Plaintiff's arguments are based on an analysis of Dr. Davis's experience that is too granular. *See* R. 400 at 1-5.

The Court agrees that Plaintiff's contentions do not constitute a basis to exclude Dr. Davis's testimony, but rather are issues for cross-examination. Dr. Davis's significant experience managing health care facilities, including health care in correctional facilities, qualifies him to testify on topics relevant to correctional healthcare and management. Being a medical director exposes him to nearly every facet of the provision of health care to inmates by any healthcare professional or correctional staff member. To the extent that Dr. Davis's experience may seem to be an imperfect fit for some of the issues in this particular case does not mean he is not qualified to offer the opinions in his report. Plaintiff's counsel can explore any deficiencies on cross-examination.

### ii.    Greifinger Is Wrong

Dr. Davis states in his report that Dr. Greifinger's "claim that 10% of persons admitted to the jail had a serious medical issue is without basis and is likely highly inaccurate." R. 389-7 at 4. Plaintiff argues that this opinion should be excluded

because Dr. Davis did not provide an explanation for this opinion in his report or during his deposition.

Dr. Davis and Dr. Greifinger reviewed the same documents. Dr. Davis is qualified to offer an opinion based on those documents as to the quality of medical care the detainees received. Unlike Dr. Davis's report and testimony, Dr. Greifinger's report and supplemental report explain why he believes certain detainees received substandard medical care. Dr. Davis, other the other hand, contradicts Dr. Greifinger's opinions without explanation. Dr. Davis will not be permitted to testify on this issue absent an analysis of the Jail's records that is at least as detailed as that of Dr. Greifinger. The Medical Defendants will be permitted to *voir dire* Dr. Davis outside the presence of the jury in order to elicit this analysis for the Court's evaluation.

### iii.    Greifinger Is Not Qualified

Dr. Davis stated in his report that Dr. Greifiner is "not qualified to opine regarding appropriate clinical judgment or the applicable standard of medical care in this case." R. 389-7 ¶ 11. It is the Court's province, not that of opinion witnesses, to determine whether witnesses are qualified to offer opinion testimony. The Court has already explained what issues Dr. Greifinger will be permitted to testify about. *See* R. 281. Dr. Davis is not permitted to offer an opinion regarding whether Dr. Greifinger is qualified to offer those opinions.

### iv.    Mr. Awalt's Alcohol Consumption

Plaintiff seeks to prevent Dr. Davis from "giving any testimony about Mr. Awalt's alcohol use." R. 386 at 25. The documentary evidence and witness testimony in this case is replete with references to Mr. Awalt's alcohol consumption and how it may have contributed to his death. Dr. Davis may mention these facts to the extent they are relevant to his opinions.

### No. 3 -  To Bar Certain Opinions and Testimony of Dr. Blum

Plaintiff seeks to bar Dr. Blum from testifying to the following opinions: (1) that Mr. Awalt committed suicide, R. 386 at 26-29; (2) that Mr. Awalt was experiencing a "sense of hopeless" and "despair" that could have been brought about by his life circumstances, *id.* at 29-31; (3) that Mr. Awalt may have been experiencing alcohol withdrawal rather than seizures, *id.* at 31-32; (4) that Mr. Awalt's "subtherapeutic" levels of Dilantin may have been the result of dilution, *id.* at 32-34.

### i.    Mental State

The Court questions whether Dr. Blum—who is not a psychiatrist or psychologist—has a basis to testify as to Mr. Awalt's mental and emotional state (i.e., whether Mr. Awalt was experiencing a "sense of hopeless" and "despair"), and whether Dr. Blum can conclude on this basis that Mr. Awalt committed suicide. Defendants argue that Dr. Blum is a qualified pathologist and that pathologists regularly determine the manner (as opposed to the cause) of death (i.e., whether a death was a suicide) using anecdotal evidence. Defendants also argue that Plaintiff's expert, Dr. James Filkins, will testify that Mr. Awalt did not commit

suicide using the same type of evidence underlying Dr. Blum's opinion. (Defendants did not, however, move to bar Dr. Filkins's testimony on this issue.)

Despite Defendants' arguments that pathologists are qualified to offer opinions like Dr. Blum's, the Court reserves decision on this issue until a *voir dire* of Dr. Blum can be conducted to enable the Court to determine whether his testimony is appropriate in light of other evidence presented at trial. Dr. Blum's testimony may be appropriate if Plaintiff's witnesses testify as to Mr. Awalt's mental state, and the *voir dire* of Dr. Blum demonstrates that he is competent—as a forensic pathologist—to offer an opinion on that topic.

### ii.     Suffocation

Dr. Blum is allowed to testify that it is possible for a person to overcome their own gag reflex to block his or her airway and commit suicide by suffocating yourself. The evidence that a sock was found in Mr. Awalt's throat and that tissues were found in his nostrils supports this opinion. Additionally, Dr. Blum has cited case studies showing that it is physically possible—albeit rare—to overcome one's own gag reflex in order to suffocate oneself. Plaintiff's expert, Dr. Filkins, cited a number of such case studies. Whether Dr. Blum may describe Mr. Awalt's action in placing the sock in his throat as "suicide" is reserved for the same reasons stated above with respect to Dr. Blum's testimony regarding Mr. Awalt's mental state.

### iii.    Alcohol Withdrawal

Plaintiff argues that Dr. Blum has no basis to describe the difference in appearance between tremors caused by alcohol withdrawal and seizures. The Court

agrees that the basis for Dr. Blum's opinion on this topic bears further examination. The *voir dire* of Dr. Blum will also examine the basis for his opinion that tremors from alcohol withdrawal can be mistaken for seizures. Even if Dr. Blum is allowed to testify that such a mistake is possible, Dr. Blum may not, on this basis, offer an opinion that witnesses who testify they saw Mr. Awalt suffer a seizure were mistaken and that Mr. Awalt was in fact experiencing tremors from alcohol withdrawal.

### iv.    Dilution

Defendants argue that Dr. Blum's opinion that the level of Dilantin in Mr. Awalt's blood was low due to the intravenous fluids he received at the hospital is supported by the hospital records. Plaintiff argues that Dr. Blum did not examine these records before giving his opinion. Plaintiff also argues that Dr. Blum did not provide any method for calculating the extent of dilution or account for the fact that the level of Benadryl in Mr. Awalt's blood was not decreased by any supposed dilution.

Neither Dr. Blum nor Plaintiff's experts have offered a theory that dilution caused by intravenous fluids explained the specific levels of various drugs found in Mr. Awalt's blood. It would appear to be an unremarkable fact that the introduction of intravenous fluids to a person's bloodstream would cause some level of dilution of other substances in the blood, however small. But no expert has proferred any opinion tethered in the facts of this case with any reference to actual levels of the substances in Mr. Awalt's blood. Despite this lack of a methodology, experts on both

sides have offered opinions about whether dilution due to intravenous fluids *could* explain the drug levels in Mr. Awalt's blood. Without a concrete method of calculating dilution no one can say whether any dilution of Dilantin that may have occurred was trivial or significant. Thus, the experts on this issue seem to be offering nothing more than a possibility of dilution. That is not helpful to a jury. Absent a significant proffer or more definite (and disclosed) testimony, Dr. Blum will be barred from testifying to this speculation.

## No. 4 - To Bar Credibility Determinations by Experts and Opinions Which Rest on Those Determinations

### i. Jeff Eiser

The County Defendants intended to have Jeff Eiser testify regarding whether the practices of the Grundy County Jail complied with correctional facility industry standards. Mr. Eiser's report contains a number of references to what he considers to be "reliable evidence." Specifically, he criticizes Plaintiff's experts, Dr. Greifinger and Dr. Bard, for relying on detainee testimony in formulating their opinions about the Jail's practices.

Certainly, Mr. Eiser is not permitted to suggest to the jury that they ignore the detainees' testimony simply because Mr. Eiser does not believe their testimony. However, if there are facts about the detainees' testimony that Mr. Eiser can interpret for the jury to assist them in drawing conclusions from those facts, that testimony may be permissible. Additionally, Mr. Eiser cited other facts in the record in support of his opinions. It is not clear from Mr. Eiser's report whether his opinions can stand on that evidence alone. *Voir dire* of Mr. Eiser is necessary for the

Court to determine the extent to which his opinions are based on pure credibility determinations regarding the detainees' testimony.

### ii.     Dr. Nathaniel Evans and Dr. Henry Davis

The Medical Defendants intend to have Dr. Evans testify regarding the care Mr. Awalt received at the Jail. Plaintiff argues that Dr. Evans and Dr. Davis improperly credited Dr. Cullinan and Nurse Clauson's testimony that they were not aware that Mr. Awalt was having seizures at the Jail. Plaintiff's expert, Dr. Pedelty, offered a contrary opinion on this topic, which the Court previously ruled would be the subject of *voir dire* before Dr. Pedelty testified. *See* R. 280; R. 281 at 8-9. It is not appropriate for experts to draw factual conclusions that the jury can draw for themselves. If there are facts about Dr. Cullinan or Nurse Clauson's testimony that an expert can interpret for a jury to assist the jury in drawing conclusions from those facts, that expert testimony may be permissible. Just as with Dr. Pedelty, *voir dire* of Dr. Evans and Dr. Davis is necessary to determine whether they have a permissible basis to credit Dr. Cullinan and Nurse Clauson's testimony.

## No. 5 -  To Bar Use of Video Edited by the Jail Staff

Plaintiff argues that the surveillance video from the Jail should be excluded because the Sheriff's Office allowed certain portions of the video to be destroyed and "allowing the hand-picked video in would create a misleading impression." R. 386 at 42. One of Plaintiff's claims was for the tort of spoliation against the County Defendants, who are no longer in the case. To the extent Plaintiff believes any particular portion of the video is unfairly prejudicial, it should be presented to the Court for review. To the extent the video has been misleadingly edited, Plaintiff will

be allowed to present evidence that a non-party did the editing. The parties should attempt to agree on a stipulation regarding this issue.

## No. 6 - To Bar Speculation that Mr. Awalt Committed Suicide

Plaintiff orally withdrew this motion on November 25, 2014. R. 420 at 63.

## No. 7 - To Bar Certain Testimony of Treaters

Plaintiff argues that medical "[t]reaters not retained by the parties . . . and who did not provide a written report in this case, should be limited to describing as a factual matter the actions that he or she performed, along with decisions that he or she made in deciding whether or not to take those actions." R. 386 at 47. "Treaters" (also known as treating physicians) are fact witnesses, meaning that they can testify to what they observed while treating a person. They can also testify to conclusions they reached during that treatment because their conclusions were based on what they observed at the time. Treaters cannot testify to their opinions beyond those that they developed at the time of treatment because that is the realm of a retained opinion witness, not a fact witness, which is not proper testimony absent disclosure in accordance with the Federal Rules of Civil Procedure.

Plaintiff's motion, however, does not identify any witness in particular, but is made in the abstract. Thus, although Plaintiff's motion is granted in principle, specific application of the principle the Court has described must await actual testimony during trial. Nonetheless, all parties should take note of this ruling during the examination of any treating physician.

**No. 8 - To Bar All References to Mr. Awalt's Unrelated Medical Conditions**

Plaintiff argues that evidence of the source or cause of Mr. Awalt's seizure condition, R. 386 at 49-51, and evidence regarding accumulation of fat cells in Mr. Awalt's liver (also known as a "fatty liver") should be barred, *id.* at 51-52. Defendants have stated that they do not intend to offer evidence of the source of Mr. Awalt's seizure condition. R. 398 at 21.

Plaintiff argues that there is no evidence that Mr. Awalt's fatty liver had anything to do with his death. Plaintiff also argues that "there is no evidence in the record to suggest that the fatty liver condition is relevant to damages, i.e., that it would have affected Mr. Awalt's longevity or quality of life." R. 386 at 51. According to Plaintiff, "Without any expert testimony, the admission of this evidence would do nothing but invite improper speculation on scientific matters by a lay jury." *Id.*

Defendants argue that Mr. Awalt's liver condition is relevant to his cause of death because "the medical examiner testified that fatty infiltration of the liver due to chronic alcoholism 'contribute[d] to [Mr. Awalt's] death as an underlying significant stressor or a condition." R. 398 at 21-22. Defendants also argue that Mr. Awalt's liver condition "is intimately related to the parties' competing theories about the level of Dilantin in Mr. Awalt's post-mortem blood." *Id.* at 22. And Defendants contend that Mr. Awalt's "fatty liver condition and related chronic alcoholism is relevant to Plaintiff's damage claims, because Awalt's medical condition establishes his quality of life and his overall health and functionality." *Id.* at 23. Defendants argue that Plaintiff's contention that expert testimony is necessary on this subject is incorrect. *Id.* at 23-24.

At this pre-trial stage, the Court agrees with Defendants' contention that the condition of Mr. Awalt's liver is relevant, and the motion is denied. At oral argument, Plaintiff argued the condition of Mr. Awalt's liver is not relevant because none of the experts in the case have testified that a fatty liver is relevant to a body's processing of Dilantin. R. 420 at 67. But there is certainly expert testimony that the condition of Mr. Awalt's liver is relevant to his ability to metabolize Dilantin, whether or not the condition of a fatty liver was specifically addressed. The Court will not bar an expert from testifying that Mr. Awalt's fatty liver condition was relevant to his processing of Dilantin if the opinion is scientifically supported. There is certainly nothing inherently prejudicial about a person having a fatty liver. It is simply a physical condition. To the extent it is caused by alcoholism, the fact of Mr. Awalt's heavy alcohol use is already going to be part of the case for a variety of reasons. White a final determination of the relevance of the condition of Mr. Awalt's liver will await the context of the testimony that will be elicited at trial, the Court preliminarily rules that it is relevant.

**No. 9 - To Bar Evidence of Prior Convictions, Arrests, and Prior Bad Acts**

       **i.       Prior Convictions of Detainees Other than Mr. Awalt**

Plaintiff argues that the Court should bar Defendants from using prior convictions to impeach detainee witnesses under Federal Rule of Evidence 609. Plaintiff states she asked Defendants to identify the detainee witnesses they intended to impeach with prior convictions, and Defendants did not respond other than identifying Mr. Awalt. If Defendants intend to use prior convictions to impeach

a particular witness they must inform Plaintiff of that evidence before the witness takes the stand to begin direct testimony. If Plaintiff objects, Plaintiff can raise it with the Court before the witness's testimony begins and can make an informed decision whether to call a witness with knowledge of the impeachment based on any prior convictions that will be allowed.[4]

### ii. Mr. Awalt's Prior Bad Acts

Plaintiff also argues that Mr. Awalt's prior bad acts should be barred under Rule 404. Defendants contend, however, that they intend to introduce Mr. Awalt's prior bad acts not to attack his character, which is the concern of Rule 404, but because such evidence is relevant to Plaintiff's damages. In the context of a wrongful death case very similar to this one, the Seventh Circuit held that it is permissible to use such evidence to demonstrate the extent of damages. *See Cobige v. City of Chicago*, 651 F.3d 780, 784-85 (7th Cir. 2011). In *Cobige*, the plaintiff's testimony painted a "rosy" picture of his relationship with the deceased, and the court held that the defendant was "entitled to introduce evidence" to the contrary. *Id.* Whether Defendants are permitted to introduce evidence of Mr. Awalt's prior bad acts will depend on the extent to which Plaintiff places Mr. Awalt's character in issue with respect to damages. Prior to her actual testimony at trial, Plaintiff may raise with the Court certain areas of testimony about her late husband so that the

---

[4] Plaintiff also argues with respect to detainees other than Awalt, that Defendants should be barred from attempting to admit evidence of "convictions and arrest that would not qualify for use under Rule 609" through Rules 402, 403, and 404. Defendants concede that such evidence must satisfy Rule 609. R. 398 at 27; R. 400 at 12-13.

Court can rule on the extent to which such testimony would open the door to evidence of Mr. Awalt's prior bad acts.

### iii.    Matthew Haberkorn's Prior Convictions

Plaintiff moves to exclude Haberkorn's conviction for misdemeanor sexual abuse. Defendants do not oppose this motion, so it is granted. In any event, the conviction does not involve a dishonest act or false statement, and the inflammatory nature of criminal sexual conduct is unfairly prejudicial.

Plaintiff also moves to exclude Haberkorn's conviction for the felony of "unlawful presence." This conviction is admissible under Rule 609 because it is a felony conviction and Haberkorn is a witness, not a defendant. *See* Fed. R. Evid. 609(a)(1)(A). The Court, however, still must decide whether the probative value of this conviction is substantially outweighed by any of the dangers listed in Rule 403. Haberkorn's conviction for of "unlawful presence" relates to his status as a registered sex offender and his visiting a high school to watch a friend's swim meet. Since Haberkorn will be called to testify to his experience in the Grundy County Jail, the jury will know he has been in jail and will likely assume he was criminally charged. Cross examination on this specific conviction, however, will almost inevitably reveal facts concerning the prior sexual abuse conviction, which the Court has barred. As already noted, this subject is inflammatory and will mislead the jury as to the seriousness of Haberkorn's "unlawful presence" conviction. Therefore, Haberkorn's conviction for "unlawful presence" is also excluded.

**No. 10 -  To Bar Evidence and Argument Relating to IDOC Approval of the Grundy County Jail**

Plaintiff contends that Defendants should be barred from offering evidence that the Illinois Department of Corrections inspected the Grundy County Jail annually from 2007 to 2011 and found that it complied with the Illinois County Jail Standards. R. 386 at 59. In support of this argument, Plaintiff notes that the Seventh Circuit has held that "[w]hether [a police officer's] conduct conformed with [police department regulations] was irrelevant to the jury's determination of whether [the police officer's] actions . . . were objectively reasonable under the Fourth Amendment." *Thompson v. City of Chicago*, 472 F.3d 444, 455 (7th Cir. 2006).

The Seventh Circuit's decision in *Thompson* clearly holds that state regulations and standards are irrelevant to the Fourth Amendment's standard of objective reasonableness. Thus, Defendants are barred from using evidence of the Jail's compliance with state standards to argue that Defendants did not violate the Fourth Amendment.

This case, however, also involves claims under the deliberate indifference standard of the Eighth and Fourteenth Amendments. Unlike the objective nature of the Fourth Amendment standard, the deliberate indifference standard includes a subjective element concerning whether the state actor knew of and disregarded a substantial risk to the plaintiff. The Seventh Circuit has held that "prison rules" were relevant to a claim that a strip search of an inmate violated the Eighth Amendment because the rules were "evidence on which the jury could have relied to

conclude that the searches were done with an intent to harass." *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009).

The intent element of the Eighth Amendment claim in *Mays*, however, is not analogous to the subjective element of a deliberate indifference claim. The prison rules at issue in *Mays* were relevant to the defendant prison guard's intent because if the guard intended to follow the prison's rules in conducting the strip search it was less likely that he intended to harass the plaintiff. In a deliberate indifference claim, by contrast, the correctional officers' motivation for their actions is not relevant. This is true for both the individual defendants' liability, and the entity defendants' liability under *Monell* due to the actions of a final policy-maker. Rather, the question for both types of claims is whether the individual defendant in question knew that Mr. Awalt suffered an objectively serious risk of harm and disregarded that risk. Whether any of the individual defendants had such knowledge and failed to take sufficient action can only be shown with evidence of what actions the individual defendants did or did not take. Evidence that the Jail was in compliance with state standards does not make it more or less likely that a particular individual had any particular knowledge or took or failed to take action in light of that knowledge. Thus, such evidence that the Jail complied with state standards is barred from the trial of the individual defendants.

The relevance analysis is different, however, with respect to the *Monell* claims based on the entity defendants' practices or policies. The key question with regard to whether the entity defendants disregarded a substantial risk of harm to

Mr. Awalt is whether the entity defendants' policies and practices can be said to have been a sufficient response to any known risk Mr. Awalt's health. Both parties plan to offer testimony from experts on the standard practices for managing healthcare at a correctional facility. Among these standards, Defendants' expert Jeff Eiser referenced the Illinois state standards and the state evaluation reports finding that the Jail was in compliance with those standards. This is just the sort of evidence that can assist a jury in determining whether the entity defendants' policies and practices constituted a disregard of Mr. Awalt's healthcare. Thus, evidence regarding the state standards and the fact that the Jail was found to be in compliance with those standards is admissible in the trial of the entity defendants with respect to their practices and policies.

Plaintiff argues that even if evidence of the Jail's compliance with state standards is relevant, the evaluation from the Illinois Department of Corrections noting the Jail's compliance, *see* R. 389-36, is hearsay. The evaluation is hearsay, but it satisfies an exception to hearsay as a public record under Federal Rule of Evidence 803(8). Thus, the evaluations are admissible.

Plaintiff also argues that the evaluation reports should be barred as propensity evidence under Federal Rule of Evidence 404. The Illinois Department of Corrections, however, found that the Jail was in compliance with state standards during the time periods relevant to this case. *See* R. 389-36 at 8-11 (inspection reports for 2010 and 2011). Thus, this evidence is not being used to ask the jury to draw a propensity inference based on past conduct, and Rule 404 is not relevant.

Plaintiff also argues that Defendants lack a foundation to introduce evidence of the Jail's compliance with state standards because Defendants have not disclosed the state investigators as witnesses. The evaluation reports and state standards, however, are referenced in the report submitted by Mr. Eiser. *See* R. 389-15 ¶ 19. Since the evaluation reports are public records, and the standards are public information, no expert is required to lay a foundation for their admission.

## No. 11 -  To Bar Any Evidence, Testimony, or Argument about the Fact that Mr. Awalt was Eluding the Police Prior to His Arrest

Plaintiff argues that any reference to Mr. Awalt "eluding" the police amounts to inadmissible character attack, for which there is little actual evidence, and which has little probative value. Mr. Awalt is likely the only witness who could have testified as to whether he intended to "elude" arrest, although Defendants contend that two witnesses who were with Mr. Awalt during the week in question could testify as to his intent. The probative value of this evidence is unclear and almost inherently speculative. Thus, it is barred.

However, if Plaintiff opens the door and affirmatively testifies that Mr. Awalt was doing something other than eluding arrest during the week between her complaint against him and his arrest, Defendants very well may be permitted to offer evidence from the two witnesses that Mr. Awalt intended to elude arrest. Silence by Plaintiff on the subject will not open the door to such evidence. Testimony that Mr. Awalt was not at home prior to his arrest will be allowed, as it is relevant to his access to his medications.

**No. 12 -   To Bar All References to After-Acquired Evidence Regarding Mr. Awalt's Past Compliance with Medical Treatment**

Plaintiff argues that any evidence of Mr. Awalt's medical history prior to the week leading up to his arrest is irrelevant because Defendants did not have this information when they determined how to provide him medical care in the Jail. Plaintiff offers to stipulate that Mr. Awalt was not taking his medication for one week prior to his arrest. Defendants argue that evidence of Mr. Awalt's failure to medicate even earlier than one week before his arrest is relevant to damages because it goes to Mr. Awalt's quality of life and the extent of damages Plaintiff suffered from her husband's death. To the extent that the damages Plaintiff seeks are based on Mr. Awalt's quality of life, evidence that Mr. Awalt failed to properly care for himself is admissible, and Plaintiff's motion is denied.

**No. 13 -   To Bar Testimony From Experts About What Materials Plaintiff's Experts Reviewed and What Role Plaintiff's Attorneys Played in the Case**

Plaintiff informed the Court that she has withdrawn this motion.

**No. 14 -   To Bar Argument, Testimony, or Evidence that Plaintiff's Attorneys Received Five Years of Medical Records and "Used" Three Months**

Plaintiff informed the Court that she has withdrawn this motion.

**No. 15 -   To Bar Argument that an Inference Should Be Drawn Against Plaintiff Because Third-Party Witnesses Are Absent at Trial**

This motion is granted by agreement.

**No. 16 -   To Bar Any Reference to Claims No Longer in the Case and the Fact that Individuals Were Formerly or Should Now be Defendants**

This motion is granted by agreement.

**No. 17 - To Limit Evidence of the Care that Defendants Provided to Mr. Awalt After he was Found Unconscious**

Plaintiff informed the Court that she has withdrawn this motion.

**No. 18 - To Bar Defendant Clauson From Mounting the Defense of Poverty or Permitting Plaintiff to Introduce Evidence of Insurance**

The parties have agreed that "Defendants will be barred from presenting evidence of a financial inability to pay a compensatory judgment." R. 406 at 72. Plaintiff also seeks to bar Nurse Clauson from arguing to the jury that she will not be able to pay punitive damages, unless Plaintiff is permitted to put on evidence regarding insurance coverage. Punitive damages are apparently not necessarily covered by the insurance policy. Plaintiff argues that once Nurse Clauson testifies that she does not have enough money to cover *any* portion of the damages, Plaintiff should be allowed to show that insurance will cover some portion of the damages for which Nurse Clauson could be liable.

The Court agrees that once Nurse Clauson opens the door to her ability to pay damages of any kind, the jury should be informed as to what insurance coverage she has. She cannot so finely dice her testimony to say that she can pay compensatory damages (without saying why) but not punitive damages. Despite limiting instructions to the contrary, juries certainly take evidence of financial resources into account (whether consciously or not) when determining damage awards. Plaintiff will be permitted to present evidence of Nurse Clauson's insurance resources if Nurse Clauson argues that she is unable to pay a damage award.

**No. 1 - To Bar Certain Opinions of Mr. Bard**

Plaintiff has withdrawn her opposition this motion, so it is granted without opposition.

**No. 2 - To Bar Dr. Pedelty From Using a Chart She Did Not Prepare and Was Instructed Not to Answer Questions About**

Dr. Pedelty's rebuttal report attached two versions of a chart showing how a drug will be eliminated from a person's blood: one version included data for five different dosing rates, and the other version included data for only two dosing rates. The Medical Defendants argue that Dr. Pedelty should be barred from using the chart in question because (1) the chart with only two dosing rates was prepared for her by someone else who is unidentified; (2) whoever prepared the chart believed there was some reason to alter it by removing data for three of the dosing rates, and Plaintiff's counsel instructed Dr. Pedelty not to answer questions about the alterations at her deposition; and (3) under Rule 403, "introduction of the altered chart will waste time and cause undue delay by requiring direct and cross-examination on all the reasons how and why the second chart was made, which would confuse the issues if not mislead the jury to think the second chart had some heretofore undisclosed and unexplained meaning." *See* R. 357 at 2.

The motion is denied. Dr. Pedelty is permitted to use the chart. Defendants can cross-examine Dr. Pedelty on her knowledge of the information on the chart. If the data that was removed from the chart is relevant to the case, Defendants may

question Dr. Pedelty about the data. How the data came to be removed, unless done by Dr. Pedelty or someone at her direction, is not relevant to the case and thus, is not a proper topic of cross-examination.

**No. 3 - To Bar Evidence of Other Acts Generally Under Fed. R. Evid. 404(b)**

The Medical Defendants seek to bar evidence regarding (1) work-related discipline of the Correctional Officers; (2) claims of misconduct by the Correctional Officers regarding treatment of detainees; and (3) claims of denial of detainee medical care by the Correctional Officers.

The motion is denied. As the Court explained with reference to Plaintiff's arguments concerning Rule 404(b) on the motions to bifurcate the trial, the Court cannot make rulings under Rule 404(b) in a pre-trial vacuum. As Plaintiff points out in response to this motion, the Medical Defendants' motion "requires anticipating every possible item of evidence that might be used by the other side, and for each one, demonstrating that every possible ground for admissibility is inapplicable." R. 401 at 14. At present, the categories of evidence the Medical Defendants seek to exclude are all too broad for the Court to give rulings on outside the context of a specific 404(b) request and proffer by Plaintiff that satisfies *United States v. Gomez*, 763 F.3d 845, 855 (7th Cir. 2014), and Rule 404(b). If the Medical Defendants are reluctant to call a witness without knowing in advanced whether certain Rule 404(b) evidence will be admissible on cross-examination, the matter should be raised with specificity upon identification of that witness.

### No. 4 - To Preclude Melissa Micklos from Testifying to Hearsay Statements made by an Inmate about Medical Care

The Medical Defendants seek to bar Melissa Micklos, an ambulance driver, from testifying that two detainees told her that they were worried they would not receive their medication while detained at the Jail, because these statements are hearsay. Plaintiff argues that these statements fall under the exception to hearsay for statements reasonably pertinent to a medical diagnosis or treatment that describes medical history under Federal Rule of Evidence 803(4). Micklos, however, was unable to identify the detainees who she says made the statements at issue. In order for the Court to consider whether these statements satisfy the hearsay exception Plaintiff relies on, Plaintiff will first need to establish a sufficient evidentiary foundation for admission of the statements, including identifying the speakers. The motion is granted because Plaintiff has not demonstrated that she will be able to make such a showing.

### No. 5 - To Preclude T.F. or any other Witness from Testifying to Hearsay Statements Allegedly [Made] by Defendants Regarding Mr. Awalt and His Relationship with Current Superintendent Ken White

The Medical Defendants seek to bar T.F., a former detainee at the Jail, from testifying that a trustee of the Jail told T.F. that the trustee heard Correctional Officer Van Cleave tell Mr. Awalt to "put a sock in it." This statement is hearsay. The trustee is not an agent of the County, the Sheriff's Office, or the Medical Defendants, so the statement does not qualify as a party admission and will not be admitted.

The Medical Defendants also seek to bar evidence of T.F.'s familial relationship with current Jail Superintendent, Ken White. Since T.F. is not testifying, this request is moot.

## No. 6 - To Bar Testimony, Evidence, Arguments or Comments that the County Defendants Failed to Prevent Mr. Awalt from Committing Suicide

The Medical Defendants did not adopt this motion, *see* R. 442 at 2, so it is withdrawn.

## No. 7 - To Preclude M.H. or any other Witness from Testifying to Hearsay Statements Allegedly by Defendants Regarding Mr. Awalt

The Medical Defendants seek to bar M.H., a detainee at the Jail while Mr. Awalt was detained there, from testifying that he heard Mr. Awalt's cellmate "push the button" and say "it's happening again" and "Awalt's on the floor." If M.H. heard the button being pushed (to the extent someone can hear a button being pushed), that is a non-verbal act within his personal knowledge and he can testify to that. If M.H. heard Mr. Awalt's cellmate say "push the button," this is statement is admissible under the "present sense impression" or "excited utterance" hearsay exceptions under Federal Rules of Evidence 803(1) and 803(2). The statement, "Awalt's on the floor" is also covered by these exceptions and is admissible.

However, the statement, "It's happening again," does not have the same indicia of reliability as the other two statements. Such a statement reflects a more considered analysis of the situation being described, and reflects in part a recollection of at least one prior incident, as opposed to the first two statements which were uttered in direct (almost involuntary) response to an event. Mr. Awalt's

cellmate cannot be located to testify, and Defendants cannot cross-examine him about his statement. Because the declarant is unavailable and there is no appropriate exception to the rule against hearsay, the statement, "It's happening again," is excluded.

**No. 8 - To Bar Plaintiff's Counsel from Expressing Personal Beliefs During the Questioning of any Witness**

This motion is granted by agreement.

**No. 9 - To Bar Plaintiff's Counsel from Asking The Jury to Sympathize with the Decedent**

This motion is granted by agreement.

**No. 10 - To Bar Evidence or Admission of All Video Recordings and Autopsy Photographs**

The Court addressed the admissibility of the video recordings in its ruling on Plaintiff's motion *in limine* No. 5.

The Medical Defendants argue that autopsy photographs are not relevant. Autopsy photographs are almost always gruesome in their depiction of the body of the deceased. If there is an intention by either side to introduce autopsy photographs, they should be provided to the Court at the final pretrial conference, at which point the Court will hear argument as to why the particular photographs should be admissible in any trial. Absent such proffer, the autopsy photographs will not be admitted.

**No. 11 - To Bar Argument or Innuendo that the Jury Should Punish or "Send a Message" to Grundy County or Grundy County Sheriff's Office**

The Medical Defendants did not adopt this motion, *see* R. 442 at 2, so it is withdrawn.

**No. 12 - To Bar Evidence, Argument, Instruction or Verdict that Grundy County or the Grundy County Sheriff's Office is Liable for Defendants Cullinan's and Clauson's Alleged Torts**

The Medical Defendants did not adopt this motion, *see* R. 442 at 2, so it is withdrawn.

**No. 13 - To Bar Testimony, Evidence, Comments or Arguments Regarding Subsequent Remedial Measures**

The Medical Defendants seek to bar admission of evidence regarding subsequent remedial measures taken at the Jail. Plaintiff argues that "policy changes instituted at the [Jail] just two months after Mr. Awalt's death prove that the county defendants are culpable." R. 401 at 41. Plaintiff also argues that the prohibition on admission of subsequent remedial measures in Federal Rule of Evidence 407 is inapplicable because the remedial measures in question were taken by non-defendants.

The problem with Plaintiff's argument is that it fails to take into account the reason Rule 407 exists. The point of Rule 407 is to allow parties to make changes in conditions for the better without worrying about it being used against them later at trial. The fact that the new County, Sheriff, and Jail administrations may have made changes does not change the fact that they may have been reluctant to make

such changes if they thought those changes would be used against them as admissions at a trial. The motion is granted.

## No. 14 - To Bar Testimony, Evidence, or Comments by or About Nicholas Winchester

Nicholas Winchester was an inmate at the Grundy County Jail before, during, and after Awalt's time there. Winchester filed and settled a lawsuit against the County claiming that many of the same parties to this lawsuit were deliberately indifferent to Winchester's medical needs. The Medical Defendants seek to bar Winchester's testimony, arguing that "[i]ntroduction of evidence of this settled lawsuit (and any allegations in support of the lawsuit) would confuse the jury and necessitate additional explanation of unrelated, collateral, and prejudicial issues." R. 369 at 2.

To the extent the Court has ruled that evidence of the care other Grundy County inmates received is relevant to Plaintiff's *Monell* claims, Winchester may testify in this case. It may be that Winchester's testimony is not relevant to Awalt's claims since Winchester's stay at the Jail extended beyond Awalt's time there. But such a ruling is dependent upon the actual testimony Plaintiff seeks to offer. However, the fact that Winchester filed and settled a lawsuit against Grundy County, and the pleadings from that lawsuit, are not relevant to Awalt's claim, and are not admissible.

**No. 15 - To Bar Plaintiff's Expert from Offering Opinions as to Defendants' "Deliberate Indifference"**

In his expert report, Mr. Bard opines that the County Defendants acted with "deliberate indifference." The Medical Defendants argue that this opinion is an inadmissible legal conclusion.

Plaintiff argues that "Mr. Bard's opinions about Defendants' policies, practices, and actions in this case would reference 'deliberate indifference' only in the way that an ordinary layman would use the phrase." R. 401 at 46. The problem with this argument is that "ordinary laymen" do not use the phrase "deliberate indifference." That phase invokes the legal standard the jury will be required to apply in this case, and permitting Mr. Bard to use the phrase will only serve to confuse the jury. Mr. Bard—and any other expert witnesses who testify at trial—can express their opinions about the quality of the medical care provided at the Jail without using the words "deliberate indifference."

**No. 16 - To Bar Testimony, Evidence, Argument or Comment about Mr. Awalt's Pain and Suffering While Asphyxiating and to Allow The County Defendants to Explain to the Jury Why No Such Damages Should be Awarded**

The Medical Defendants argue that Plaintiff should be barred from introducing any evidence that Mr. Awalt experienced pain and suffering while he suffocated because no such evidence is in the record and "[t]o allow Plaintiff to now introduce such evidence . . . would be manifestly unfair." R. 371 at 2. Plaintiff is fully entitled to argue for damages that are supported by the evidence. Both Dr. Denton and Dr. Filkins would seem to be able to provide evidentiary support for

an argument that Mr. Awalt experienced pain and suffering while he was suffocating. The fact that witnesses did not see Mr. Awalt suffocate does not mean that a logical conclusion cannot be drawn from expert testimony that he did suffocate, and that there was pain attendant to that experience. Therefore, the motion is denied.

### No. 17 - Pursuant to Rule 702 and Rule 403 To Bar Drs. Denton, Filkins, Pedelty, and Greifinger from Offering Opinions that the Level of Dilantin in Mr. Awalt's Blood at The Time of Death Was Inconsistent with the Medical Administration Record

The Medical Defendants argue that the opinions of Dr. Denton, Dr. Filkins, Dr. Pedelty, and Dr. Greifinger regarding the level of Dilantin in Mr. Awalt's blood at the time of his death are duplicative of the opinion offered by Plaintiff's retained toxicologist, Dr. Negrusz. Plaintiff's counsel states, however, that they do not intend to offer Dr. Griefinger's opinion on this issue. In any event, although all four experts come to the same conclusion, they do so for different reasons. Since their testimony is based on different reasoning, they are not testifying in an identical fashion. Therefore, the motion is denied. The Court will reconsider this motion if Defendants can point to testimony of any of the experts that is identical to that of another expert.

### No. 18 - To Bar Dr. Filkins from Testifying about an Assumed Relationship Between Legal Standards and Forensic Standards for Certifying a Death as a Suicide

The language used to describe the standard employed by forensic science for certifying death as a suicide is misleadingly similar to the burden of proof followed in this case. The National Association of Medical Examiners requires suicides be

established by a "preponderance of the evidence," defined as "about 70% or great[er] certainty," whereas most manner-of-death classification may be established by a "reasonable probability," defined as "a 50/50 chance." *See* R. 401 at 64-65. The similarity of the forensic and legal standards is bound to confuse the jury such that the parties are barred from referencing the forensic standards at trial.

**No. 19 - To Bar Testimony, Evidence, or Comments by or About L.B.**

This motion is granted by agreement.

**No. 20 - To Bar use and Reference of Newspaper Articles**

This motion is granted by agreement to the extent that Plaintiff agrees the newspaper articles at issue are hearsay which Plaintiff will not use in opening statements. To the extent that Plaintiff desires to use newspaper articles to impeach witnesses, the Plaintiff must raise this issue with the Court and Defendants prior to such use.

**No. 21 - To Bar and Mention or Comment During Jury Selection Which Seeks to Condition the Jury to Award Specific Amount of Money**

This motion is granted, although it is likely also moot as the Court has already ruled on proposed jury *voir dire* questions. To the extent that there is appropriate questioning about jurors' attitudes towards specific jury awards, those questions have already been included in the proposed *voir dire* that is the subject of earlier rulings.

## No. 22 - To Exclude Cassandra Miller's Testimony Regarding her Relationship with Decedent

Plaintiff informed the Court that Cassandra Miller will not testify, so this motion is moot.

MEDICAL DEFENDANTS' MOTIONS *IN LIMINE*

## No. 1 - To Bar Evidence of Other Acts Under Federal Rule 404(b) and 403

The Medical Defendants seek to bar evidence of their prior bad acts under Rules 404(b) and 403. Specifically, the main evidence that the Medical Defedants believe Plaintiff intends to offer in this area relates to lawsuits against CHC, board discipline against Dr. Cullinan, grievances against Dr. Cullinan and Nurse Clauson, disciplinary action against Nurse Clauson, media accounts, and the broad category of "*Monell* witness" testimony. The Medical Defendants also seek to bar evidence relating to the testimony of Lincoln Whitaker, a nurse with the Illinois Department of Corrections. Lastly, they also seek to exclude Nurse Clauson's grievance response.

The Court addressed this issue in granting Defendants' motions to bifurcate the trial of the individual claims from the trial of the *Monell* claims. Most of the evidence that Plaintiff intends to offer in support of her *Monell* claims will now be admitted in a separate proceeding absent a finding that it satisfies the requirements of Rule 404(b) with respect to the trial of the individual defendants. Plaintiff will have to reevaluate which of these pieces of evidence she intends to offer against the individual defendants in light of the Court's bifurcation ruling. The Court will allow Defendants the opportunity to make their arguments as to the

admissibility of this evidence under Rule 404(b) should Plaintiff decide to offer it in the individual case. Plaintiff should be reminded that to the extent the *Monell* evidence—even when characterized as Rule 404(b) evidence—overwhelms the evidence against the individual defendants on the deliberate indifference claim, the Court is more likely to exclude the evidence as overly prejudicial under Rule 403.

The Medical Defendants also argue that the medical care received by other detainees at the Jail is not sufficiently similar to the denial of anti-seizure medication to Mr. Awalt such that it establishes a widespread pattern or practice. The Medical Defendants read the case law and complaint too narrowly. Plaintiff's *Monell* claim is that CHC and HPL failed to have a practice of providing adequate medical care in general. The other detainees' medical complaints do not have to precisely match those of Mr. Awalt to be relevant in this case. In fact, it would be surprising if they did. Each individual presents with different medical issues. Notably, in this case there are at least two other people who presented with seizure issues who claim they did not receive adequate medical care. Because Plaintiff alleges a general failure by the Entity Defendants to provide adequate medical care, evidence does not have to be identical to Mr. Awalt's circumstances to be admissible in this case. Rather, as the Court explained in its opinion and order on the Defendants' motions for summary judgment, the fact that the detainees allegedly received inadequate medical care in the Jail makes their experience relevant to this case. *See* R. 412 (*Awalt v. Marketti*, 2014 WL 6686498 (N.D. Ill. Nov. 24, 2014)).

### No. 2 - To Bar Speculation as to Any Other Pharmacy Records

The Medical Defendants seek to bar speculation as to any other undiscovered pharmacy records because it "would be baseless speculation." R. 380 at 2. Plaintiff testified that she filled prescriptions at Health Mart Pharmacy in Morris and perhaps other places. She also said she thought Mr. Awalt may have obtained Dilantin from some other source. There are factual questions regarding whether or not Mr. Awalt took Dilantin prior to entering the Jail, and if he did take Dilantin, where he got it from.

Mr. Awalt, of course, is no longer available to testify. But to the extent Plaintiff—his wife—can testify in a nonspeculative manner as to where he obtained Dilantin, she will be allowed to do so. On the other hand, Defendants will be allowed to offer evidence that the obvious pharmacies where he would have obtained those drugs show no record of him having obtained them. Plaintiff can challenge assertions that Mr. Awalt did not have Dilantin as long as her challenges are based on evidence. Each side has its own argument as to the use of medications before Mr. Awalt was arrested, and they can present nonspeculative arguments in front of the jury based on evidence that may be adduced at trial. The motion *in limine* is essentially a motion to prevent non-speculative testimony. As with all testimony, if no foundation can be laid for it such that the witness can only testify to a fact based on speculation, that testimony will be barred.

**No. 3 - To Bar Speculation as to Mr. Awalt Receiving Medical Care Other Than at Morris Hospital as Documented**

Similar to their motion *in limine* No. 2, the Medical Defendants contend that any argument that Mr. Awalt received medical care anywhere other than Morris Hospital would be baseless speculation because there is no evidence in the record to support such argument. Certainly the Medical Defendants can use the Morris Hospital records to make the reasonable inference that those records reflect the full extent of Mr. Awalt's medical care. However, if there is any nonspeculative evidence that Plaintiff can use to suggest that Mr. Awalt received care elsewhere, Plaintiff will be allowed to offer it. The Court will not make a pretrial ruling prohibiting witnesses from testifying that Mr. Awalt may have received care at places other than Morris Hospital, or prohibiting Plaintiff from challenging the veracity of certain records at Morris Hospital. But the Court again emphasizes that any evidence Plaintiff presents on this issue must not be speculative.

**No. 4 - To Bar Greifinger Opinions Regarding Medical Treatment of Mr. Awalt, Standard of Care and Deliberate Indifference Opinions as Untimely or Duplicative Pursuant to F.R.E. 403**

The Medical Defendants argue that Dr. Greifinger's opinions about the standard of care and deliberate indifference should be barred as untimely and duplicative. As to untimeliness, the motion is denied. Dr. Greifinger provided opinions related to the care that Mr. Awalt received at the Jail. Those opinions were intertwined with his opinions on the policies and practices of CHC and the County because the harm allegedly done to Mr. Awalt was the result of the policies and practices discussed by Dr. Greifinger. His opinions are relevant to the *Monell*

claims, and therefore, are within the date agreed to by all parties for *Monell* discovery.

The Medical Defendants also contend that Dr. Greifinger's opinions are duplicative of those of Dr. Pedelty. However, they do not point to any particular opinion that is *necessarily* duplicative. It may very well be that Dr. Greifinger's testimony will not be duplicative if he only testifies during the *Monell* portion of the trial. However, if he does testify during the case relating to individual liability, the Court will hear a proffer of what opinions Dr. Greifinger intends to offer that are not relevant to the individual defendants' liability, and therefore, would have to satisfy Rule 404(b). At that time the Court will determine whether those opinions are duplicative of those of Dr. Pedelty.

Additionally, mere duplication is not necessarily a sufficient basis for exclusion. There may be bases for the offering of Dr. Greifinger's testimony that differ from Dr. Pedelty's if for no other reason than Dr. Greifinger's background is in correctional medicine where as Dr. Pedelty's is in a different setting. They may also reach the same opinion using different reasoning.

## No. 5 - To Bar Greifinger's Opinions Regarding Prior Discipline and Termination of RN Clauson Pursuant to Rule 403

The Medical Defendants seek to bar Dr. Greifinger from testifying regarding any discipline of Nurse Clauson. This evidence is relevant to the *Monell* claims, but will not be admissible against Nurse Clauson individually unless Plaintiff can satisfy Rules 404(b) and 403. The Court has already discussed the process for making such a showing in its opinion and order bifurcating the trial.

**No. 6 -  Pursuant to F.R.C.P. 26(a)(2) and F.R.E. 702 and 403 to Bar Pedelty from Attempting to Offer an Expert Opinion that Patients Such as Mr. Awalt Do Not Fabricate Taking Topamax**

The Medical Defendants argue that Dr. Pedelty has no scientific basis for the opinion expressed during her deposition (but not included in her report) that patients such as Mr. Awalt do not lie about taking Topamax. This motion is denied because the Court already ruled on this issue at the *Daubert* hearing on August 20, 2014. Dr. Pedelty is permitted to testify about the unusual nature of the medication and how she did not believe that a person would randomly ask for Topamax if they were not in fact using it. The Court's August 20 ruling made clear that Dr. Pedelty could not opine about whether Mr. Awalt did, in fact, have a prescription for Topamax when he entered the Jail, but can simply testify as a general matter based on her extensive experience in treating patients with seizure disorders that this type of drug is not commonly ordered or abused.

**No. 7 -  Pursuant to F.R.E. 801 and F.R.E. 403 to Bar Witness Haberkorn from Testifying as to Alleged Conversations Between Mr. Awalt and "A Nurse" That Did Not Occur**

The Medical Defendants seek to bar Haberkorn—a detainee during the period Mr. Awalt was also detained—from testifying that he heard Mr. Awalt talking with a nurse about medication. This is essentially a foundation issue. The parties should *voir dire* this witness outside the presence of the jury. Absent a showing that the conversation Haberkorn overheard included Nurse Clauson, this testimony is irrelevant to Nurse Clauson's trial. It may, however, be admissible in the *Monell* case. The Court will reserve judgment on that question until it has heard the testimony of the witness outside the presence of the jury to see if his

recollection is clear enough to lay a proper foundation for a conversation even if he can no longer state with certainty who Mr. Awalt spoke to.

**No. 8 - To Adopt Applicable Grundy Co. Motions *in Limine***

As noted, the Medical Defendants adopted certain of the County Defendants' motions in the joint status report of July 6, 2015. The Court has addressed the motions accordingly.

**No. 9 - To Bar Certain Testimony/Opinions of Plaintiff's Expert Richard Bard**

Plaintiff has withdrawn her opposition this motion, so it is granted without opposition.

**No. 10 - To Bar Any Opinion Regarding the Necessity of Dilantin Blood Level Testing Absent Awareness of Seizures at Jail**

The Medical Defendants seek to "bar Plaintiff and her witnesses from commenting that it was necessary for the Medical Defendants to have ordered a test of Awalt's blood for his Dilantin level, unless they were aware of Awalt suffering a seizure at the jail," because "Plaintiff had not disclosed any witness or expert to testify" to that opinion. R. 393 at 4. But as Plaintiff points out, Dr. Filkins expressed this opinion at his deposition. This deposition testimony provided Defendants with sufficient notice. Thus, the motion is denied.

**No. 11 - To Bar Plaintiff's Expert Greifinger from Testifying Regarding CHC's Medication Ordering and Stock Medication Policies**

The Medical Defendants argue that Dr. Greifinger should be barred from testifying regarding Defendants' "medication ordering and stock policies" due to his lack of qualifications relevant to this issue. The Medical Defendants note the

Plaintiff sought to bar Dr. Davis from testifying on this topic because he is not qualified, and the Medical Defendants contend that Dr. Greifinger is no more qualified than Dr. Davis. But the Court has already denied Plaintiff's motion to disqualify Dr. Davis on this issue. The Court will deny the Medical Defendants' motion to disqualify Dr. Greifinger for the same reasons.

## No. 12 – To Bar Plaintiff From Introducing Evidence Regarding the Medical Defendants' Net Worth

The Medical Defendants seek to bar evidence of Dr. Cullinan's assets. Such evidence is not relevant to Dr. Cullinan's liability unless the Medical Defendants open the door and argue that Dr. Cullinan may be unable to pay a judgment of a certain amount. Plaintiff is barred from introducing such evidence unless Defendants open the door.

### CONCLUSION

For the foregoing reasons, in addition to the reasons already stated on the record, the parties' motions *in limine* are granted, denied, or continued as follows:

- Plaintiff's Motion No. 1 is granted in part and denied in part pending voir dire of Dr. Long;
- Plaintiff's Motion No. 2 is granted in part and denied in part pending voir dire of Dr. Davis;
- Plaintiff's Motion No. 3 is granted in part and denied in part pending void dire of Dr. Blum;
- Plaintiff's Motion No. 4 is denied pending void dire of Mr. Eiser, Dr. Evans, and Dr. Davis;
- Plaintiff's Motion No. 5 is continued pending review of the video recording;
- Plaintiff's Motion No. 6 is withdrawn;
- Plaintiff's Motion No. 7 is granted pending application of this ruling to the actual testimony heard at trial;

- Plaintiff's Motion No. 8 is granted in part and denied in part pending application of this ruling to the actual testimony heard at trial;

- Plaintiff's Motion No. 9 is denied in part, granted in part, and continued in part;

- Plaintiff's Motion No. 10 is granted in part and denied in part;

- Plaintiff's Motion No. 11 is granted pending application of this ruling to the actual testimony heard at trial;

- Plaintiff's Motion No. 12 is denied;

- Plaintiff's Motion No. 13 is withdrawn;

- Plaintiff's Motion No. 14 is withdrawn;

- Plaintiff's Motion No. 15 is granted;

- Plaintiff's Motion No. 16 is granted;

- Plaintiff's Motion No. 17 is withdrawn;

- Plaintiff's Motion No. 18 is granted;

- County Defendants' Motion No. 1 adopted by the Medical Defendants is granted without opposition;

- County Defendants' Motion No. 2 adopted by the Medical Defendants is denied;

- County Defendants' Motion No. 3 adopted by the Medical Defendants is denied;

- County Defendants' Motion No. 4 adopted by the Medical Defendants is granted;

- County Defendants' Motion No. 5 adopted by the Medical Defendants is granted;

- County Defendants' Motion No. 6 was not adopted by the Medical Defendants and is withdrawn;

- County Defendants' Motion No. 7 adopted by the Medical Defendants is granted in part and denied in part;

- County Defendants' Motion No. 8 adopted by the Medical Defendants is granted;

- County Defendants' Motion No. 9 adopted by the Medical Defendants is granted;

- County Defendants' Motion No. 10 adopted by the Medical Defendants is granted in part and continued in part;

- County Defendants' Motion No. 11 was not adopted by the Medical Defendants and is withdrawn;

- County Defendants' Motion No. 12 was not adopted by the Medical Defendants and is withdrawn;

- County Defendants' Motion No. 13 adopted by the Medical Defendants is granted;

- County Defendants' Motion No. 14 adopted by the Medical Defendants is granted in part and denied in part;

- County Defendants' Motion No. 15 adopted by the Medical Defendants is continued;

- County Defendants' Motion No. 16 adopted by the Medical Defendants is denied;

- County Defendants' Motion No. 17 adopted by the Medical Defendants is denied;

- County Defendants' Motion No. 18 adopted by the Medical Defendants is granted;

- County Defendants' Motion No. 19 adopted by the Medical Defendants is granted;

- County Defendants' Motion No. 20 adopted by the Medical Defendants is granted;

- County Defendants' Motion No. 21 adopted by the Medical Defendants is granted;

- County Defendants' Motion No. 22 adopted by the Medical Defendants is moot;

- Medical Defendants' Motion No. 1 is granted in part and denied in part;

- Medical Defendants' Motion No. 2 is denied;

- Medical Defendants' Motion No. 3 is denied;

- Medical Defendants' Motion No. 4 is denied;

- Medical Defendants' Motion No. 5 is granted in part and denied in part;

- Medical Defendants' Motion No. 6 is denied;

- Medical Defendants' Motion No. 7 is continued;

- Medical Defendants' Motion No. 8 is granted;

- Medical Defendants' Motion No. 9 is granted;

- Medical Defendants' Motion No. 10 is denied;

- Medical Defendants' Motion No. 11 is denied;

- Medical Defendants' Motion No. 12 is granted.

ENTERED

Honorable Thomas M. Durkin
United States District Judge

Dated:  July 15, 2015